SCHLAM STONE & DOLAN LLP
David J. Goldsmith
Bradley D. Simon (*admitted Pro Hac Vice*)
Thomas A. Kissane (*admitted Pro Hac Vice*)
26 Broadway, 19th Fl.
New York, NY 10004
(212) 344-5400
(212) 344-7677 (fax)
dgoldsmith@schlamstone.com

*Attorneys for Plaintiff CoreCivic, Inc.*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CORECIVIC, INC.,<br><br>               Plaintiff,<br><br>     v.<br><br>PHILIP D. MURPHY, in his official capacity as Governor of the State of New Jersey, and MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey,<br><br>               Defendants. | Civ. No. 3:23-cv-00967-RK-TJB |

**PLAINTIFF CORECIVIC'S MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR PRELIMINARY <u>INJUNCTION WITH TEMPORARY RESTRAINING ORDER</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................................1

FACTUAL BACKGROUND...................................................................................2

    A.    Legal Regime Governing Detention of Aliens.....................................2

    B.    ICE's Use Of Privately Operated Immigration Detention Centers.......5

    C.    CoreCivic's Contract With ICE To Operate The Elizabeth Detention Center ..................................................................................................5

    D.    New Jersey Law AB 5207..................................................................7

ARGUMENT ........................................................................................................9

I.    CORECIVIC HAS MORE THAN A REASONABLE PROBABILITY OF EVENTUAL SUCCESS ON ITS CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF PREMISED ON VIOLATION OF THE SUPREMACY CLAUSE ...................................................................10

    A.    Intergovernmental Immunity Forbids Application Of AB 5207 To Bar CoreCivic From Contracting With ICE To House Civil Immigration Detainees .........................................................................................14

    B.    AB 5207 Is Preempted By Federal Law .........................................23

II.    CORECIVIC WILL SUFFER IRREPARABLE INJURY ABSENT THE REQUESTED RELIEF ..............................................................................33

III.    THE BALANCE OF HARMS, THE POSSIBILITY OF HARM TO OTHER INTERESTED PERSONS AND CONSIDERATIONS OF PUBLIC POLICY FAVOR CORECIVIC'S APPLICATION FOR PRELIMINARY RELIEF ..............................................................................36

IV.    A TEMPORARY RESTRAINING ORDER SHOULD BE ISSUED TO ALLOW CORECIVIC TO NEGOTIATE TOWARD A NEW AGREEMENT WITH ICE PENDING RESOLUTION OF THE PRELIMINARY INJUNCTION APPLICATION.......................................37

CONCLUSION ...................................................................................................39

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Fatah Center v. Township of Bridgewater*,
  No. 11-cv-2397, 2013 WL 12322637 (D.N.J. 2013)............................................34

*Am. Civil Liberties Union v. Ashcroft*,
  322 F.3d 240 (3d Cir.2003) ...................................................................37

*Am. Freedom Def. Initiative v. Se. Pennsylvania Transp. Auth.*,
  92 F.Supp.3d 314 (E.D. Pa. 2015).............................................................39

*Arizona v. California*,
  283 U.S. 423 (1931)...........................................................................19

*Arizona v. United States*,
  567 U.S. 387 (2012)................................................................... passim

*AT&T v. Winback & Conserve Program*,
  42 F.3d 1421 (3d Cir. 1994) ..................................................................36

*Barnett Bank of Marion Cty., N.A. v. Nelson*,
  517 U.S. 25 (1996)............................................................................30

*Boeing Co. v. Movassaghi*,
  768 F.3d 832 (9th Cir. 2014) .................................................................20

*Clark v. Martinez*,
  543 U.S. 371 (2005).............................................................................4

*Coffelt v. Fawkes*,
  No. 2014-cv-025, 2014 WL 2566516 (D.V.I. June 6, 2014), *vacated on other
  grounds*, 765 F.3d 197 (3d Cir. 2014) ................................................... 37-38

*Const. Party of Pennsylvania v. Aichele*,
  757 F.3d 347 (3d Cir. 2014) ..................................................................14

*Council of Alternative Political Parties v. Hooks*,
  121 F.3d 876 (3d Cir. 1997) ..................................................................34

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000) ...................................................................................... passim

*Dawson v. Steager,*
    139 S. Ct. 698 (2019) .................................................................................. 22-23

*Demore v. Kim,*
    538 U.S. 510 (2003) ............................................................................................3

*Farina v. Nokia Inc.,*
    625 F.3d 97 (3d Cir. 2010) .......................................................................... 24, 32

*Finkelman v. Nat'l Football League,*
    877 F.3d 504 (3d Cir. 2017) ...............................................................................14

*Florida Lime & Avocado Growers, Inc. v. Paul,*
    373 U.S. 132 (1963) ...........................................................................................26

*Geier v. Am. Honda Motor Co.,*
    529 U.S. 861 (2000) ...........................................................................................32

*Geo Group v. Newsom,*
    50 F.4th 745 (9th Cir. 2022) ....................................................................... passim

*Goodyear Atomic Corp. v. Miller,*
    486 U.S. 174 (1988) ...........................................................................................17

*Granillo v. FCA US LLC,*
    No. 16-cv-153, 2016 WL 9405772 (D.N.J. Aug. 29, 2016)................................18

*Hancock v. Train,*
    426 U.S. 167 (1976) ...................................................................................... 14-16

*Harisiades v. Shaughnessy,*
    342 U.S. 580 (1952) ...................................................................................... 2-3

*Hines v. Davidowitz,*
    312 U.S. 52 (1941)........................................................................................ 26-27

*Johnson v. Maryland,*
    254 U.S. 51 (1920) ............................................................................................19

*Leslie Miller, Inc. v. Arkansas*,
  352 U.S. 187 (1956) ................................................................ 17, 31, 33

*Lozano v. City of Hazleton*,
  724 F.3d 297 (3d Cir. 2013) ......................................................... passim

*Mayo v. United States*,
  319 U.S. 441 (1943) ................................................................. 10, 15, 19

*McCulloch v. Maryland*,
  17 U.S. (4 Wheat.) 316 (1819) .................................................. 10, 12, 14

*MD Mall Assocs., LLC v. CSX Transp., Inc.*,
  715 F.3d 479 (3d Cir. 2013) ................................................................24

*Minard Run Oil Co. v. U.S. Forest Serv.*,
  670 F.3d 236 (3d Cir. 2011) ................................................................34

*Nat'l Inst. of Sci. & Tech. v. Mohapatra*,
  No. 2012-cv-361, 2020 WL 6323683 (D.N.J. Oct. 28, 2020)................................9

*Nat'l Shooting Sports Found. v. Platkin*,
  No. 22-cv-6646, 2023 WL 1380388 (D.N.J. 2023), *appeal filed* by Nat'l
  *Shooting Sports Found. v. Attorney General New Jersey* (3rd Cir., Feb. 13, 2023)
  .................................................................................. 9, 32, 35, 38

*Nat'l Collegiate Athletic Ass'n v. Murphy*,
  No. 14-cv-06450, 2020 WL 7074398 (D.N.J. Dec. 3, 2020) ..............................38

*NCAA v. Christie*,
  926 F. Supp. 2d 551 (D.N.J) *aff'd*, 730 F.3d 208 (3d Cir. 2013),
  *abrogated on other grounds*, Murphy v. Nat'l Collegiate Athletic Ass'n, 200 L.
  Ed. 2d 854 (2018) ...................................................................... 33-34

*New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*,
  669 F.3d 374 (3d Cir. 2012) ........................................................... 36-37

*North Dakota v. United States*,
  495 U.S. 423 (1990)..................................................................... 11, 15, 22

*Oburn v. Shapp*,
  521 F.2d 142 (3d Cir. 1975) ................................................................9

*Osborn v. Bank of the United States,*
  22 U.S. (9 Wheat.) 738 (1824) ....................................................................... 17-18

*Ouadah v. Att'y Gen. of U.S.,*
  411 F. App'x 504 (3d Cir. 2011) ............................................................................3

*Pennsylvania R. Co. v. Transp. Workers Union of Am., C.I.O.,*
  191 F. Supp. 915 (E.D. Pa.), *aff'd sub nom. Pennsylvania R. Co. v. Transp.*
  *Workers Union of Am., CIO,* 280 F.2d 343 (3d Cir. 1960) ...................................37

*Phillips Chemical Co. v. Dumas Independent School District,*
  361 U.S. 376 (1960) ...............................................................................................23

