## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CORECIVIC, INC., <br><br> Plaintiff, <br><br> v. <br><br> PHILIP D. MURPHY, in his official capacity as Governor of New Jersey, *et al.*, <br><br> Defendants. | Case No. 3:23-CV-00967-RK-TJB |

## UNITED STATES OF AMERICA'S STATEMENT OF INTEREST IN SUPPORT OF PLAINTIFF'S PRELIMINARY-INJUNCTION MOTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND.................................................................................................. 2

LEGAL STANDARDS ........................................................................................ 5

ARGUMENT........................................................................................................ 6

I.     AB 5207 violates the Supremacy Clause. .................................................. 6

        A.     AB 5207 violates intergovernmental immunity by impermissibly regulating the Federal Government's operations............................................ 7

        B.     AB 5207 violates intergovernmental immunity by singling out immigration detention, which is exclusively the Federal Government's responsibility. ............................................................................................. 11

        C.     AB 5207 is field and conflict preempted because Congress has occupied the field of contracting for federal detainee housing and AB 5207 frustrates the Federal Government's ability to arrange for appropriate detention. .......................................................................... 13

II.     AB 5207 would seriously impair immigration operations in the region and cause irreparable harm to the United States, its detainees, and the public.............. 19

III.     New Jersey has no countervailing interest in maintaining an unconstitutional law. ............................................................................... 24

IV.     The Court should enter a permanent injunction because there are no material facts in dispute.................................................................................... 25

CONCLUSION .................................................................................................... 26

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*,
   39 F.4th 95 (3d Cir. 2022) ........................................................................................ 5

*Anderson v. Wachovia Mortg. Corp.*,
   621 F.3d 261 (3d Cir. 2010) .................................................................................... 25

*Arizona v. California*,
   283 U.S. 423 (1931) .................................................................................................. 7

*Arizona v. United States*,
   567 U.S. 387 (2012) .......................................................................................*passim*

*Augustine v. Dep't of Veterans Affairs*,
   429 F.3d 1334 (Fed. Cir. 2005) ............................................................................... 9

*Boeing Co. v. Movassaghi*,
   768 F.3d 832 (9th Cir. 2014) .................................................................................... 9

*Boyle v. United Techs. Corp.*,
   487 U.S. 500 (1988) ................................................................................................ 16

*Buckman Co. v. Plaintiffs' Legal Comm.*,
   531 U.S. 341 (2001) ................................................................................................ 16

*Cigar Ass'n of Am. v. City of Philadelphia*,
   2020 WL 6703583 (E.D. Pa. Nov. 13, 2020) ......................................................... 24

*Clark v. Suarez Martinez*,
   543 U.S. 371 (2005) .................................................................................................. 2

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000) ................................................................................................ 18

*Demore v. Kim*,
   538 U.S. 510 (2003) ..........................................................................................14, 16

*Farina v. Nokia Inc.*,
   625 F.3d 97 (3d Cir. 2010) ...............................................................................14, 18

*Farmers & Mechanics Sav. Bank of Minneapolis v. Minnesota*,
   232 U.S. 516 (1914) .................................................................................................. 7

*Ferring Pharms., Inc. v. Watson Pharms., Inc.*,
 765 F.3d 205 (3d Cir. 2014) ................................................................... 5

*Geo Grp., Inc. v. Newsom*,
 50 F.4th 745 (9th Cir. 2022) ..................................................*passim*

*Goodyear Atomic Corp. v. Miller*,
 486 U.S. 174 (1988) ................................................................. 9

*Hillsborough Cnty. v. Automated Med. Lab'ys.*, Inc.,
 471 U.S. 707 (1985) ............................................................... 15

*Hines v. Davidowitz*,
 312 U.S. 52 (1941) ................................................................ 15

*In re Nat'l Sec. Agency Telecomm. Records Litig.*,
 633 F. Supp. 2d 892 (N.D. Cal. 2007) ........................................ 11

*James v. Dravo Contracting Co.*,
 302 U.S. 134 (1937) ................................................................ 8

*Johnson v. Maryland*,
 254 U.S. 51 (1920) ............................................................8, 10

*Klotz v. Celentano Stadtmauer & Walentowicz LLP*,
 991 F.3d 458 (3d Cir. 2021) ...............................................13, 19

*Leslie Miller, Inc. v. Arkansas*,
 352 U.S. 187 (1956) ...........................................................8, 19

*Lozano v. City of Hazleton*,
 724 F.3d 297 (3d Cir. 2013) ....................................14, 15, 16, 19

*Mayo v. United States*,
 319 U.S. 441 (1943) ................................................................ 7

*McCulloch v. Maryland*,
 17 U.S. (4 Wheat.) 316 (1819).................................. 6, 7, 10, 11

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
 138 S. Ct. 1461 (2018) ......................................................20, 26

*Nat'l Collegiate Athletic Ass'n v. Christie*,
 61 F. Supp. 3d 488 (D.N.J. 2014)........................................... 25

*Nat'l Collegiate Athletic Ass'n v. Christie*,
  926 F. Supp. 2d 551 (D.N.J. 2013) ............................................................... 20

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
  491 U.S. 350 (1989) ..................................................................................... 19

*Osborn v. Bank of U.S.*,
  22 U.S. 738 (1824) ..................................................................................8, 11

*Pennsylvania v. Navient Corp.*,
  967 F.3d 273 (3d Cir. 2020) ......................................................................... 14

*Perkins v. Lukens Steel Co.*,
  310 U.S. 113 (1940) ..................................................................................... 16

*Pub. Utilities Comm'n of Cal. v. United States*,
  355 U.S. 534 (1958) ....................................................................................... 8

*Reilly v. City of Harrisburg*,
  858 F.3d 173 (3d Cir. 2017) ........................................................................... 5

*Rodriguez v. Robbins*,
  715 F.3d 1127 (9th Cir. 2013) ...................................................................... 24

*Rowe v. N.H. Motor Transp. Ass'n*,
  552 U.S. 364 (2008) ..................................................................................... 24

*Takahashi v. Fish & Game Comm'n*,
  334 U.S. 410 (1948) ..................................................................................... 15

*Travis v. Reno*,
  163 F.3d 1000 (7th Cir. 1998) ...................................................................... 12

*Treasurer of New Jersey v. U.S. Dep't of Treasury*,
  684 F.3d 382 (3d Cir. 2012) ........................................................................... 7

*Trump v. Vance*,
  140 S. Ct. 2412 (2020) ................................................................................... 7

*Union Pac. R. Co. v. Peniston*,
  85 U.S. 5 (1873) ............................................................................................. 8

*United States v. City of Philadelphia*,
  798 F.2d 81 (3d Cir. 1986) ............................................................................. 9

*United States v. Fresno Cnty.*,
 429 U.S. 452 (1977) .................................................................................. 8, 12

*United States v. Kernen Constr.*,
 349 F. Supp. 3d 988 (E.D. Cal. 2018) ........................................................ 12

*United States v. Lewis Cnty.*,
 175 F.3d 671 (9th Cir. 1999) ...................................................................... 12

*United States v. Locke*,
 529 U.S. 89 (2000) ...................................................................................... 14

*United States v. Texas*,
 557 F. Supp. 3d 810 (W.D. Tex. 2021) ....................................................... 20

*United States v. Tingey*,
 30 U.S. 115 (1831) ...................................................................................... 16

*United States v. Town of Windsor*,
 765 F.2d 16 (2d Cir. 1985) ........................................................................... 9

*United States v. Virginia*,
 139 F.3d 984 (4th Cir. 1998) ........................................................................ 9