*Pub. Utils. Comm'n of California v. United States,*
  355 U.S. 534 (1958) ....................................................................................... 19, 31

*Rowe v. New Hampshire Motor Transp. Ass'n,*
  552 U.S. 364 (2008) ........................................................................................ 31-32

*Siemens United States Holdings Inc. v. Geisenberger,*
  17 F.4th 393 (3d Cir. 2021) ...................................................................................35

*South Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.,*
  274 F.3d 771 (3d Cir. 2001) ....................................................................................9

*Sperry v. State of Fla. ex rel. Fla. Bar,*
  373 U.S. 379 (1963) ...............................................................................................19

*Stein v. Lee Eye Ctr., Inc.,*
  No. 2:21-cv-01730, 2021 WL 5770212 (W.D. Pa. Dec. 6, 2021) .......................38

*Temple Univ. v. White,*
  941 F.2d 201 (3d Cir. 1991) ..................................................................................38

*Toll Bros. Inc. v. Twp. of Readington,*
  555 F.3d 131 (3d Cir. 2009) ..................................................................................14

*Toll v. Moreno,*
  458 U.S. 1 (1982) ................................................................................................. 2-3

*Treasurer of New Jersey v. U.S. Dep't of Treasury,*
  684 F.3d 382 (3d Cir. 2012) ........................................................................... passim

*United States v. Alabama*,
   691 F.3d 1269 (11th Cir.2012) ...............................................................25

*United States v. California*,
   921 F.3d 865 (9th Cir. 2019) ....................................................... 13, 37

*United States v. City of Philadelphia*,
   798 F.2d 81 (3d Cir. 1986) ......................................................... 16-17

*United States v. Locke*,
   529 U.S. 89 (2000).................................................................................25

*United States v. Town of Windsor*,
   765 F.2d 16 (2d Cir.1985) ...................................................................17

*United States v. Washington*,
   142 S. Ct. 1976 (2022)................................................... 11, 13, 15, 22

*Valley Nat. Bank v. Lavecchia*,
   59 F.Supp.2d 432 (D.N.J. 1999) .................................................. 33, 35

*Washington v. United States*,
   460 U.S. 536 (1983)..............................................................................15

*WR Property LLC v. Township of Jackson*,
   No. 17-cv-3226, 2021 WL 1790642 (D.N.J. May 5, 2021) ......................... 34, 36

*Wyeth v. Levine*,
   555 U.S. 555 (2009)..............................................................................25

**Statutes**

U.S. Const. Art. IV, § 3, cl. 2.................................................................18

U.S. Const. Art. I, § 8, cl. 4..................................................................2

6 U.S.C. §112(b)(2)..................................................................................4

6 U.S.C. § 251 .........................................................................................4

6 U.S.C. § 252 .........................................................................................4

6 U.S.C. § 271 .........................................................................................4

8 U.S.C. §§ 1101–1537 ........................................................................3

8 U.S.C. §§ 1221-1232 ......................................................................28

8 U.S.C. § 1225 ..................................................................................3

8 U.S.C. § 1226 ..................................................................................3

8 U.S.C. §1231 ........................................................................... 3, 4, 31

8 U.S.C. §§ 1324 ...............................................................................27

8 U.S.C.A. § 1357 ...............................................................................3

47 U.S.C. § 151 .................................................................................32

47 U.S.C. § 332 .................................................................................32

N. J. Statute §30:4-91.10 ............................................................... 8, 21

N.J. Rev. Stat. § 30:4-8.15 to -8.16 ................................................1, 8

**Rules**

Fed. R. Civ. P. 65(c).........................................................................38

Fed.R.Civ.P. 12(b)(1)........................................................................13

**Regulations**

48 C.F.R. §1.601(a)...........................................................................4

48 C.F.R. §3017.204-90......................................................................5

Plaintiff CoreCivic, Inc. ("CoreCivic") submits this memorandum of law in support of its application for a preliminary injunction with temporary restraining order against enforcement of New Jersey Assembly Bill 5207 ("AB 5207"), L.2021, c. 199, §§ 1-2, codified at N.J. Stat. Ann. §§ 30:4-8.15 to -8.16, with respect to CoreCivic's relationship with The U.S. Department of Immigration and Customs Enforcement ("ICE").  AB 5207 purports to give the state of New Jersey the power to bar the Federal Government from contracting with CoreCivic to house civil immigration detainees in the state.

## PRELIMINARY STATEMENT

AB 5207 prohibits private contracts "to house or detain individuals for civil immigration violations" in the State of New Jersey.  Before the bill was signed, ICE renewed, through August 31, 2023, a contract (the "ICE Contract") under which CoreCivic has long housed federal immigration detainees at the Elizabeth Detention Center ("EDC") in Elizabeth, New Jersey.

As set forth below, both the purpose and, absent the requested relief, the effect of AB 5207 is to interfere with – indeed, to defeat – the Federal Government's ability to house civil immigration detainees in the State of New Jersey.  CoreCivic has brought this action for declaratory and injunctive relief either clarifying that AB 5207 by its terms does not prevent CoreCivic from contracting with ICE to continue housing civil immigration detainees after the ICE

Contract's August 31, 2023 expiration (Amended Complaint, Count III, ¶¶58-61) or, absent such clarification, that AB 5207 violates the Supremacy Clause of the United States Constitution and may not be enforced with respect to ICE's relationship with CoreCivic.  Complaint, Counts I-II, ¶¶ 45-57.

For the reasons set forth below and in the accompanying declarations of Bradley D. Simon (the "Simon Dec.") and Bart Verhulst  (the "Verhulst Dec."), this Court should issue a preliminary injunction with temporary restraining order confirming that AB 5207 does not prevent CoreCivic from negotiating toward or reaching an agreement with ICE to continue to house civil immigration detainees at the EDC upon the ICE Contract's August 31, 2023 expiration, pending final resolution of CoreCivic's claims.

## FACTUAL BACKGROUND

### A.      Legal Regime Governing Detention of Aliens

"[A]ny policy toward aliens" is "exclusively entrusted to the" Federal Government. *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952).  *See also, e.g., Toll v. Moreno*, 458 U.S. 1, 10 (1982) ("Our cases have long recognized the preeminent role of the Federal Government with respect to the regulation of aliens within our borders.").  "Federal authority to regulate the status of aliens derives from various sources, including the Federal Government's power '[t]o establish [a] uniform Rule of Naturalization,' U.S. Const., Art. I, § 8, cl. 4, its power '[t]o

regulate Commerce with foreign Nations', id., cl. 3, and its broad authority over foreign affairs.'" *Id.* (citations omitted).

The federal power over immigration includes the power to detain aliens in connection with deportation proceedings. *See Demore v. Kim*, 538 U.S. 510, 523 (2003) (Supreme Court "has recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process"). Congress has codified statutory powers and responsibilities for immigration matters through the Immigration and Nationality Act ("INA"), 8 U.S.C. §§1101–1537, which, among other things, provides for the detention of aliens in various contexts. *See, e.g.*, 8 U.S.C. § 1225(b)(1)(B)(ii) (requiring detention pending consideration of asylum application for aliens determined to have credible fear of persecution); 8 U.S.C. § 1226(a) (allowing detention pending removal determination); 8 U.S.C. § 1231(a)(2) (requiring detention of aliens awaiting removal). States and their employees may participate in immigration detention under the INA's comprehensive scheme at the written agreement of, and subject to the direction and supervision of, the U.S. Attorney General/Secretary. 8 U.S.C.A. § 1357(g)(1, 3).[1]

---

[1] In March 2003, "the Immigration and Naturalization Service ceased to exist as an independent agency within the Department of Justice and its functions were transferred to the newly formed Department of Homeland Security and placed under the Bureau of Immigration and Customs Enforcement." *Ouadah v. Att'y Gen. of U.S.*, 411 F. App'x 504, 505 n.2 (3d Cir. 2011). As a result, functions "having been exercised by the Attorney General" as referenced in the Immigration and Nationality Act "now reside in the Secretary of Homeland Security" (the

As more specifically relevant here, Congress has directed the Secretary to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal."  8 U.S.C. §1231(g)(1).  The statute gives the Secretary options for obtaining the necessary detention space when existing U.S. Government facilities or other suitable facilities are unavailable.  Thus, the Secretary may expend "amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities . . . necessary for detention."  8 U.S.C. §1231(g)(1).  However, before "initiating any project for the construction of any new detention facility," ICE "shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use."  8 U.S.C. §1231(g)(2).  Thus, Congress has expressed a clear preference for using existing detention centers, including leased private detention facilities, over building new ones.