*United States v. Washington*,
 142 S. Ct. 1976 (2022) ........................................................................ *passim*

*Washington v. United States*,
 460 U.S. 536 (1983) .................................................................................... 12

*Weston v. City Council of Charleston*,
 27 U.S. 449 (1829) ........................................................................................ 8

*Wis. Dep't of Indus., Lb. & Hum. Raltions v. Gould, Inc.*,
 475 U.S. 282 (1986) .................................................................................... 24

## Constitutional and Statutory Provisions

U.S. Const., art. IV, § 3, cl. 2 ........................................................................... 9

6 U.S.C. § 112 ............................................................................................... 3, 17

6 U.S.C. § 557 .................................................................................................... 2

8 U.S.C. § 1103 ................................................................................................ 17

8 U.S.C. § 1225 ....................................................................................................3, 17

8 U.S.C. § 1226 ....................................................................................................3, 17

8 U.S.C. § 1231 .................................................................................................*passim*

8 U.S.C. § 1368 ........................................................................................................ 17

18 U.S.C. § 4001 ....................................................................................................2, 14

18 U.S.C. § 4086 ........................................................................................................ 2

28 U.S.C. § 517 .......................................................................................................... 1

41 U.S.C. § 1101(b) .................................................................................................. 18

Consolidated Appropriation Act, 1997,
    Pub. L. No. 104-208 § 241, 110 Stat. 3009 (1996) ......................................... 17

Consolidated Appropriations Act, 2020,
    Pub. L. No. 116-93, 133 Stat. 2317, 2507 (2019)........................................... 18

N.J. Stat. § 30:4-8.15 ............................................................................................... 13

N.J. Stat. § 30:4-8.16 .......................................................................................*passim*

N.J. Stat. § 30:4-91.10................................................................................... 6, 13, 25

## **Regulations**

48 C.F.R. § 1.101..................................................................................................... 18

48 C.F.R. § 1.601.....................................................................................................3, 17

48 C.F.R. § 3017.204-90 ........................................................................................3, 18

## **Other Authorities**

3 J. Story, COMMENTARIES ON THE CONSTITUTION § 1099 (3d ed. 1858) ................................ 11

General Services Administration, Federal Acquisition Regulation,
    https://www.acquisition.gov/sites/default/files/current/far/pdf/FAR.pdf ............... 18

*Modification & Extension to Contract No. ODT-5-C-0010; Detention Services at Elizabeth De-*
*    tention Center* (July 12, 2023), https://perma.cc/R2YT-2EM8 ........................................... 5

## INTRODUCTION

Under bedrock principles of the Supremacy Clause, authority to make contracting decisions *for* the Federal Government resides *with* the Federal Government.  New Jersey's Assembly Bill 5207 flouts those principles.  Enacted in August 2021, AB 5207 proclaims that "the State," a "local government agency," or "a private detention facility operating in this State shall not enter into, renew, or extend any immigration detention agreement," which is "any contract" or "agreement" that authorizes the detention of "individuals for civil immigration violations."  N.J. Stat. § 30:4-8.16.  But only the United States has authority under the U.S. Constitution and federal law to regulate immigration and, more specifically, to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal."  8 U.S.C. 1231(g)(1)."  As a result, AB 5207 improperly overrides the Federal Government's contracting decisions and intrudes on a core federal responsibility.

The United States therefore submits this statement of interest in support of Plaintiff CoreCivic's motion to enjoin AB 5207.  *See* 28 U.S.C. § 517 (allowing "any officer of the Department of Justice" to "attend to the interests of the United States in a suit pending in a court of the United States").  On the merits, the state law violates the Supremacy Clause.  The only court of appeals to address this question—the en banc Ninth Circuit—held exactly that in striking down a similar California law just last year.  "[A]ny state regulation that purports to override the federal government's decisions about who will carry out federal functions," the court said, "runs afoul of the Supremacy Clause."  *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022) (en banc).  California's law, like New Jersey's law, "would override the federal government's decision, pursuant to discretion conferred by Congress, to use private contractors to run its immigration detention facilities."  *Id.* at 750–51.  And "[w]hether analyzed under intergovernmental immunity or preemption," States "cannot exert this level of control over the federal government's detention operations."  *Id.* at 751.  This Court should hold the same and enjoin enforcement of AB 5207.

Doing so is necessary to prevent immediate and irreparable harm to the Federal Government and the public. "Due to significant fluctuations in the population of noncitizens who are detained," and AB 5207's forced cancellation of other arrangements, Immigration and Customs Enforcement (ICE) "relies almost exclusively on privately operated detention facilities in the state to maintain flexibility." *Id.* at 750. But AB 5207 "would prevent ICE's contractors from continuing to run detention facilities, requiring ICE to entirely transform its approach to detention in the state or else abandon its [New Jersey] facilit[y]." *Id.* This, in turn, would cause numerous harms to the United States' immigration operations, its detainees, and the public, including the possible release of certain dangerous noncitizens, frequent and costly transport of detainees, the isolation of detainees at great distance from their families, and the obstruction of federal proceedings. The Court should enjoin AB 5207.

## BACKGROUND

Congress has explicitly delegated to the Executive Branch full authority over federal prisoner and detainee housing. *See* 8 U.S.C. § 1231(g)(1) ("The [Secretary of Homeland Security] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal.")[1]; *see also* 18 U.S.C. § 4001(b)(1) ("The control and management of Federal penal and correctional institutions . . . shall be vested in the Attorney General . . . ."); *id.* § 4086 ("United States marshals shall provide for the safe-keeping of any person arrested, or held under authority of any enactment of Congress pending commitment to an institution."). And federal agencies have long exercised this authority to contract for private detention facilities.

ICE is one of those agencies. As part of the Department of Homeland Security (DHS), ICE "is charged with enforcement of more than 400 federal statutes, and its mission is to protect the United States from the cross-border crime and illegal immigration that threaten

---

[1] Following the Homeland Security Act of 2002, many references in the Immigration and Nationality Act to the "Attorney General" are now read to mean the Secretary of Homeland Security. *See* 6 U.S.C. § 557; *Clark v. Suarez Martinez*, 543 U.S. 371, 374 n.1 (2005).

national security and public safety." Guadian Decl. ¶ 5.  To that end, "Congress has directed federal officials to detain noncitizens in various circumstances during immigration proceedings."  *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 751 (9th Cir. 2022) (en banc); 8 U.S.C. §§ 1225(b)(1)(B)(ii), (b)(2)(A), 1226(a), (c)(1), 1231(a)(6).  And by statute, the Secretary of DHS "shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," 8 U.S.C. § 1231(g)(1), including through entering "contracts" as "may be necessary and proper to carry out the Secretary's responsibilities."  6 U.S.C. § 112(b)(2); *see* 48 C.F.R. § 1.601(a) (federal procurement regulations allowing the Secretary "authority and responsibility to contract for authorized supplies and services" and allowing the Secretary to "delegate broad authority to manage the agency's contracting functions to heads of such contracting activities").  As a subagency of DHS, ICE is responsible for immigration detention and "may enter into contracts of up to fifteen years' duration for detention or incarceration space or facilities" and "related services."  48 C.F.R. § 3017.204-90.