Congress also has vested the Secretary with "authority to make contracts . . . as may be necessary and proper to carry out the Secretary's responsibilities." 6 U.S.C. §112(b)(2). The Secretary in turn may "delegate broad authority to manage the agency's contracting functions to heads of such contracting activities." 48 C.F.R. §1.601(a). ICE regulations further allow the agency to "enter into contracts

---

"Secretary") *Clark v. Martinez*, 543 U.S. 371, 375 n.1 (2005) (citing Homeland Security Act of 2002, §§ 441(2), 442(a)(3), 451(b), 116 Stat. 2192, 2193, 2196, 6 U.S.C. §§ 251(2), 252(a)(3), 271(b) (2000 ed., Supp. II)).

of up to fifteen years' duration for detention or incarceration space or facilities, including related services."  48 C.F.R. §3017.204-90.

B.    **ICE's Use Of Privately Operated Immigration Detention Centers**

In keeping with Congress's directive to favor use of existing facilities and for practical reasons, "ICE does not build or operate its own detention facilities." *Geo Group v. Newsom*, 50 F.4th 745, 751 (9th Cir. 2022).  "Instead, ICE contracts out its detention responsibilities to (1) private contractors, who run facilities owned either by the contractor or the federal government, and (2) local, state, or other federal agencies."  *Id*.

All facilities housing ICE detainees, whether operated by a state or local entity or private contractor, "are required to follow a strict set of detention standards" set by ICE.[2]  ICE likewise employs a "multilevel oversight and compliance program" to "ensure compliance with each contract's terms and conditions and the applicable [ICE] detention standards."  *Id.*

C.    **CoreCivic's Contract With ICE To Operate The Elizabeth Detention Center**

CoreCivic is a Maryland corporation and one of the country's largest private prison operators.  It operates 36 prisons in 15 states under contracts with local municipalities, states and the Federal Government.  As relevant here, CoreCivic

---

[2] https://www.ice.gov/detain/detention-management ("Detention Facility Oversight"), last visited April 30, 2023.

operates 15 immigration detention centers in 8 states under contract with federal and local governmental agencies.  The immigration detention centers house approximately 5,500 immigration detainees.  Verhulst  Dec., ¶5.  CoreCivic operates the EDC under the ICE Contract.  *Id.*, ¶6.  The EDC principally houses noncitizens detained at ports of entry at John F. Kennedy International Airport and Newark Liberty International Airport.  *Id.*  The EDC is the only dedicated ICE detention facility in the State of New Jersey.  *Id.*  EDC currently houses approximately 285 detainees.  *Id.*

The ICE Contract was awarded to CoreCivic for an initial base period of three years (July 1, 2005, through September 30, 2008), and included five three-year renewal periods exercisable at the Government's option.  Thus, Option Period One began October 1, 2008, and ended September 30, 2011.  Option Period Five began October 1, 2020 and ends September 30, 2023 (amended to August 31, 2023.)  *Id.* ¶7.  ICE exercised its renewal options to extend the ICE Contract for all five renewal periods.  Accordingly, the ICE Contract will expire on August 31, 2023.  *Id.*  But for AB 5207, ICE would negotiate toward and enter into a new contract with CoreCivic providing for CoreCivic's continued operation of the EDC after the ICE Contract expires.  Amended Complaint, ¶31; Verhulst Dec., ¶¶9-15.

On or about May 30, 2023, ICE issued a Request for Information ("RFI") seeking possible facilities to house non-citizens and immigration violators in

support of its Newark, New Jersey field office.  Verhulst Dec., ¶10 & Exh. 1.  The

EDC is the only facility in the area meeting the RFI's specifications.  *Id.,* ¶¶11-14.

Due to a lack of existing detention capacity in the New York-New Jersey-

Philadelphia region, absent the ability to use the EDC, ICE will have no ability to

house detainees in this region.  Verhulst Dec., ¶¶14-15.  Attempting to transfer all

the EDC detainees to other facilities outside the region presents a host of practical

problems, including finding an available facility, entering into new contracts,

making complex transportation arrangements, and potentially even building,

acquiring, and/or renovating new facilities.  *Id.,* ¶15.  None of this could be

accomplished by the time ICE needs to house the EDC Detainees under a new

contract starting on September 1, 2023.  *Id.*

### D.   New Jersey Law AB 5207

In August 2021, AB 5207 became law.[3]  AB 5207 prohibits the State, local

entities, and private detention facilities from entering into, renewing, or extending

immigration detention agreements.  The statute directs in pertinent part:

> (1)    the State or a local government agency shall not enter into,
> renew, or extend any immigration detention agreement as defined in
> subsection a. of this section; or

> (2)    a private detention facility operating in this State shall not enter
> into, renew, or extend any immigration detention agreement as
> defined in subsection a. of this section.

---

[3] *See* https://www.njleg.state.nj.us/bill-search/2020/A5207.

N.J. Rev. Stat. § 30:4-8.16(b).  An "immigration detention agreement" means any contract "that authorizes the State, local government agency, or private detention facility to house or detain individuals for civil immigration violations."  *Id*. §30:4-8.16(a).  The definition therefore covers the ICE Contract.  A "private detention facility" is defined as "any privately owned or operated facility that houses or detains individuals for civil immigration violations," *id*. §30:4-8.16(a), and therefore covers the EDC.

While the statute provides that it shall not be construed "to prohibit, or in any way restrict, any action where the prohibition or restriction would be contrary to federal law, the United States Constitution, or the New Jersey Constitution" (§30:4-8.16.c), New Jersey intends to apply AB 5207 to prohibit ICE and CoreCivic from renewing the ICE Contract upon its August 31, 2023 expiration. Section 30:4-8.15.d states: it is "the intent of the Legislature to prevent new, expanded, or renewed agreements to detain people for civil immigration purposes", and statements by the statute's sponsor and supporters confirm their intention that the statute applies to shut down civil immigration detention in the State of New Jersey.  See Amended Complaint, ¶¶18-19 and Simon Dec., ¶¶7-8.  In notable contrast, New Jersey law allows use of private detention facilities for state detainees.  *See* N. J. Statute §30:4-91.10 (". . . the Commissioner of Corrections may authorize the confinement of eligible inmates in private facilities.")

## **ARGUMENT**

The familiar standard for obtaining a preliminary injunction was recently reiterated in *Nat'l Shooting Sports Found. V. Platkin*, No. 22-cv-6646, 2023 WL 1380388 (D.N.J. 2023), *appeal filed* by *Nat'l Shooting Sports Found. v. Attorney General New Jersey* (3rd Cir., Feb. 13, 2023):

> To obtain a preliminary injunction, the moving party must demonstrate: "(1) the reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured if relief is not granted. Moreover, the Court also should take into account, when relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest. *South Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.* ("SCCIA"), 274 F.3d 771, 777 (3d Cir. 2001). "[A] district court—in its sound discretion—should balance those four factors so long as the party seeking the injunction meets the threshold on the first two." *Id.* (citing *Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir. 1975)).

*See id.* at *1 (citations omitted.). The standard for granting a temporary restraining order is the same as that for a preliminary injunction. *Nat'l Inst. of Sci. & Tech. v. Mohapatra,* No. 2012-cv-361, 2020 WL 6323683, at *3 (D.N.J. Oct. 28, 2020).

CoreCivic is entitled to a preliminary injunction and temporary restraining order, pending a final judgment in this action, clarifying that AB 5207 does not prevent CoreCivic and ICE from negotiating toward or entering into a contract to house civil immigration detainees after the ICE Contract's August 31, 2023 expiration, and/or prohibiting Defendants from enforcing AB 5207 to prevent CoreCivic and ICE from contracting to house civil immigration detainees after the

ICE Contract's expiration.  CoreCivic has established the requisite probability of

success on its claims (Point I, *infra*), CoreCivic will suffer irreparable injury absent

preliminary relief (Point II, *infra*), and the balance of equities and considerations of

public policy favor CoreCivic's application (Point III, *infra*).  Finally, a temporary

restraining order should issue against enforcement of AB 5207 so that CoreCivic

can pursue negotiations with ICE for a new contract to house civil immigration

detainees upon the ICE Contract's August 31, 2023 expiration (Point IV, *infra*).