ICE houses about 27,000 detainees in private detention facilities nationwide.  Burke Decl. ¶ 7.  That's partly because the agency neither constructs nor operates its own detention facilities.  *Id.* ¶ 8.  "Congress has expressed that the Secretary should favor the use of existing facilities for immigration detention, whether through purchase or lease."  *Geo Grp.*, 50 F.4th at 751 (citing 8 U.S.C. § 1231(g)(1)–(2)).  And due to significant fluctuations in the number and location of noncitizens, it is important for ICE to maintain flexibility for its detention facilities.  *Id.*; Burke Decl. ¶¶ 8, 22.  Otherwise, ICE would expend large sums on its own facilities only to have them stand idle if a particular area later experiences a drastic decrease in demand for detainee housing.  *Geo Grp.*, 50 F.4th at 751; Burke Decl. ¶¶ 8, 22.

Just two years ago, ICE used four contracts to house detainees in New Jersey: two intergovernmental-service agreements with Essex County and Hudson County, the use of the U.S. Marshals' agreement with Bergen County, and a contract for the privately owned-and-operated Elizabeth Contract Detention Facility run by CoreCivic since 2005.  Burke Decl.

¶¶ 14–15.  In Fiscal Year 2020, the Essex, Hudson, and Bergen County facilities housed an average daily population of nearly 1,300 detainees.  *Id.* ¶ 15.  Then came AB 5207.

In August 2021, New Jersey enacted AB 5207, which prohibited "the State," a "local government agency," or "a private detention facility operating in this State" from "enter[ing] into, renew[ing], or extend[ing] any immigration detention agreement."  N.J. Stat. § 30:4-8.16(b).  The state law defines "immigration detention agreement" as "any contract" or "agreement" that authorizes "the State, local government agency, or private detention facility to house or detain individuals for civil immigration violations."  *Id.* § 30:4-8.16(a).  And it defines "private detention facility" as "any privately owned or operated facility that houses or detains individuals for civil immigration violations."  *Id.*  Within three months after this law was enacted, the Essex, Hudson, and Bergen Counties ended their relationships with ICE.  Burke Decl. ¶ 15.

That left only the privately owned-and-operated Elizabeth facility for all of New Jersey, which can house about 300 detainees.  But due to the loss of space from other facilities, ICE began transporting many detainees outside the State, mainly to Pennsylvania and New York.  Guadian Decl. ¶ 27.  The agency was then hit with a putative class-action lawsuit, alleging (among other things) that ICE was unlawfully transferring detainees out of New Jersey and thus hindering detainees' access to counsel and families.  *Id.*  While that lawsuit was eventually dismissed, ICE continues to face informal complaints relating to its out-of-state transfers, including concerns about limited attorney-client access, visiting limitations for family and friends, and the possible impact on ongoing criminal and family court proceedings if an out-of-state facility has inadequate technology for virtual appearances.  *Id.*

For these reasons and others, the privately owned-and-operated Elizabeth facility is "mission critical."  *Id.* ¶ 8.  That facility is the only one within 60 miles of New York City that houses immigration detainees, making its proximity to the Newark Liberty International Airport and JFK International Airport crucial to effect removals from field offices nationwide.  *Id.* ¶¶ 8–9.  Many ICE removals require a direct flight out of the United States.  *Id.* ¶ 9.  And

for many countries, direct flights are only available from a handful of airports, including Newark and JFK. *Id.* Losing the Elizabeth facility would therefore not only seriously impair ICE's immigration operations but would also negatively impact detainees and the public given (1) the lack of a key detention location in Elizabeth, (2) the possible release of certain dangerous noncitizens, (3) costly out-of-state relocation and transportation of detainees, and (4) possible obstruction of federal proceedings. *Id.* ¶¶ 8–29; *see* Section II., *infra*.

So ICE intends to extend CoreCivic's contract to run the Elizabeth facility before its contract expires on August 31, 2023. Burke Decl. ¶¶ 27–30; *see* System for Award Management, *Modification & Extension to Contract No. ODT-5-C-0010; Detention Services at Elizabeth Detention Center* (July 12, 2023), available [here](#). When it does, ICE and CoreCivic will be in violation of AB 5207. And New Jersey has made clear that it will seek to enforce that state law against the facility. *See* CoreCivic Ltr., ECF No. 31. The United States therefore submits this statement of interest in support of CoreCivic's motion to enjoin AB 5207.

## LEGAL STANDARDS

"District courts have the freedom to fashion preliminary equitable relief so long as they do so by exercising their sound discretion." *Reilly v. City of Harrisburg*, 858 F.3d 173, 178–79 (3d Cir. 2017) (citation omitted). "To determine whether a preliminary injunction should issue," a court must consider: "(1) whether the movant has a reasonable probability of success on the merits; (2) whether irreparable harm would result if the relief sought is not granted; (3) whether the relief would result in greater harm to the non-moving party, and (4) whether the relief is in the public interest." *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 102–03 (3d Cir. 2022). "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 215 n.9 (3d Cir. 2014) (citation omitted).

## ARGUMENT

### I.   AB 5207 violates the Supremacy Clause.

AB 5207 is invalid under two doctrines flowing from the Supremacy Clause: intergovernmental immunity and preemption.  As to intergovernmental immunity, the Constitution "prohibit[s] States from interfering with or controlling the operations of the Federal Government."  *United States v. Washington*, 142 S. Ct. 1976, 1984 (2022).  After all, "[i]t is of the very essence of supremacy, to remove all obstacles to [the Federal Government's] action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence."  *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427 (1819) (Marshall, C.J.).  Intergovernmental immunity also prohibits States from "discriminat[ing] against the Federal Government or those with whom it deals."  *Washington*, 142 S. Ct. at 1984 (citation omitted).  But by eliminating the United States' ability—and only the United States' ability—to contract for private detention facilities, AB 5207 violates both prongs of intergovernmental immunity.  Indeed, New Jersey allows itself to use whatever facilities it wants for its own prisoners and detainees.  *See, e.g.*, N.J. Stat. § 30:4-91.10.

As to preemption, the Constitution or Congress can explicitly preempt state law, or they can implicitly do so in two ways.  *Arizona v. United States*, 567 U.S. 387, 399 (2012).  First, "States are precluded from regulating conduct in a field that" the Constitution or Congress commits to the Federal Government's "exclusive governance."  *Id.*  Second, "state laws are preempted when they conflict with federal law," either because compliance with both "is a physical impossibility" or the "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Id.* (citation omitted).  Here, AB 5207 is both field and conflict preempted because it intrudes on various dominant federal interests and directly conflicts with Congress's pervasive statutory scheme, which entrusts the Executive Branch—not individual States—to "arrange for appropriate places of detention."  8 U.S.C. § 1231(g)(1).  New Jersey's AB 5207 is unconstitutional and should be enjoined.

### A. AB 5207 violates intergovernmental immunity by impermissibly regulating the Federal Government's operations.

By attempting to eliminate certain contracts (and contractors) for the United States, New Jersey has violated the Supremacy Clause. Under the doctrine of intergovernmental immunity, the Constitution "prohibit[s] States from interfering with or controlling the operations of the Federal Government." *United States v. Washington*, 142 S. Ct. 1976, 1984 (2022); *Mayo v. United States*, 319 U.S. 441, 445 (1943); ("[A]ctivities of the Federal Government are free from regulation by any state."); *Treasurer of New Jersey v. U.S. Dep't of Treasury*, 684 F.3d 382, 410 (3d Cir. 2012) ("[S]tates may not directly regulate the federal government's operations or property."). This foundational principle means that New Jersey cannot regulate, much less abolish, the United States' contracts for private detention facilities.