## I.    CORECIVIC HAS MORE THAN A REASONABLE PROBABILITY OF EVENTUAL SUCCESS ON ITS CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF PREMISED ON VIOLATION OF THE SUPREMACY CLAUSE

"[T]he activities of the Federal Government are free from regulation by any

state."  *Mayo v. United States*, 319 U.S. 441, 445 (1943). This fundamental

principal of Constitutional law stretches back over two hundred years to

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819), where the Supreme

Court pronounced:

> [T]he states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government. This is, we think, the unavoidable consequence of that supremacy which the constitution has declared.

Thus,

> [t]he Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land; and the Judges in every State shall be

bound thereby, any Thing in the Constitution or Laws of any state to
the Contrary notwithstanding.'  Art. VI, cl. 2.

*Arizona v. United States*, 567 U.S. 387, 399 (2012).

"State law may run afoul of the Supremacy Clause in two distinct ways: The

law may regulate the Government directly or discriminate against it . . . or it may

conflict with an affirmative command of Congress."  *North Dakota v. United*

*States*, 495 U.S. 423, 434 (1990) (citations omitted).  The first of these principles is

commonly known as intergovernmental immunity, the second as preemption.

Intergovernmental immunity "prohibit[s] state laws that *either* 'regulat[e]

the United States directly *or* discriminat[e] against the Federal Government or

those with whom it deals.'" *United States v. Washington*, 142 S. Ct. 1976, 1984

(2022) (emphasis in original, citation omitted).  See also *Treasurer of New Jersey*

*v. U.S. Dep't of Treasury,* 684 F.3d 382, 406 (3d Cir. 2012) (same).  Preemption

forbids the application of state law in two circumstances: first, where "there is a

'federal interest . . . so dominant that the federal system will be assumed to

preclude enforcement of state laws on the same subject'" (commonly known as

field preemption); next, where "'compliance with both federal and state regulations

is a physical impossibility'" or the challenged state law "'stands as an obstacle to

the accomplishment and execution of the full purposes and objectives of

Congress'" (conflict/obstacle preemption). *Arizona v. United States,* 567 U.S. at

399 (internal citations omitted).

Whatever the category, the question of Congressional intent governs any preemption analysis:

> Although courts define the categories of preemption separately the categories are not "rigidly distinct. Indeed, field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent ... to exclude state regulation. . .  [and] the purpose of Congress is the ultimate touchstone in every pre-emption case."

*Treasurer of New Jersey,* 684 F.3d at 406-07 (internal citation omitted.)

In *Geo Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022), the Ninth Circuit vacated the district court's denial of an application for injunctive and declaratory relief against enforcement of a California State statute (AB 32) that forbade all use of private immigration detention facilities:

> Simply put, AB 32 would breach the core promise of the Supremacy Clause. To comply with California law, ICE would have to cease its ongoing immigration detention operations in California and adopt an entirely new approach in the state. But the Supremacy Clause protects against state laws that would "in any manner control ... the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." *McCulloch*, 17 U.S. at 436. This foundational limit on state power cannot be squared with the dramatic changes that AB 32 would require ICE to make.

50 F.4th at 758.

The Court relied on preemption in finding that movants had established their probability of success, and noted that intergovernmental immunity would support the same result:

12

Modern Supremacy Clause cases discuss two separate doctrines: intergovernmental immunity and preemption. See *United States v. California*, 921 F.3d 865, 878–79 (9th Cir. 2019). Intergovernmental immunity "prohibit[s] state laws that either regulate the United States directly or discriminate against the Federal Government or those with whom it deals (e.g., contractors)." [*United States v.] Washington*, 142 S. Ct. at 1984 [2022] (cleaned up). Under the doctrine of obstacle preemption (the only preemption doctrine the parties discuss), a state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *California*, 921 F.3d at 879 (quoting *Arizona v. United States*, 567 U.S. 387, 399, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012)). In light of the principles and case law discussed above, much of which precedes and confounds such a rigid distinction, either doctrine would lead to the same result.[4]

50 F.4th at 758.

As we show below, intergovernmental immunity, as well as each of the preemption principles, bar enforcement of AB 5207 to preclude CoreCivic from contracting with ICE to house civil immigration detainees.

Defendants' stated intention to file a motion to dismiss under Fed.R.Civ.P. 12(b)(1), after their first motion was mooted by CoreCivic's Amended Complaint, is no bar to the requested Order to Show Cause with temporary restraining order. The Amended Complaint contains allegations of injury that are "specific,

---

[4]  The Circuit remanded for the district court to consider irreparable harm, balance of the equities, and considerations of the public interest.  50 F.4th 745 at 763. After the parties stipulated to injunctive relief on remand, Dkt. No. 75 in S.D. CA Case 3:19-cv-02491-RSH-LR, on May 23, 2023 the district court entered an order granting plaintiffs final declaratory and injunctive relief.  *Id.*, Dkt. No 87.

plausible, and susceptible to proof at trial," which are sufficient at least until

Defendants bring any new motion to contest them.  *Finkelman v. Nat'l Football*

*League*, 877 F.3d 504, 513 (3d Cir. 2017).[5]

### A.    Intergovernmental Immunity Forbids Application Of AB 5207 To Bar CoreCivic From Contracting With ICE To House Civil Immigration Detainees

The doctrine of intergovernmental immunity precludes state regulation of

the Federal Government.  As set forth in *Hancock v. Train,* 426 U.S. 167 (1976):

> It is a seminal principle of our law "that the constitution and the laws made in pursuance thereof are supreme; that they control the constitution and laws of the respective States, and cannot be controlled by them." *McCulloch v. Maryland*, 4 Wheat. 316, 426, 4 L.Ed. 579, 606 (1819). From this principle is deduced the corollary that
>> "(i)t is of the very essence of supremacy to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence." *Id.*, at 427, 4 L.Ed., at 606.

---

[5] While we reserve response to Defendants' jurisdictional arguments until they are asserted in a live paper, we note that Third Circuit precedent does not support the argument, advanced in their mooted motion, that ICE's intention to enter into a new contract is too speculative to support Article III injury and standing.  See, e.g., *Const. Party of Pennsylvania v. Aichele,* 757 F.3d 347, 364-7 (3d Cir. 2014) (in suit challenging state election law, rejecting argument that, because candidates or volunteers may have elected not to participate in the election for reasons unrelated to the challenged statute, injury was too speculative to support Article III standing: "it is not the actions of other actors alone that cause the injury. Those third parties could take no action without the mechanisms by which the Commonwealth's officials oversee the election code provisions at issue here."); *Toll Bros. Inc. v. Twp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009) (rejecting Article III standing challenge premised on argument that developer might not proceed with option on property even if challenged regulation were stricken.)

> The effect of this corollary, which derives from the Supremacy
> Clause. . . is "that the activities of the Federal Government are free
> from regulation by any state."

426 U.S. at 178, citing *Mayo, supra,* 319 U.S. at 445 (other footnotes omitted).

In *United States v. Washington*, *supra*, 142 S. Ct. at 1979, the Supreme

Court explained that the intergovernmental immunity doctrine:

> bar[s] state laws that either regulate the United States directly or
> discriminate against the Federal Government or its contractors. A state
> law discriminates against the Federal Government or its contractors if
> it "single[s them] out" for less favorable "treatment," *Washington v.*
> *United States*, 460 U.S. 536, 546, 103 S.Ct. 1344, 75 L.Ed.2d 264
> [(1983)], or if it regulates them unfavorably on some basis related to
> their governmental "status," *North Dakota v. United States*, 495 U.S.
> 423, 438, 110 S.Ct. 1986, 109 L.Ed.2d 420 [1990] (plurality opinion).

Enforcement of AB 5207 to prevent CoreCivic from contracting with ICE to

house civil immigration detainees violates the intergovernmental immunity

doctrine in both ways.

i.    *AB 5207 violates the intergovernmental immunity doctrine because it*
      *directly regulates the Federal Government*

In *Hancock*, the Attorney General of Kentucky sought to compel various

federal actors with facilities in Kentucky to secure operating permits from the state.

The Court affirmed summary judgment dismissing the State's claims, holding that

intergovernmental immunity applied where state law:

> ". . . places a prohibition on the Federal Government."  The permit
> requirement is not intended simply to regulate the amount of
> pollutants which the federal installations may discharge. Without a
> permit, an air contaminant source is forbidden to operate even if it is

in compliance with every other state measure respecting air pollution control and abatement.