Across two centuries, the Supreme Court has repeatedly affirmed that "the Constitution guarantees 'the entire independence of the General Government from any control by the respective States,'" so States can neither "control the operations of the constitutional laws enacted by Congress," nor impede the Executive Branch's "execution of those laws." *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020) (quoting *Farmers & Mechanics Sav. Bank of Minneapolis v. Minnesota*, 232 U.S. 516, 521 (1914) & *McCulloch*, 17 U.S. at 436); *id.* at 2442–43 & n.5 (Alito, J., dissenting) (collecting cases for the proposition that "two centuries of case law prohibit the States from taxing, regulating, or otherwise interfering with the lawful work of federal agencies, instrumentalities, and officers"); *Arizona v. California*, 283 U.S. 423, 451 (1931) ("The United States may perform its functions without conforming to the police regulations of a state."). As Chief Justice Marshall put it, "[t]he sovereignty of a state extends to everything which exists by its own authority, or is introduced by its permission," but it does not "extend to those means which are employed by congress to carry into execution powers conferred on that body by the people of the United States." *McCulloch*, 17 U.S. at 429. That's why the

7

Supreme Court has, from the beginning, distinguished between *property* of the Federal Government's contractors—which States may regulate on equal terms as other property—and *operations* of the Federal Government and its contractors—which States cannot regulate at all.[2]

This well-settled principle has been consistently applied to invalidate state laws that impose requirements on federal contractors.  In *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 189–90 (1956) (per curiam), for example, a State sought to prevent the Federal Government from entering into agreements with its chosen contractors until the States' own licensing standards were satisfied.  The Supreme Court struck down the law because it "would give the State's licensing board a virtual power of review over the federal [contracting] determination," violating the "immunity of the instruments of the United States from state control in the performance of their duties."  *Id.* at 190 (quoting *Johnson v. Maryland*, 254 U.S. 51, 57 (1920) (Holmes, J.)).  Similarly, the Court invalidated a state law requiring common carriers to seek approval from a state agency for rates negotiated with the Federal Government to transport federal property.  *Pub. Utilities Comm'n of Cal. v. United States*, 355 U.S. 534, 544 (1958).  Such a law, the Court held, improperly allowed the state agency to approve or disapprove the decisions of federal officials exercising the discretion entrusted to them by federal law.  *Id.*  Other

---

[2] *See Weston v. City Council of Charleston*, 27 U.S. 449, 469 (1829) (Marshall, C.J.) (holding that although "property acquired by [the bank of the United States] in a state was supposed to be placed in the same condition with property acquired by an individual," a "tax on government stock is thought by this Court to be a tax on the contract . . . and consequently to be repugnant to the constitution"); *Osborn v. Bank of U.S.*, 22 U.S. 738, 866–67 (1824) (Marshall, C.J.) ("[T]he property of the contractor may be taxed, as the property of other citizens," but "we do not admit that the act of purchasing, or of conveying the articles purchased, can be under State control."); *see also United States v. Fresno Cnty.*, 429 U.S. 452, 462 (1977) (canvassing prior cases and stating that "a State may, in effect, raise revenues on the basis of property owned by the United States" if the property "is being used by a private citizen or corporation" and the tax is nondiscriminatory); *James v. Dravo Contracting Co.*, 302 U.S. 134, 155 (1937) (explaining that States may tax federal contractors "so long as his contract and its execution are not interfered with"); *Union Pac. R. Co. v. Peniston*, 85 U.S. 5, 36 (1873) (recognizing the "distinction, so clearly drawn in the earlier [Supreme Court] decisions, between a tax on the property of a governmental agent, and a tax upon the action of such agent," and explaining that "[a] tax upon their operations is a direct obstruction to the exercise of Federal powers").

federal courts have also routinely struck down state laws seeking to regulate federal contractors in the performance of their duties.[3]

AB 5207 goes much further than the state laws invalidated in those cases. Rather than placing certain requirements on the United States' chosen contractors, AB 5207 bans the United States' chosen contractors *altogether*. But if a State "could not prohibit ICE from hiring a particular private detention operator by imposing licensing requirements, it surely cannot regulate private detention operators out of existence through a direct ban."[4]  *See Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 757–58 (9th Cir. 2022). Such a law "breach[es] the core promise of the Supremacy Clause." *Id.* at 758.

That is exactly what the en banc Ninth Circuit held when it reviewed California's similar law banning private detention facilities. "Under *Leslie Miller* and *Public Utilities Commission*, when federal law gives discretion to a federal official to hire a contractor to perform federal work, a state cannot override the federal official's decision to do so." *Id.* at 757. "That

---

[3] *See Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014) (holding that California violated intergovernmental immunity by "regulat[ing] not only the federal contractor but the effective terms of federal contract itself"); *Augustine v. Dep't of Veterans Affairs*, 429 F.3d 1334, 1340 (Fed. Cir. 2005) (holding that "California has no authority to require that attorneys practicing before the [Merits Systems Protection] Board obtain a state license . . . for work before federal agencies"); *United States v. Virginia*, 139 F.3d 984, 987–88 (4th Cir. 1998) (holding that the Virginia Criminal Justice Services Board could not require FBI-contracted private investigators to obtain state private-investigator licenses); *United States v. City of Philadelphia*, 798 F.2d 81, 89 (3d Cir. 1986) (noting that a town may not "enforce its building permit regulations against the contractor hired to construct a top-secret federal research facility" (citing *United States v. Town of Windsor*, 765 F.2d 16 (2d Cir. 1985)).

[4] AB 5207 would even apply when the United States *owns* a detention facility and contracts with a private company to *operate* the facility. *See* N.J. Stat. § 30:4-8.16(a) (defining "private detention facility" as "any privately owned *or* operated facility that houses or detains individuals for civil immigration violations" (emphasis added)). But the United States has constitutional control of its own property. U.S. Const., art. IV, § 3, cl. 2. So a state law attempting to dictate allowable personnel and activities in federally owned facilities is plainly unconstitutional. *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 (1988) ("[A] federally owned facility performing a federal function is shielded from direct state regulation, even though the federal function is carried out by a private contractor, unless Congress clearly authorizes such regulation.").

is a level of control over federal operations that the Supremacy Clause does not tolerate." *Id.* Yet both California's and New Jersey's laws banning private detention facilities cross that line.  In both cases, "ICE has determined that privately run facilities are the most 'appropriate' for" the State.  *Id.* (quoting 8 U.S.C. § 1231(g)).  In both cases, the state law "would take away that choice."  *Id.*  In both cases, "ICE would have to cease its ongoing immigration detention operations in [the State] and adopt an entirely new approach in the [S]tate."  *Id.* at 758.  And so in both cases, the state law improperly gives the State "the power to control ICE's immigration detention operations in the [S]tate by preventing ICE from hiring the personnel of its choice."  *Id.* at 757.  Intergovernmental immunity's "foundational limit on state power" simply "cannot be squared" with AB 5207's immigration-detention ban.  *Id.* at 758.

It makes no difference that AB 5207 does not expressly mention the United States. "When a state regulation of a contractor would control federal operations, enforcement of the substance of the regulation against the contractors would have the same effect as direct enforcement against the Government."  *Id.* at 760 (citation omitted).  And "the Supreme Court [has] held that neutral state laws imposed on the private conduct of federal contractors violated the Supremacy Clause."  *Id.*  It also doesn't matter that New Jersey restricts both its own ability to house immigration detainees and the United States' ability to do so.  Indeed, "no matter how reasonable, or how universal and undiscriminating, the State's inability to interfere [with federal operations] has been regarded as established since [1819]."[5] *Johnson*, 254 U.S. at 55–56 (citing *McCulloch*, 17 U.S. 316).  "[E]ven the most unquestionable and most universally applicable of state laws . . . will not be allowed to control the conduct of" individuals "acting under and in pursuance of the laws of the United States."  *Id.* at 56–57.