426 U.S. at 180 (footnote citation omitted).

Because civil immigration detention can happen only by or under the direct federal statutory supervision of the Federal Government, AB 5207 directly regulates the federal government.  This is confirmed by the Third Circuit's holding in *United States v. City of Philadelphia,* 798 F.2d 81, 89 (3d Cir. 1986), which concerned a city ordinance that prohibited employment agencies (including defendant Temple University) from discriminating against homosexuals.  The district court granted the United States a prohibitory injunction against the City "adjudicating any complaint or taking any adverse action under the [Ordinance] against any person, corporation, association or group based on the Commission's objection to the policy of the United States in discriminating on the basis of sexual orientation in its military recruitment efforts."  798 F.2d at 85.

Although all parties agreed that the Ordinance could not be enforced against the United States military, 798 F.2d at 85, the Third Circuit found its enforcement against private actors who cooperated in military recruiting to be an impermissible direct regulation of the Government and affirmed the injunction where, under an order of the Philadelphia Commission on Human Relations enforcing the Ordinance:

. . . Temple is barred from cooperating with the military unless and until the United States changes its employment policy with respect to homosexuals. *Under these circumstances, we believe that the Commission has no more right to enforce the Ordinance against Temple than did the Town of Windsor to enforce its building permit regulations against the contractor hired to construct a top-secret federal research facility.* See *United States v. Town of Windsor*, 765 F.2d 16, 19 (2d Cir.1985) (holding that the Town of Windsor cannot enforce its building-permit requirements against contractor hired to build addition to nuclear facility, because *the impact of the local regulation would fall directly on the Government* and result in classified information being disclosed and a classified area being opened to Town officials").

798 F.2d at 89 (emphasis supplied.)[6]  *See also Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 (1988) ("a federally owned facility performing a federal function is shielded from direct state regulation, even though the federal function is carried out by a private contractor, unless Congress clearly authorizes such regulation"); *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 189–90 (1956) (state could not require a federal contractor to obtain a license before constructing facilities at an Air Force Base); *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738, 867 (Marshall, C.J.) (1824) ("the right of the State to control [a

---

[6] *United States v. City of Philadelphia*'s analysis of what constitutes direct regulation applies to both intergovernmental immunity and preemption, the latter of which, as discussed at Point II(B), appeared to be the basis on which it ultimately grounded relief.  798 F.2d at 85 ("While ostensibly a question of governmental immunity this issue is perhaps "best understood as posing an issue essentially of federal preemption." (Footnote, internal citation, omitted.)

federal contractor's] operations, if those operations be necessary to its character, as a machine employed by the government, cannot be maintained").

In other words, a provision that regulates the operations of the Federal Government by restricting the actions of its contracting partners constitutes direct regulation of the Federal Government. *See also Granillo v. FCA US LLC,* No. 16-cv-153, 2016 WL 9405772, at *19 (D.N.J. Aug. 29, 2016) (because "[a] recall of motor vehicles cannot be conducted pursuant to the [National Highway Traffic Safety Administration]'s guidelines without the involvement of, and action being taken by, the NHTSA",  Plaintiff's requested order for automobile manufacturer to recall certain vehicles "clearly violates the doctrine of intergovernmental immunity.")

In *Treasurer of New Jersey*, 684 F.3d at 410, the Third Circuit again confirmed that intergovernmental immunity precludes the enforcement of state statutes that regulate the Federal Government. There, the Court barred the enforcement of various states' abandoned property statutes with respect to federal bonds because "the unclaimed property acts would interfere with Congress's '[p]ower to dispose of and make all needful Rules Acts and Regulations respecting the ... Property belonging to the United States.'  See U.S. Const. art. IV, § 3, cl. 2."

The Third Circuit's repeated recognition that intergovernmental immunity prohibits direct regulation of the Federal Government is deeply rooted in Supreme

Court precedent.  For example, In *Pub. Utils. Comm'n of California v. United States*, 355 U.S. 534 (1958), the Supreme Court found intergovernmental immunity barred California from setting conditions upon the shipping rates charged by private contractors using privately owned vehicles to transport property on non-federal highways to perform federal activity: "'It is of the very essence of supremacy to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence.'"  355 U.S. at 544 (citation omitted.)  In *Arizona v. California*, 283 U.S. 423, 451 (1931), the Supreme Court held that the state could not require the Secretary of Interior to submit plans for building a federal dam and reservoir to a state engineer for approval because "[t]he United States may perform its functions without conforming to the police regulations of a state."  *Johnson v. Maryland*, 254 U.S. 51, 57 (1920) held that a Maryland driver's license law violated intergovernmental immunity as applied to postal worker carrying out their federal functions because it "la[id] hold of [federal employees] in their specific attempt to obey orders and requires qualifications in addition to those that the Government has pronounced sufficient."[7]

---

[7] See also *Sperry v. State of Fla. ex rel. Fla. Bar,* 373 U.S. 379, 385 (1963) (state cannot enforce its attorney licensing requirements against individuals authorized to practice before the Patent Office.); *Mayo v. United States,* 319 U.S. at 447 (intergovernmental immunity bars State of Florida from requiring the U.S. Secretary of Agriculture to obtain a state tax stamp as a condition to distributing

*Geo Grp., Inc. v. Newsom*, *supra*, concerned a California statute that barred all private detention facilities. Recognizing the obvious reality that this obstructed the operations of the Federal Government and its contractors if applied to federal (and, specifically, immigration) detainees, the Ninth Circuit, citing *Hancock, Leslie, Osborn, Public Utilities Commission, Johnson, McCulloch* and *Boeing* among other authorities, found such application barred by intergovernmental immunity:

> If California could not prohibit ICE from hiring a particular private detention operator by imposing licensing requirements, it surely cannot regulate private detention operators out of existence through a direct ban. There is 'no important difference' for Supremacy Clause purposes between a state 'requir[ing] a permit' and 'order[ing] compliance with state regulations.'") (citation omitted) . . ..

> When a state regulation of a contractor would control federal operations, "[e]nforcement of the substance of [the regulation] against the contractors would have the same effect as direct enforcement against the Government." . . ..

> AB 32 prohibits ICE from exercising its discretion to arrange for immigration detention in the privately run facilities it has deemed appropriate. Therefore, we reject California's argument that AB 32 does not implicate intergovernmental immunity.

---

farming materials in Florida pursuant to a federal program); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 840 (9th Cir. 2014) (intergovernmental immunity barred application of California's statute that "replace[d] the federal cleanup standards that Boeing has to meet to discharge its contractual obligations to DOE with the standards chosen by the state", "over[ode] federal decisions as to necessary decontamination measures", and "regulate[d] not only the federal contractor but the effective terms of federal contract itself").

50 F.4th at 758, 760, 761 (citations omitted.)

If AB 5207 is interpreted to bar private contractors from entering into detention agreements with ICE for civil immigration detainees, its effect would be identical in regulating the Federal Government's immigration policies and operations. Accordingly, on grounds of intergovernmental immunity the statute may not be enforced to prevent CoreCivic from housing civil immigration detainees under contract with ICE. CoreCivic therefore has a probability of success on its first and second claims, for injunctive relief against enforcement of the statute to bar further contracting with ICE. And if the statute, by virtue of its saving clause or otherwise, is interpreted *not* to bar private contractors from entering into private detention agreements with ICE for civil immigration detainees, CoreCivic has established its probability of success on its third claim, which seeks a declaration saying precisely that.

ii.  *AB-5207 violates the intergovernmental immunity doctrine because it discriminates against the Federal Government and against CoreCivic in its capacity as a federal contractor*

N.J. Statute § 30:4-91.10 expressly permits "the Commissioner of Corrections [to] authorize the confinement of eligible inmates in private facilities." AB 5207, however, prohibits the use of private detention facilities for civil immigration detainees. This violates the non-discrimination principle of the intergovernmental immunity doctrine, as to both ICE and CoreCivic.

"The nondiscrimination rule finds its reason in the principle that the States may not directly obstruct the activities of the Federal Government." *North Dakota*, 495 U.S. at 437 (plurality opinion).  Moreover,

> Since a regulation imposed on one who deals with the Government has as much potential to obstruct governmental functions as a regulation imposed on the Government itself, the Court has required that the regulation be one that is imposed on some basis unrelated to the object's status as a Government contractor or supplier, that is, that it be imposed equally on other similarly situated constituents of the State.