---

[5] As explained below, AB 5207 is far from "universal"; it also violates intergovernmental immunity by discriminating against the United States and its contractors.

If States could regulate—or outright ban—certain contracts with the United States, the Federal Government would grind to a halt.  Chief Justice Marshall recognized, and dismissed, this notion almost two centuries ago:

> Can a contractor for supplying a military post with provisions be restrained from making purchases within any State, or from transporting the provisions to the place at which the troops were stationed? or could he be fined or taxed for doing so?  We have not yet heard these questions answered in the affirmative.

*Osborn*, 22 U.S. at 867.  Modern examples only further demonstrate the point.  For example, a State could not thwart Department of Defense contracts (and national security) by prohibiting any person from manufacturing fighter jets, missiles, and submarines under a contract with the Federal Government.  Nor could a State hamper contracts (and critical research) of the Department of Health and Human Services by forbidding any person from operating a research laboratory under a contract with the Federal Government.  Federal powers "are given by the people of the United States, to a government whose laws, made in pursuance of the constitution, are declared to be supreme," and "the people of a single state cannot confer a sovereignty which will extend over them." *McCulloch*, 17 U.S. at 429.

AB 5207 contravenes bedrock principles of our constitutional system.  New Jersey can decide that it will no longer use private detention facilities for its own detainees.  But "a concurrent power in the [S]tates" to regulate immigration operations "would bring back all the evils and embarrassments, which the uniform rule of the constitution was designed to remedy."  3 J. Story, COMMENTARIES ON THE CONSTITUTION § 1099 (3d ed. 1858).

**B.    AB 5207 violates intergovernmental immunity by singling out immigration detention, which is exclusively the Federal Government's responsibility.**

AB 5207 also violates intergovernmental immunity because it discriminates against the United States and its contractors.  State laws are invalid if they "discriminate against the Federal Government or those with whom it deals." *United States v. Washington*, 142 S. Ct. 1976, 1984 (2022) (citation omitted).  This "nondiscrimination rule prevents states from meddling with Federal Government activities indirectly by singling out for regulation those who

deal with the government." *In re Nat'l Sec. Agency Telecomm. Records Litig.*, 633 F. Supp. 2d 892, 903 (N.D. Cal. 2007). Intergovernmental immunity is therefore violated when "a state law discriminates against the federal government or its contractors" by "singl[ing] them out for less favorable treatment" or "if it regulates them unfavorably on some basis related to their governmental status." *United States v. Washington*, 142 S. Ct. at 1984 (citation omitted); *Washington v. United States*, 460 U.S. 536, 545 (1983) (discrimination where a State "treats someone else better than it treats" the United States or its contractors). AB 5207 does exactly that.

First, AB 5207 regulates exclusively governmental conduct. Only governments detain individuals, and only the Federal Government detains individuals for "civil immigration violations." *See* N.J. Stat. § 30:4-8.16 (banning state, local, and private facilities operating under an "Immigration detention agreement," which means any "agreement" that authorizes such facilities "to house or detain individuals for civil immigration violations"). The sole regulation of federal governmental actors itself renders AB 5207 constitutionally infirm. *See Travis v. Reno*, 163 F.3d 1000, 1002 (7th Cir. 1998) ("[O]ne government may tax (or regulate) another's trading partners only to the extent it imposes equivalent burdens on those who do business with private citizens."); *United States v. Kernen Constr.*, 349 F. Supp. 3d 988, 994 (E.D. Cal. 2018) (holding that a state law violated intergovernmental immunity "because it excludes private actors from its coverage"). AB 5207 would pose no obstacle if, for example, a private hospital contracted with a private company to house the mentally ill. Yet AB 5207 would bar the United States from seeking the same arrangement for the individuals it detains. This asymmetrical regulation of contractors raises concerns because "the federal government does not have a direct voice in state legislatures," so States "can unfairly burden its operations by subjecting it to disparate treatment." *Kernen Constr.*, 349 F. Supp. 3d at 994 (citing *Washington*, 460 U.S. at 545). "As such, it is important that burdens also fall on private parties to ensure that there is a broad state constituency that can provide a political check against the abuse of a state's regulatory authority." *Id.* (citing *United States v. Fresno Cnty.*, 429 U.S. 452, 463 (1977) and *United States v. Lewis Cnty.*, 175 F.3d 671, 676 (9th Cir. 1999)).

12

Second, AB 5207 improperly targets only operations of the United States and its contractors, "singl[ing] them out for less favorable treatment" and regulating "them unfavorably on some basis related to their governmental status." *United States v. Washington*, 142 S. Ct. at 1984 (citation omitted). While the New Jersey legislature acknowledged its "responsibility" to "protect the health and safety . . . of individuals detained within New Jersey" and readily admitted that "[d]etention centers and correctional facilities in New Jersey have a history of poor conditions," it did not ban *all* such facilities. N.J. Stat. § 30:4-8.15. It did not even ban some facially neutral subset of them, like all private detention facilities. Instead, the State exclusively banned detention facilities that "house or detain individuals for civil immigration violations." N.J. Stat. § 30:4-8.16(a). Only the Federal Government, not the State, does that. New Jersey thus permits itself to use whatever facilities it wants for its own prisoners and detainees while restricting the United States' ability to do the same. *See, e.g.*, N.J. Stat. § 30:4-91.10 (allowing New Jersey's "Commissioner of Corrections" to "authorize the confinement of eligible inmates in private facilities"). That's a textbook example of intergovernmental discrimination prohibited by the Supremacy Clause.

### C.   AB 5207 is field and conflict preempted because Congress has occupied the field of contracting for federal detainee housing and AB 5207 frustrates the Federal Government's ability to arrange for appropriate detention.

AB 5207 is preempted under principles of both field and conflict preemption. Field preemption occurs where there is a "federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or where there is "a framework of regulation so pervasive that Congress left no room for the States to supplement it." *Arizona*, 567 U.S. at 399 (citations omitted). Conflict preemption occurs where "compliance with both state and federal law is impossible, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 463 (3d Cir. 2021). But these categories are not "rigid" and in every preemption case "the intent of Congress is the 'ultimate

touchstone' of preemption analysis."[6] *Pennsylvania v. Navient Corp.*, 967 F.3d 273, 288 (3d Cir. 2020).  Here, Congress's intent was for the Federal Government—not the 50 individual States—to determine the appropriate means of immigration detention.

Start with the "federal interest[s]" that are "so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010).  There are at least three: (1) the United States' prerogative to provide for those in its custody, (2) the federal power over foreign relations and immigration, and (3) the Federal Government's authority to control obligations under its contracts.

Federal detainees are held by the United States only because they have violated (or may have violated) federal law, so the Federal Government has both the unquestionable power and the obligation to house those in its custody.  *See* 18 U.S.C. § 4001(a) ("No citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress."); *Demore v. Kim*, 538 U.S. 510, 523 (2003) (explaining that Congress's "considerable authority over immigration matters" includes the "power to detain aliens in connection with removal").  Congress has not only recognized this responsibility but has explicitly delegated it to the Executive Branch.  *See* 8 U.S.C. § 1231(g)(1).  Allowing States to regulate contracts for detainee housing would encroach on the United States' sovereign prerogative to house *its own* detainees.