495 U.S. at 438 (quotation marks omitted).  In *United States v. Washington, supra,* 142 S. Ct. at 1979, the Court prohibited enforcement of a state statute that created a presumption that certain medical conditions contracted by federal workers at a federal facility were caused by radioactive cleanup work, because it "treat[ed] federal workers differently than state or private workers . . . [a]nd, in doing so, the law imposes upon the Federal Government costs that state or private entities do not bear."  In *Dawson v. Steager,* 139 S. Ct. 698 (2019) a federal pensioner objected that the State of West Virginia unlawfully discriminated against him as a federal employee by taxing his pension, when it did not tax those of similarly situated state law enforcement officers.  The Court found impermissible discrimination because all that matters in assessing discrimination is "whether the letter of the law 'treat[s] those who deal with' the federal government as well as it treats those with whom

[the State] deals itself.'" 139 S. Ct. at 704 (quoting *Phillips Chemical Co. v. Dumas Independent School District*, 361 U.S. 376, 385 (1960)).

As noted earlier, civil immigration detention is authorized and controlled exclusively by the Federal Government.  AB 5207 thus plainly meets the Supreme Court's definition of impermissible discrimination because it allows the State of New Jersey and its contractors to enter into private detention agreements, while denying that right to ICE and its contractors, including CoreCivic.

CoreCivic has not only a "reasonable likelihood", but a high probability, of success on its challenge to AB 5207.  For the reasons set forth above, AB 5207 violates principles of intergovernmental immunity in its regulation of the Federal Government and CoreCivic as its contractor, and in its discrimination against them.

**B.      AB 5207 Is Preempted By Federal Law**

As the Supreme Court recognized in *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n.6 (2000):

> the categories of preemption are not "rigidly distinct." . . ..  Because a variety of state laws and regulations may conflict with a federal statute, whether because a private party cannot comply with both sets of provisions or because the objectives of the federal statute are frustrated, "field pre-emption may be understood as a species of conflict pre-emption . . .." (internal citations omitted).

The Third Circuit recognized obstacle preemption as a type of conflict preemption,[8] has noted that both overlap with field preemption, and has emphasized that the question of Congressional intent governs any preemption analysis regardless of what title is attached.  *Treasurer of New Jersey, supra*, 684 F.3d at 406-07 ("field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent . . . to exclude state regulation . . .  [and] the purpose of Congress is the ultimate touchstone in every pre-emption case.") (internal citations omitted).  In discerning the Congressional intent, "we look not only to Congress's express statements, but also to the 'structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law.'" *Farina v. Nokia Inc.,* 625 F.3d 97, 115 (3d Cir. 2010) (internal citations omitted.)

Broadly, then, field preemption applies where state law intrudes upon an area that the Federal Government has manifested its intention to preserve for itself,

---

[8] *MD Mall Assocs., LLC v. CSX Transp., Inc.,* 715 F.3d 479, 495 (3d Cir. 2013) *as amended* (May 30, 2013) ("Conflict preemption thus embraces two distinct situations. In the easier but rarer case, compliance with both federal and state duties is simply impossible. . . . In the second and more common situation, compliance with both laws is possible, yet state law poses an obstacle to the full achievement of federal purposes.") (Citation omitted.)

such that state or local statutes are invalid even if they do not conflict with federal law, while conflict preemption applies where a state or local statute cannot be complied with under, or obstructs the operation of, federal law.[9]

In *Arizona v. United States*, *supra*, 567 U.S. at 399 (citations omitted), the Supreme Court reviewed these different preemption principles in assessing when the INA, which does not contain an express preemption provision, would preempt state law:

> First, the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance. . . . The intent to displace state law altogether can be inferred from a framework of regulation "so pervasive ... that Congress left no room for the States to supplement it" or where there is a "federal interest ... so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."

---

[9] While a "presumption against preemption" generally applies in areas the States "have traditionally occupied," *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quotation marks omitted), no such presumption applies to regulation touching on the traditionally-federal field of immigration.  For example, in *Lozano v. City of Hazleton,* 724 F.3d 297, 314 n.23 (3d Cir. 2013), the Third Circuit Court of Appeals declined to apply the presumption against preemption to a state law concerning the housing of immigrants.  The Circuit cited *United States v. Locke,* 529 U.S. 89, 108 (2000) for the proposition that "an 'assumption' of nonpreemption is not triggered when the State regulates in an area where there has been a history of significant federal presence", and quoted *United States v. Alabama,* 691 F.3d 1269, 1296–97 (11th Cir. 2012) as "concluding that state law prohibiting courts from recognizing contracts with aliens lacking lawful immigration status 'constitutes a thinly veiled attempt to regulate immigration under the guise of contract law,' and thus, the presumption against preemption does not apply. . .".

Second, state laws are preempted when they conflict with federal law. *Crosby*, supra, at 372, 120 S.Ct. 2288. This includes cases where "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), and those instances where the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines,* 312 U.S., at 67, 61 S.Ct. 399; see also *Crosby,* supra, at 373, 120 S.Ct. 2288 ("What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects").

As we show below, enforcement of AB 5207 with respect to CoreCivic's housing of immigration detainees is subject to preemption by the INA under each of the preemption principles.

i.     *State law in the field of immigration detention is preempted by the INA*

"When the national government by treaty or statute has established rules and regulations touching the rights, privileges, obligations or burdens of aliens as such, the treaty or statute is the supreme law of the land."  *Hines v. Davidowitz,* 312 U.S. 52, 62–63 (1941) *superseded by statute on other grounds* as stated in *Lozano v. City of Hazleton,* 724 F.3d 297, 303 (3d Cir. 2013).  In *Arizona v. United States*, the Supreme Court found an Arizona statute preempted by the INA where the state statute 1) criminalized noncompliance with federal alien-registration requirements and the seeking of or engaging in work by an unauthorized alien, and 2) permitted arrests where state law enforcement officers believed an alien to be removable by reason of some public offense.  The Court explained:

the Federal Government has occupied the field of alien registration . . .. The federal statutory directives provide a full set of standards governing alien registration, including the punishment for noncompliance. It was designed as a "'harmonious whole.'" *Hines*, supra, at 72, 61 S.Ct. 399. Where Congress occupies an entire field, as it has in the field of alien registration, even complementary state regulation is impermissible. Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards . . .. *Federal law makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders . . ..*

567 U.S. at 401-2 (citations omitted, emphasis supplied.)

Similarly, in *Lozano, supra,* the Third Circuit found that federal immigration law preempted the field of immigrant residence.  Considering the interaction of two local laws, the Illegal Immigration Relief Act Ordinance ("IIRAO") and the Rental Registration Ordinance ("RO"), with the Immigration Reform and Control Act ("IRCA", 8 U.S.C. §§ 1324a–1324b), a subdivision of the INA, the Circuit concluded: "The INA's comprehensive scheme 'plainly precludes state efforts, whether harmonious or conflicting, to regulate residence in this country based on immigration status.' . . .".  724 F.3d at 315 (internal citation omitted).

*Lozano* continued:

We agree with the Eleventh Circuit and other courts that have held that "the federal government has clearly expressed more than a 'peripheral concern' with the *entry, movement, and residence of aliens within the United States and the breadth of these laws illustrates an overwhelmingly dominant federal interest in the field*."

724 F.3d at 316 (internal citation omitted) (emphasis supplied.)

27

As set out at Point I(A) of the foregoing Factual Background, the INA

provides a full set of standards governing immigrant detention that was designed as

a harmonious whole.  Those standards are as comprehensive as the standards

concerning alien registration held to be field preempted in *United States v.*

*Arizona*, and far more comprehensive than the standards regarding non-detainee

alien residence held to be field preempted in *Lozano*.  *See* 8 U.S.C. §§ 1221-1232.

The field of immigration detention is therefore preempted, foreclosing any state

regulation in the area.  *Arizona v. United States, supra,* 567 U.S. at 401.

> ii.    *Enforcement of AB 5207 regarding CoreCivic's relationship with ICE*
>        *is barred by conflict/obstacle preemption*

In *Lozano*, the Third Circuit not only found that federal immigration law

preempted the field of immigrant residence (as discussed above), it also found

statutes concerning the housing and employment of immigrants to be

conflict/obstacle preempted by the INA.