---

[6] Courts generally presume that "the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." *Arizona*, 567 U.S. at 400.  But that so-called presumption against preemption does not apply where, as here, "a state law would interfere with inherently federal relationships." *Geo Grp.*, 50 F.4th at 761.  In fact, where a state law "would control federal operations," the exact opposite presumption applies: "courts presume that Congress did not intend to allow the state law to be enforced." *Id.* at 761–62.  "In this area of 'significant federal presence,' [courts] will not apply the presumption against preemption." *Lozano v. City of Hazleton*, 724 F.3d 297, 314 n.23 (3d Cir. 2013) (citing *United States v. Locke*, 529 U.S. 89, 108 (2000)).

This is particularly troubling because the Federal Government is detaining foreign nationals, implicating the United States' foreign-relations and immigration powers. "The Government of the United States has broad, undoubted power over the subject of immigration and the status of" noncitizens. *Arizona*, 567 U.S. at 395. "Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws." *Id.* at 395. It is "fundamental" that "foreign countries concerned about the *status, safety, and security* of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Id.* (emphasis added). That's important, in part, because "perceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad." *Lozano v. City of Hazleton*, 724 F.3d 297, 318–19 (3d Cir. 2013) (quoting *id.*). So "[o]ur system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941). The Federal Government can neither ensure the safety and security of noncitizens in its custody, nor communicate effectively with foreign countries as "one national sovereign," if States like New Jersey can dictate how and where the United States may house such individuals.

That would contravene the Supreme Court's repeated admonition that "the regulation of aliens is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the [S]tate also acts on the same subject," the state law must give way. *Id.* at 62; *see Arizona*, 567 U.S. at 401; *Hillsborough Cnty. v. Automated Med. Lab'ys.*, Inc., 471 U.S. 707, 719 (1985) (recognizing "the dominance of the federal interest" in immigration and foreign affairs as the paradigmatic example of field preemption); *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948) (acknowledging that States "can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization *and residence* of aliens in the United States or the several states" (emphasis added)); *Lozano*, 724 F.3d

at 315 (recognizing the "primacy of the federal government's concern for the treatment and regulation of aliens in this country").  Such a dominant federal interest applies doubly to AB 5207 because the United States is not merely regulating foreign nationals on American soil but controlling the detention of noncitizens in federal custody—a fundamental part of the deportation process.  *See Demore*, 538 U.S. at 523.

AB 5207 also disregards the United States' sovereign authority to control obligations to and rights of the United States under its contracts for federal detainee housing.  As "an incident to the general right of sovereignty," the United States has inherent authority to "enter into contracts not prohibited by law[] and appropriate to the just exercise of [its] powers." *United States v. Tingey*, 30 U.S. 115, 128 (1831).  The Supreme Court has unequivocally held that "obligations to and rights of the United States under its contracts are governed exclusively by federal law" because they involve "uniquely federal interests."  *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988); *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) ("[T]he relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law.").  Were it otherwise, States like New Jersey could supplement or eliminate contractual terms negotiated between the national sovereign and a federal contractor executing sovereign prerogatives.  The States do not have that power.  Instead, the United States "enjoys the unrestricted power" to "determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases."  *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940).

Individually or combined, these dominant federal interests preempt the field of federal detainee housing contracts.  In the Third Circuit's words, "the federal government has clearly expressed more than a 'peripheral concern' with the entry, movement, and residence of aliens within the United States and the breadth of these laws illustrates an overwhelmingly dominant federal interest in the field."  *Lozano*, 724 F.3d at 316 (citations omitted).  And AB 5207

directly conflicts with Congress's comprehensive scheme because federal statutes allow the Executive Branch, not the States, to decide how and where federal detainees may be housed.

Congress has directed federal officials to detain noncitizens in various circumstances. *See* 8 U.S.C. §§ 1225(b)(1)(B)(ii), (b)(2)(A), 1226(a), (c)(1), 1231(a)(6).  And while expressly contemplating detention facilities "operated directly by [ICE] or through contract with other persons or agencies," Congress explicitly delegated to the Executive Branch full authority to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal."  8 U.S.C. § 1231(g)(1); *see id.* § 1368(b)(2)(a)(i); Consolidated Appropriation Act, 1997, Pub. L. No. 104-208 § 241, 110 Stat. 3009 (1996).  This "gives both the responsibility and broad discretion to the Secretary to choose the place of detention for deportable aliens."  *Geo Grp.*, 50 F.4th at 751 (citation omitted).  He can do so by renting "facilities adapted or suitably located for detention" and by entering agreements with States and localities.  8 U.S.C. §§ 1103(a)(11)(B), 1231(g)(1).  He may also "acquire, build, remodel, repair, and operate facilities . . . necessary for detention," but must first "consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use."  *Id.* § 1231(g)(1)–(2).

Congress also granted the Secretary blanket "authority to make contracts" as "may be necessary and proper to carry out the Secretary's responsibilities."  6 U.S.C. § 112(b)(2); *see* 48 C.F.R. § 1.601(a) (federal procurement regulations allowing the Secretary "authority and responsibility to contract for authorized supplies and services" and allowing the Secretary to "delegate broad authority to manage the agency's contracting functions to heads of such contracting activities").  ICE officials, who are responsible for immigration detention, may also "enter into contracts of up to fifteen years' duration for detention or incarceration space or

facilities, including related services."[7]  48 C.F.R. § 3017.204-90.  It is therefore no surprise that Congress has repeatedly funded ICE's contracts for private detention.[8]

Unquestionably, under both field and conflict preemption, "the intent underlying the federal scheme" is to have DHS use its expertise and discretion to contract for private detention facilities as needed.  *Farina*, 625 F.3d at 121.  And that discretion is congressionally guided: the statutory regime strikes a "careful balance" by allowing various options to house detainees under "a full set of standards," including whether there are "existing prison[s], jail[s], detention center[s], or other comparable facilit[ies] suitable for such use."  *Arizona*, 567 U.S. at 400–01; *see, e.g.*, 8 U.S.C. § 1231(g)(1)–(2).

As the Third Circuit explained, "[w]hen Congress charges an agency with balancing competing objectives, it intends *the agency* to use its reasoned judgment to weigh the relevant considerations and determine how best to prioritize between these objectives."  *Farina*, 625 F.3d at 123 (emphasis added).  "Allowing state law to impose a different standard"—or, worse, eliminate congressionally prescribed balancing altogether—violates the Supremacy Clause.  *Id.*; *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 376–77 (2000) (finding preempted a state law that "impos[ed] a different, state system" that "undermines the Presi-

---

[7] Undergirding this pervasive framework governing detainee housing is another pervasive framework: the Executive Branch's uniform regulations governing federal agencies' procurement.  Congress established the Office of Federal Procurement Policy within the Office of Management and Budget to "promote economy, efficiency, and effectiveness in the procurement of property and services by the [E]xecutive [B]ranch."  41 U.S.C. § 1101(b).  Under this authority, the Executive Branch has promulgated more than 2000 pages of policies and procedures governing acquisition by all federal agencies, spanning everything from contractor qualifications to contract financing and contract provisions.  *See* 48 C.F.R. § 1.101; General Services Administration, Federal Acquisition Regulation, available here.

[8] *See, e.g.*, Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, 133 Stat. 2317, 2507 (2019) ("For necessary expenses of [ICE] for operations and support, . . . not less than $4,429,033,000 shall be for . . . detention . . . ."); *id.* § 215(a) ("None of the funds provided . . . may be used to continue any contract for the provision of detention services" if the contracted facilities received certain ratings on their recent performance evaluations).

dent's intended statutory authority"). That's especially true in this immigration context be-cause "interference with the federal removal process and the discretion entrusted to the Exec-utive Branch are key reasons" to find state laws preempted. *Lozano*, 724 F.3d at 317–18. Put simply, AB 5207 wrongly and "unilaterally" attempts to eliminate ICE's contracts for private detention facilities "with no regard for the federal scheme, federal enforcement priorities, or the discretion Congress vested in the [Secretary]." *Id.* at 318.