The Circuit noted that, where a field is not entirely preempted by federal

law:

> Courts must utilize their judgment to determine what constitutes an
> unconstitutional impediment to federal law, and that judgment is
> "informed by examining the federal statute as a whole and identifying
> its purpose and intended effects."

724 F.3d at 303, quoting *Crosby*, 530 U.S. at 373.  Third Circuit found that

conflict/obstacle preemption barred enforcement of the housing provisions:

> the housing provisions constitute an attempt to unilaterally attach additional consequences to a person's immigration status *with no regard for the federal scheme, federal enforcement priorities, or the discretion Congress vested in the Attorney General*. . . . Hazleton may not unilaterally prohibit those lacking lawful status from living within its boundaries, without regard for the Executive Branch's enforcement and policy priorities . . . *Hazleton's attempt to regulate where aliens can live implicates strong national interests and must be done with a single voice.*

724 F.3d at 318-19 (emphasis supplied). Thus, the municipality's attempt to

regulate where aliens can live through the housing provisions was subject to

conflict preemption, because under IRCA/INA:

> employers are not required to verify contractors' work eligibility, as they must with employees. Given the intricate framework of IRCA, we cannot assume that the distinction is immaterial. Rather, it appears to be a deliberate distinction that Congress included as part of the balance it struck in determining the scope and impact of IRCA's employer sanctions. However, Hazleton's ordinance does not distinguish between employees, on the one hand, and independent contractors or casual hires, on the other.  . . . *The result is a local ordinance that conflicts with Congress's intent to limit IRCA's application to the employer/employee relationship. See Arizona,* 132 S.Ct. at 2505 ('[A] "[c]onflict in technique can be fully as disruptive to the system Congress enacted as conflict in overt policy."') . . .

*Lozano*, 724 F.3d at 307, 309 (internal citation omitted, emphasis supplied.)

In *Crosby, supra,* 530 U.S. at 376-79, the Supreme Court found a state

statute imposing sanctions on the nation of Burma (now Myanmar) that differed

from the federal sanctions regime to be subject to conflict preemption.  There, as in

*Lozano*, the challenged state law provisions provided additional means toward the

goals of the federal scheme. 530 U.S. at 379.  (Here, of course, AB 5207 prohibits

activity that Congress expressly authorized and thus undermines the grant of substantial discretion afforded to the Attorney General by the INA.)  As the Court found with respect to the President's Congressionally-authorized sanction authority in *Crosby*, it is "implausible" that Congress "would have gone to such lengths to empower" the Attorney General with broad discretion in housing civil immigration detainees and yet "been willing to compromise his effectiveness by deference to every provision of state statute or local ordinance that might, if enforced, blunt the consequences of discretionary . . . action." 530 U.S. at 376.  See also *Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 33 (1996) ("normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted").

CoreCivic has shown that AB 5207 stands to defeat the Federal Government's ability to carry out its policies and operational plans for using private facilities and contractors to handle the detention of civil immigration detainees.  In any event, as AB 5207 prohibits conduct the INA expressly authorizes the Federal Government to carry out, AB 5207 plainly is in conflict with "the federal scheme, federal enforcement priorities, [and] the discretion Congress vested in the Attorney General", and thus subject to conflict/obstacle preemption. *Lozano*, 724 F.3d at 318.

A host of other authorities join *Crosby* and *Lozano* in making clear AB 5207 is preempted under conflict/obstacle preemption. *Geo. Grp.,* 50 F.4th at 762, held that a California statute prohibiting all contracts for private detention of immigrants was conflict/obstacle preempted:

> Congress sought to delegate to the DHS Secretary the responsibility to "arrange for appropriate places of detention." 8 U.S.C. § 1231(g)(1). AB 32 frustrates that congressional intent, creating a "conflict between [AB 32's] requirement . . . and the action which Congress and the Department [of Homeland Security] have taken to insure the" appropriateness of facilities to house detainees. *Leslie Miller*, 352 U.S. at 190, 77 S.Ct. 257; *see also Pub. Utils. Comm'n*, 355 U.S. at 544, 78 S.Ct. 446 (noting a "conflict between the federal policy of negotiated rates and the state policy of regulation of negotiated rates"). *Such interference with the discretion that federal law delegates to federal officials goes to the heart of obstacle preemption*.

In *Treasurer of New Jersey v. U.S. Dep't of Treasury, supra*, 684 F.3d at 407, the Third Circuit found that, although there was "no federal statute or regulation that expressly preempts" their application, the abandoned property statutes of several states were preempted by federal law regarding United States savings bonds where they found abandonment more readily than the federal scheme. *See also Rowe v. New Hampshire Motor Transp. Ass'n,* 552 U.S. 364, 371-72 (2008) (state law that "forbids licensed tobacco retailers to employ a 'delivery service' unless that service follows particular delivery procedures" within scope of preemption provision of Federal Aviation Administration Authorization Act where it "produces the very effect that the federal law sought to avoid, namely, a State's

direct substitution of its own governmental commands for 'competitive market forces' in determining (to a significant degree) the services that motor carriers will provide."); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000) (state common law claim for automobile manufacturer's failure to install airbag restraints conflict/obstacle preempted by Federal Motor Vehicle Safety Standard where it would require manufacturers "to install airbags rather than other passive restraint systems" and thereby "presented an obstacle to the variety and mix of devices that the federal regulation sought."); *Farina v. Nokia Inc., supra*, 625 F.3d at 124, 126[10] (state law claims based on cell phone provider's representations regarding radiofrequency radiation emissions that were within Federal Communications Agency regulations barred by conflict preemption); *Nat'l Shooting Sports Found. v. Platkin, supra*, 2023 WL 1380388, at *7 (finding likelihood of success on preemption and enjoining application of state gun control statute that "would subject manufacturers, distributors, dealers, and importers of firearms or ammunition products and their trade associations to civil liability for the harm

---

[10] "The stated purpose behind the FCA is to 'regulat[e] interstate and foreign commerce in communication by wire and radio so as to make available ... a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges....' 47 U.S.C. § 151. In setting standards for wire and radio communications, the FCC must also consider the promotion of "the safety of life and property." 47 U.S.C. § 332(a)(1). . . . Allowing juries to perform their own risk-utility analysis and second-guess the FCC's conclusion would disrupt the expert balancing underlying the federal scheme."

solely caused by the criminal or unlawful misuse of firearm or ammunition products by others . . . in direct conflict with the [federal Protection of Lawful Commerce in Arms Act]'s purpose."); *Valley Nat. Bank v. Lavecchia*, 59 F.Supp.2d 432, 436–38 (D.N.J. 1999) (enjoining state statute barring banks from acting as agent for a title insurance company as preempted by federal law.)

The INA directly authorizes the Federal Government and ICE to use private detention of civil immigrants in enforcing federal immigration law.  In forbidding such action, AB 5207 "create[es] a 'conflict [with] the action which Congress and the Department [of Homeland Security] have taken to insure the' appropriateness of facilities to house detainees," and is thus subject to conflict/obstacle preemption. *Geo. Grp., supra,* 50 F.4th at 762, quoting, *Leslie Miller*, *supra*, 352 U.S. at 190.

## II.   CORECIVIC WILL SUFFER IRREPARABLE INJURY ABSENT THE REQUESTED RELIEF

CoreCivic has pleaded detailed facts in support of its allegation that, but for AB 5207,  ICE would enter into a new agreement with CoreCivic to house immigration detainees.  Amended Complaint, ¶¶31-36, 40-42; .  Verhulst Dec., ¶¶9-15.  As a result, CoreCivic meets the irreparable injury requirement in three distinct and independently-sufficient ways.

**First,** CoreCivic's injuries will result from Defendants' unconstitutional actions.  *NCAA v. Christie*, 926 F. Supp. 2d 551, 578 (D.N.J) ("enactment of the Sports Wagering Law in violation of the Supremacy Clause, alone, likely

constitutes an irreparable harm requiring the issuance of a permanent injunction" (citations omitted), *aff'd*, 730 F.3d 208 (3d Cir. 2013), *abrogated on other grounds*, *Murphy v. Nat'l Collegiate Athletic Ass'n*, 200 L. Ed. 2d 854 (2018)); s*ee also Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 883 (3d Cir. 1997) ("Having concluded that requiring plaintiffs to file their petitions by April 10 likely violates their constitutional rights, it clearly follows that denying them preliminary injunctive relief will cause them to be irreparably injured."); *WR Property LLC v. Township of Jackson*, No. 17-cv-3226, 2021 WL 1790642, *13 (D.N.J. May 5, 2021) (granting preliminary injunction against enforcement of New Jersey land use ordinance where any potential harm was outweighed by prospective harm from Constitutional violations.)