The en banc Ninth Circuit reached the same conclusion in striking down California's similar law. "[T]here can be little doubt," the court said, that such a state law is preempted. *Geo Grp.*, 50 F.4th at 762. "Congress sought to delegate to the DHS Secretary the responsi-bility to 'arrange for appropriate places of detention,'" but the state law "frustrates that con-gressional intent, creating a conflict between [its] requirement and the action which Congress and the Department of Homeland Security have taken to insure the appropriateness of facili-ties to house detainees." *Id.* (quoting 8 U.S.C. § 1231(g)(1) and *Leslie Miller*, 352 U.S. at 190). "Such interference with the discretion that federal law delegates to federal officials goes to the heart of obstacle preemption." *Id.*

"If every other state enacted similar legislation to" ban private detention facilities, "the immigration scheme would be turned on its head." *Lozano*, 724 F.3d at 318. *States* would be able to dictate how the *Federal Government* conducts its own sovereign task of housing immi-gration detainees. That is not the constitutional system we have, and it's certainly not the statutory regime Congress set up. AB 5207 is an "obstacle to the accomplishment and execu-tion of the full purposes and objectives of Congress." *Klotz*, 991 F.3d at 463.

## II.   AB 5207 would seriously impair immigration operations in the region and cause irreparable harm to the United States, its detainees, and the public.

Because the United States and its contractor will suffer immediate and irreparable harm if AB 5207 is applied to the Federal Government's contracts, the public interest favors an injunction. As courts have explained, irreparable harm necessarily results from enforce-ment of a preempted state law. *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491

U.S. 350, 366–67 (1989) (noting that irreparable injury may be established "by a showing that the challenged state statute is flagrantly and patently violative of" the Supremacy Clause); *United States v. Texas*, 557 F. Supp. 3d 810, 821 (W.D. Tex. 2021) ("Because the United States has established a likelihood that the [state law] violates the Supremacy Clause, irreparable harm is presumed."); *Nat'l Collegiate Athletic Ass'n v. Christie*, 926 F. Supp. 2d 551, 578 (D.N.J. 2013) (A "violation of the Supremacy Clause, alone, likely constitutes an irreparable harm."), *ruling on other grounds Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018).  And New Jersey has made clear that it plans to enforce AB 5207.  *See* CoreCivic Ltr., ECF No. 31. So the unconstitutionality of the state law alone suffices to establish harm.

But AB 5207's harm extends far beyond that legal injury.  As a result of the law, the United States and the public will suffer four principal harms: (1) the loss of a key detention location in Elizabeth, (2) the possible release of dangerous individuals, (3) costly out-of-state relocation and transportation of detainees with attendant consequences, and (4) possible obstruction of federal proceedings.  These injuries could significantly complicate and impair immigration operations in the region.

First, losing the privately owned-and-operated Elizabeth facility would severely disrupt law-enforcement operations in the area.  The Elizabeth facility is the only one that houses detainees within 60 miles of New York City, making its proximity to Newark and JFK airports crucial to effect removals from field offices nationwide.  Guadian Decl. ¶¶ 8–9.  Many ICE removals require a direct flight out of the United States and, for many countries, direct flights are only available from a handful of airports, including Newark and JFK.  *Id.* ¶ 9. Currently, noncitizens from around the country are housed overnight in the Elizabeth facility, whose ICE personnel places them on the foreign-bound flights and verifies departure.  *Id.* ¶ 10.  But without the Elizabeth facility, ICE officers from other areas would need to travel significant distances to and from Newark or JFK, escorting noncitizens themselves.  *Id.*  In other words, ICE would be using its "officers to transport detainees for at least a full day, rather than having them conduct their law-enforcement mission."  *Id.*

Losing the Elizabeth facility would also hinder counterterrorism and other law-enforcement operations. The Joint Terrorism Task Force operating out of the FBI's New York and Newark offices conduct counter-terrorism investigations, and they work with Customs and Border Protection (CBP) to stop and detain individuals attempting to enter the United States who are watch-listed by the Terrorist Screening Center. *Id.* ¶ 14. Many times, those individuals are placed into immigration proceedings and detained by ICE at the Elizabeth facility, which allows FBI counterterrorism agents to interview those detainees and quickly speak with them in exigent circumstances. *Id.* Likewise, CBP operates at international airports in the area and apprehends noncitizens who are denied entry, known as turnaround cases. *Id.* ¶ 15. But the Elizabeth facility is the only facility in New York and New Jersey that houses such turnaround detainees. *Id.* And in the last 18 months, ICE took custody of more than 660 turnaround detainees for removal, with around another 350 cases detained for further review. *Id.* ¶ 15. Without a nearby facility, turnaround cases would either remain in the airport for days waiting for their return flight, or be released into the United States with little hope that they would actually depart as required by law. *Id.* ¶ 15.

Second, forcing ICE to close the Elizabeth facility would likely prevent ICE from detaining noncitizens with violent criminal histories that are released from state and local facilities. Since AB 5207 was enacted and local governments no longer provide detention services, some ICE officers must now transport noncitizens released by prisons and jails throughout the State. *Id.* ¶ 19. But if there were no detention facilities in New Jersey, it would likely be impractical to immediately transport noncitizens with violent criminal histories to other facilities—especially to the key facility four hours away in Pennsylvania—upon their release. *Id.* ¶ 20. When prisons and jails in New Jersey tell ICE that they are releasing individuals subject to an immigration detainer, those facilities only detain them for a few hours before releasing them into the public. *Id.* ¶¶ 19–20. ICE needs to arrange for an immediate pickup, and without a local facility, "the logistics of bedspace location, security classification determinations (e.g., housing determinations based on prior violent offenses or gang affiliation), medical

21

housing needs, and transportation arrangements to an out-of-state facility are often too complicated to be accomplished on the same day without potentially compromising the safety of noncitizens and ICE officers." *Id.* ¶ 20. This both harms the Federal Government's immigration operations and increases the danger to the public. *Id.*

Third, current and future detainees in the Elizabeth facility would have to be relocated at great cost to the Federal Government. ICE has no access to housing capacity in New Jersey prisons, so all current detainees would need to be relocated outside New Jersey to neighboring States. *Id.* ¶¶ 21–22. Such relocation would also injure the public by isolating detainees from their families, who are usually located in New Jersey and may lack resources to visit them. *Id.* ¶¶ 25–27. Indeed, given AB 5207's forced termination of other local relationships with ICE, the agency already faced one putative class-action lawsuit, alleging (among other things) that ICE was unlawfully transferring detainees out of New Jersey facilities and thus hindering detainees' access to counsel and families. *Id.* ¶ 27 (noting that the lawsuit was eventually dismissed). And ICE continues to receive informal complaints relating to its out-of-state transfers, including concerns about limited attorney-client access, visiting limitations for family and friends, and the possible impact on ongoing criminal and family court proceedings if an out-of-state facility has limited technology for virtual appearances. *Id.* ¶ 27. Relocation could also cause overcrowding in out-of-state facilities now needed to house New Jersey detainees, most prominently the Moshannon Valley Processing Center in Philipsburg, Pennsylvania, which is four hours away. *Id.* ¶ 25. That overcrowding, in turn, would place an even greater strain on ICE operations and increase the danger to federal contractors' personnel. *Id.*