**Second,** CoreCivic faces irreparable injury because AB 5207 threatens to deprive CoreCivic of its leasehold rights at the EDC.  Verhulst Dec., ¶17; s*ee, e.g.,* *Al Fatah Center v. Township of Bridgewater,* No. 11-cv-2397, 2013 WL 12322637, *20 (D.N.J. 2013) ("'where interests involving real property are at stake, preliminary injunctive relief can be particularly appropriate because of the unique nature of the property interest'", quoting *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 256 (3d Cir. 2011) (other quotations omitted)).

**Third,** even if all of CoreCivic's damages from lost investment, uncertainty regarding ongoing investments necessary to maintain the EDC, and impairment of

its customer relationship with ICE (Verhulst Dec., ¶¶19-20) could be calculated, the harm would still meet the irreparability standard because the 11th Amendment to the United States Constitution and principles of Sovereign Immunity would prevent CoreCivic's recovery of monetary damages from Defendants.  See, e.g., *Siemens United States Holdings Inc. v. Geisenberger,* 17 F.4th 393, 408-409 (3d Cir. 2021) (finding irreparable injury sufficiently established on preliminary injunction against enforcement of New Jersey's abandoned property statute, since if movants turned over funds as required by statute "'[t]hey would not be entitled to receive those funds back if [the challenged statute was] later found to be unconstitutional, due to state sovereign immunity'") (citation omitted), *Nat'l Shooting Sports Found. v. Platkin*, *supra*, 2023 WL 1380388, *8 (movants established irreparable injury where  they faced prospect of "complying with the statute, resulting in the loss of money it could not later obtain, due to sovereign immunity, if the statute was deemed unconstitutional"); *Valley Nat'l Bank v. Lavecchia, supra*, 59 F. Supp. 2d at 437  (movant for preliminary injunction against enforcement of New Jersey statute preventing its sale of title insurance satisfied irreparable injury standard where, "because the defendant is the state, it is virtually assured that the plaintiffs will never be able to collect money damages for their losses") (internal citation and quotation marks omitted).

III.   **THE BALANCE OF HARMS, THE POSSIBILITY OF HARM TO OTHER INTERESTED PERSONS AND CONSIDERATIONS OF PUBLIC POLICY FAVOR CORECIVIC'S APPLICATION FOR PRELIMINARY RELIEF**

The balance of harms, consideration of the possibility of harm to other interested persons, and the public interest all favor the requested relief.  The ICE Contract is presently in effect and CoreCivic continues to house immigration detainees at the EDC.  Defendants can identify no harm to the State of New Jersey or anyone else from an order that allows this status quo to continue; certainly none that would outweigh the harm to CoreCivic from denial of the requested relief set forth at Point II.

Public policy also favors the requested relief. See *WR Property LLC v. Township of Jackson*, *supra*, 2021 WL 1790642, *13:

> The Third Circuit has recognized that "[a]s a practical matter, if a plaintiff demonstrates both likelihood of success on the merits and irreparable harm, it almost always will be the case that the public interest will favor the plaintiff." *AT&T v. Winback & Conserve Program,* 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)).

*WR Property LLC* also rejected defendants' "balance of harms" argument that "they 'would be greatly harmed by a preliminary injunction as it would prevent the implementation of the subject ordinances which were properly considered and passed pursuant to Township procedures'", finding any such harm outweighed by plaintiffs' prospective harm from Constitutional violations.  *Id.* See *New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff,* 669 F.3d 374, 389 (3d Cir. 2012)

("granting a preliminary injunction would be in the public's interest . . . because 'the public interest [is] not served by the enforcement of an unconstitutional law.'", q*uoting Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003)); see also *United States v. California*, *supra*, 921 F.3d at 893  ("preventing a violation of the Supremacy Clause serves the public interest").

## IV.    A TEMPORARY RESTRAINING ORDER SHOULD BE ISSUED TO ALLOW CORECIVIC TO NEGOTIATE TOWARD A NEW AGREEMENT WITH ICE PENDING RESOLUTION OF THE PRELIMINARY INJUNCTION APPLICATION

ICE is not prepared to negotiate with CoreCivic on a new contract with the effect of AB 5207 unresolved.  Verhulst Dec., ¶9.  Further to the INA's purpose of allowing ICE to use private facilities to house civil immigration detainees and to CoreCivic's right to do so, a temporary restraining order should issue to enable CoreCivic to pursue negotiations with ICE on a new contract pending resolution of its preliminary injunction application.  See *Pennsylvania R. Co. v. Transp. Workers Union of Am., C.I.O.,* 191 F. Supp. 915, 923 (E.D. Pa.) (temporary restraining order against work stoppages by union employees, pending resolution of preliminary injunction for same relief, "necessary to carry out the purposes of the Railway Labor Act"), *aff'd sub nom. Pennsylvania R. Co. v. Transp. Workers Union of Am., CIO,* 280 F.2d 343 (3d Cir. 1960); *Coffelt v. Fawkes*, No. 2014-cv-025, 2014 WL 2566516, at *7–8 (D.V.I. June 6, 2014) (granting TRO against disqualification of electoral candidates, though "there is no law that bars them from

campaigning despite their disqualification from the ballot," where disqualification would "adversely affect their ability to garner public support in furtherance of their campaign, including both voter and financial support"), *vacated on other grounds*, 765 F.3d 197 (3d Cir. 2014); see also *Stein v. Lee Eye Ctr., Inc.,* No. 2:21-cv-01730, 2021 WL 5770212, at *3 (W.D. Pa. Dec. 6, 2021) (granting TRO against enforcement of non-compete clause: "even if Defendants are correct that Dr. Stein's alleged losses are all compensable. . . this case represents one of those 'exceptional circumstances,' . . . where the impending economic loss may not be wholly remediable with damages. . . .'The right to continue a business in which [plaintiff] had engaged for twenty years ... is not measurable in monetary terms.'" (internal citations omitted)); *Nat'l Collegiate Athletic Ass'n v. Murphy*, No. 14-cv-06450, 2020 WL 7074398, at *2 (D.N.J. Dec. 3, 2020) (on motion regarding application of injunction bond after basis for issuance of injunction was vacated on other grounds, noting that this Court had granted a TRO against New Jersey's enforcement of state law that would permit sports gambling contrary to federal law.)[11]

---

[11]  Fed. R. Civ. P. 65(c) calls for the posting of a bond "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained" in connection with a temporary restraining order or preliminary injunction.  "The Third Circuit recognizes that public-interest cases may represent an exception to the strict requirements of Rule 65(c)", *Nat'l Shooting Sports Found. v. Platkin,* 2023 WL 1380388, at *10, citing *Temple Univ. v. White*, 941 F.2d 201, 218 n.25 (3d Cir. 1991).  While there do not

## **<u>CONCLUSION</u>**

For the reasons set forth above, Plaintiff CoreCivic respectfully requests that the Court issue a preliminary injunction with temporary restraining order barring Defendants from enforcing New Jersey Assembly Bill 5207 to prevent CoreCivic from negotiating toward or entering into a contract with ICE to house civil immigration detainees at the EDC.

Dated:  June 14, 2023

**SCHLAM STONE & DOLAN LLP**

By:_____

David J. Goldsmith
Bradley D. Simon (*admitted Pro Hac Vice*)
Thomas A. Kissane (*admitted Pro Hac Vice*)
26 Broadway, 19th Fl.
New York, New York 10004
(212) 344-5400
(212) 344-7677 (fax)
dgoldsmith@schlamstone.com

*Attorneys for Plaintiff CoreCivic, Inc.*

---

appear to be any significant costs or damages that Defendants might incur as a result of letting ICE and CoreCivic continue their historical relationship in housing civil immigration detainees pending resolution of this matter, CoreCivic proposes that the Court direct the posting of a bond not to exceed $10,000 on the temporary restraining order and/or preliminary injunction.  Compare *Am. Freedom Def. Initiative v. Se. Pennsylvania Transp. Auth.,* 92 F.Supp.3d 314, 331 (E.D. Pa. 2015) (in granting preliminary injunction requiring defendant transportation authority to display organization's advertisement on its buses, requiring bond of $100 where defendant  "did not offer any evidence that they will suffer a financial loss as a result of the injunction.")