Relatedly, AB 5207's forced closure of the Elizabeth facility would require frequent and costly transport of detainees. Without that facility, ICE would likely need to schedule and complete out-of-state transfers daily. *Id.* ¶ 22. Not only would that have a huge financial impact on ICE, but it would also likely require reassigning more ICE officers from their normal law-enforcement mission to handle long-distance transportation. *Id.* ¶¶ 23–25. The drastic increase in ICE transportation would also heighten security concerns for detainees, federal

personnel, and the public. Frequent transportation of detainees increases the amount of time these individuals are outside the heightened security of a detention facility. *Id.* ¶ 24. And because this frequent transportation may be regularly scheduled, individuals could gain additional opportunities to gather intelligence on ICE operations, thus increasing the chances of an adversarial encounter during transport. *Id.* Detainees with medical or mobility concerns may be further adversely affected by frequent travel. *Id.*

Finally, federal proceedings may be delayed and impaired by AB 5207 because out-of-state detention by ICE—and detainees' concomitant lack of access to their families—may slow immigration proceedings. *Id.* ¶ 26. Generally, a noncitizen uses his or her family members to gather information needed in a removal proceeding. *Id.* And because AB 5207 would force noncitizens to be housed outside New Jersey (likely at great distances from their families), detainees' ability to collect evidence in a timely fashion could be affected. *Id.* And when evidence is not collected in a timely fashion, immigration bond hearings and removal proceedings may be delayed. *Id.*

"Overall, the lack of a detention facility in Elizabeth, New Jersey would impact nationwide ICE operations, FBI operations, and CBP operations." *Id.* ¶ 29. "The lack of detention resources in New Jersey has already had a severe impact on national-security, public-safety and border-security operations in a critical area of the nation." *Id.* "[I]f the Elizabeth facility is forced to close due to AB 5207, those severe impacts will become catastrophic." *Id.*

Importantly, these effects would be felt immediately. CoreCivic's contract to run the Elizabeth facility expires on August 31, 2023. Burke Decl. ¶ 16. If ICE cannot extend that contract, it must take immediate action to begin transferring detainees and making plans for the loss of a "mission critical" location—with all the imminently harmful impacts detailed above. Burke Decl ¶ 27; Guadian Decl. ¶ 8. Although ICE may choose to begin a competitive solicitation for new private contracts in other States to replace the lost capacity in New Jersey, that typically takes six to 12 months for ICE to award a contract, plus at least three months

23

after the contract award to hire and train staff to operate the facility. Burke Decl. ¶ 25. Building its own facilities is also not a realistic option for ICE. If new construction is required, it could take nearly three years before ICE is able to gain access to detention space at the new facilities. *Id.* ¶¶ 22–23. Besides, "ICE does not have the types of employees required to operate a detention facility," so it would need to "classify, hire, and train several hundred detention officers, cooks, maintenance and sanitation workers, transportation officers, and others to safely operate a detention facility." *Id.* ¶ 23.

These serious harms do not even contemplate that, if AB 5207 is allowed to impede federal operations, other States could be emboldened to impose similar restraints. *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 373 (2008) (noting that allowing a State to set a requirement that conflicts with federal law "would allow other States to do the same"). At best, this could create a problematic "patchwork" system of laws. *Id.* At worst, "there may be a near-catastrophic impact on ICE's ability to meet its mission." Burke Decl. ¶ 26. Either way, allowing other States to follow New Jersey's lead would severely undermine both the United States' ability to provide for those in its custody and the "'integrated scheme of regulation' created by Congress," wresting control of immigration from "one national sovereign" and giving it to "the 50 separate States." *Arizona*, 567 U.S. at 395, 402 (quoting *Wis. Dep't of Indus., Lab. & Hum. Relations v. Gould, Inc.*, 475 U.S. 282, 289 (1986)).

## III. New Jersey has no countervailing interest in maintaining an unconstitutional law.

In contrast to the harm suffered by the United States, its contractors, and the public, New Jersey has no legitimate interest in thwarting the Federal Government's contracts. So New Jersey "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *Cigar Ass'n of Am. v. City of Philadelphia*, 2020 WL 6703583 (E.D. Pa. Nov. 13, 2020) (same), *aff'd* 2021 WL 5505406 (3d Cir. Nov. 24, 2021). In any event, New Jersey would not be harmed by an injunction.

For starters, New Jersey is free to implement AB 5207 for itself and its localities. *See* N.J. Stat. § 30:4-8.16 (mandating that "the State," a "local government agency," or "a private

detention facility operating in this State shall not enter into, renew, or extend any immigration detention agreement").  So New Jersey may prohibit immigration detention for those in its own custody, but it has no lawful interest in imposing that choice on the United States.

And the Federal Government's continued contracts for immigration detention facilities should be no problem for New Jersey.  The United States has been housing immigration detainees in the State since at least 1986.  Burke Decl. ¶ 12.  And, as noted above, CoreCivic has been operating the Elizabeth facility since 2005, which means New Jersey has lived with that arrangement for the 16 years before, and the two years after, it enacted AB 5207.  *Id.* ¶ 16.  Nor does the State seem to have a problem with immigration detention or private detention more generally.  If ICE wanted to build and run its own immigration-detention facility—an unavailable option for the reasons discussed above—AB 5207 poses no obstacle.  *See* N.J. Stat. § 30:4-8.16.  New Jersey therefore cannot claim any harm from housing immigration detainees in its borders.  And state law allows New Jersey to house its own detainees in private detention facilities.  *See, e.g.*, N.J. Stat. § 30:4-91.10.  So New Jersey cannot claim any harm specific to private detention facilities either.  In short, any interest the State could muster cannot outweigh the imminent and irreparable harm to the United States and the public from enforcing an unconstitutional state statute.

## IV.   The Court should enter a permanent injunction because there are no material facts in dispute.

Because the purely legal issues in CoreCivic's motion are dispositive, the Court could proceed directly to final judgment.  Under either Rule 56 or Rule 65, the Court can simply apply the Supremacy Clause to the undisputed facts and enter a permanent injunction in favor CoreCivic.  *See Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 280 (3d Cir. 2010) ("District courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence."); *Nat'l Collegiate Athletic Ass'n v. Christie*, 61 F. Supp. 3d 488, 496 (D.N.J. 2014) (explaining that "Rule 65(a)(2) provides a district court with the discretion to 'advance the trial

on the merits and consolidate it with the [preliminary-injunction] hearing'" and a "district court may also convert a decision on a preliminary injunction application into a final disposition on the merits by granting summary judgment as long as sufficient notice is provided"), *ruling on other grounds Murphy*, 138 S. Ct. at 461.  So CoreCivic's motion should end this case.

## CONCLUSION

For the reasons explained above, AB 5207 violates the Supremacy Clause, and the Court should enjoin its enforcement.

DATED:  July 19, 2023                    Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        Principal Deputy Assistant Attorney General

                                        PHILIP R. SELLINGER
                                        United States Attorney

                                        BRIAN D. NETTER
                                        Deputy Assistant Attorney General

                                        ALEXANDER K. HAAS
                                        Director, Federal Programs Branch

                                        JACQUELINE COLEMAN SNEAD
                                        Assistant Director, Federal Programs Branch

                                        */s/ Stephen Ehrlich*
                                        STEPHEN EHRLICH
                                        Attorney
                                        U.S. Department of Justice
                                        Civil Division, Federal Programs Branch
                                        Peter W. Rodino, Jr. Federal Building
                                        970 Broad Street, 7th Floor
                                        Newark, NJ 07102
                                        Phone: (202) 305-9803
                                        Email: stephen.ehrlich@usdoj.gov

                                        *Attorneys for the United States of America*