UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CORECIVIC, INC.,<br><br>   Plaintiff,<br><br>  v.<br><br>PHILIP D. MURPHY, in his official capacity as Governor of New Jersey, *et al.*,<br><br>   Defendants. | Case No. 3:23-CV-00967-RK-TJB |

**DECLARATION OF MONICA S. BURKE**

I, Monica S. Burke, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

**I. Personal Background**

1. I am the Acting Assistant Director with the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations, Custody Management Division. I have served in this capacity since August 2, 2021.

2. The Custody Management Division in Enforcement and Removal Operations provides policy and oversight for the administrative custody of ICE's highly transient and diverse population of immigration detainees. The Custody Management Division is composed of two divisions led by two Deputy Assistant Directors under my direct supervision: (1) the Oversight, Compliance and Acquisitions Division; and (2) the Custody Programs Division. As Assistant Director for the Custody Management Division, I am responsible for the effective and proficient performance of these two Divisions and their various units, including the oversight of compliance with ICE's detention standards and conditions of confinement at ICE detention facilities generally.

3. Since 2011, I have worked in other positions within ICE. From March 2020 to August 2021, I served as the Deputy Assistant Director for Custody Programs within the Custody Management Division. From 2011 to March 2020, I held various positions with the ICE's Office of the Principal Legal Advisor, including Deputy Chief of the Enforcement and Removal Operations' Law Division.

4. Due to my experience and the nature of my official duties, I am familiar with the contracting processes and detention space needs of ICE throughout the United States, including in New Jersey. This declaration is based upon my personal knowledge and information provided to me in the course of my official duties.

II. **ICE's Detention Practices and Facilities Nationwide**

5. ICE is charged with enforcement of more than 400 federal statutes, and its mission is to protect the United States from the cross-border crime and illegal immigration that threaten national security and public safety through enforcement of the federal laws governing border control, customs, trade, and immigration. To carry out this mission, ICE focuses on enforcing federal immigration laws, preventing terrorism, and combating transnational criminal threats.

6. As an operational program of ICE, Enforcement and Removal Operations is responsible for the planning, management, and direction of broad programs relating to the identification, apprehension, supervision, detention, and removal of noncitizens from the United States under U.S. immigration laws. Enforcement and Removal Operations is responsible for detaining noncitizens during the pendency of their immigration proceedings to determine whether they will be removed from the United States, and detaining noncitizens subject to an administratively final removal order, pending their removal from the United States.

7. The length of a noncitizen's detention depends on a number of factors, including whether the noncitizen is subject to mandatory detention under the U.S. immigration laws, the duration of any removal proceedings before the Department of Justice's Executive Office for Immigration Review, appeals before the federal courts of appeals, and issues

regarding execution of a final removal order. ICE also transfers noncitizens in its custody for a number of legal and operational purposes, including to ensure attendance at immigration court hearings, to facilitate removal, and to provide appropriate medical care. In Fiscal Year 2022, ICE housed an average daily population of 22,709 noncitizens nationwide. To date in Fiscal Year 2023, ICE has housed an average daily population of 27,072.

8. ICE neither constructs nor solely operates its own immigration detention facilities. Due to significant fluctuations in the number and location of removable noncitizens apprehended by DHS and subject to detention, it is important for ICE to maintain flexibility regarding its immigration detention facilities. Otherwise, ICE could invest heavily in its own facilities only to have them stand idle if a particular area later experiences a drastic decrease in demand for detainee housing. ICE coordinates the acquisition of detention bed space for removable noncitizens primarily through: (1) Service Processing Centers; (2) Contract Detention Facilities; (3) Intergovernmental Service Agreement facilities; and (4) riders on U.S. Marshals Service (USMS) or Federal Bureau of Prisons (BOP) contracts (collectively, "immigration detention facilities").

9. Service Processing Centers are owned by ICE and staffed by a combination of federal employees (who mainly provide medical care) and contract employees (who provide detention services). Contract Detention Facilities are owned by private companies that contract directly with the government and are predominantly staffed by contract employees. Intergovernmental Service Agreements are contracts between ICE and other governmental entities, like counties or cities. Intergovernmental Service Agreement facilities can be either publicly or privately owned and are operated by either local governments themselves or private companies operating under contracts with local governments. Some of these facilities are non-dedicated facilities that house both ICE detainees and a population of non-ICE detainees (like USMS detainees or County inmates), while others are dedicated exclusively to housing ICE detainees. Other facilities used by ICE under various contractual arrangements include: facilities used by ICE under a contract awarded by USMS, facilities operated by BOP,

staging facilities for transportation, holding facilities for temporary detention, and hospitals for emergency care, among other types of facilities. ICE does not have any federally owned and operated detention facilities.

10. Ordinarily, when ICE needs private contractors and privately owned detention facilities to assist in its detention of removable noncitizens, the agency begins by identifying a requirement (i.e., an approximate amount of detention space in a certain geographic area) and creates a written performance work statement that describes in detail the detention services ICE wants to acquire. ICE then creates a solicitation package that is publicly posted, inviting interested vendors to submit offers. ICE then evaluates the offers against the evaluation criteria included in the solicitation package. Based on the final evaluation, ICE awards the contract to the offeror that represents the best value to the government. It typically takes 6 to 12 months from the beginning of preparation for ICE to award a contract, but this time can be longer or shorter depending on the circumstances.

11. Sometimes, ICE may issue a request for information (RFI) to identify interested parties that may meet ICE's needs. The agency may do so if it knows of very few, if any, facilities that may meet its requirements in the area, or it is seeking unique services. Once it receives responses to an RFI, the program office, in conjunction with ICE's Office of Acquisition Management, will assess the capabilities of respondents and use this information to determine the best strategy for acquiring the needed assets.

### III. ICE's Detention Facilities in New Jersey and AB 5207's Impact

12. The federal government has been housing immigration detainees in New Jersey since at least 1986.

13. I am aware that, in August 2021, the State of New Jersey enacted New Jersey Assembly Bill No. 5207 (AB 5207), N.J. Stat. §§ 30:4-8.15, 8.16, which to prohibits agreements between the federal government and state, local, and private entities for civil immigration detention. This law impairs ICE's ability to strategically plan at a national level for the contracts required to ensure there is sufficient capacity in New Jersey to enforce our nation's

immigration laws. Additionally, AB 5207 prevents ICE from quickly adjusting bed-space requirements based on the actual need at any given time, costing ICE much needed flexibility in its operations. Overall, AB 5207 frustrates and impedes the enforcement of federal immigration law and will result in significant fiscal and public safety costs.

14.   Immediately before AB 5207 was enacted, ICE had use of four contracts to house detainees in New Jersey: two intergovernmental-service agreements with Essex County and Hudson County, the use of the U.S. Marshals' agreement with Bergen County, and the privately owned-and-operated Elizabeth Contract Detention Facility run by CoreCivic.

15.   Following AB 5207, Essex had an average daily population of 616 ICE detainees in Fiscal Year 2020 but stopped housing ICE detainees on August 23, 2021. Hudson County had an average daily population of 561 ICE detainees in Fiscal Year 2020 but terminated its contract on November 1, 2021. Bergen County had an average daily population of 121 ICE detainees in Fiscal Year 2020 but stopped housing ICE detainees on November 15, 2021.

16.   The only detention facility currently available to ICE in New Jersey is the Elizabeth facility. CoreCivic was awarded the contract in July 2005 by a component of the Department of Justice, with beds allocated to ICE. In November 2009, DOJ transferred to contract to ICE. The current contract expires on August 31, 2023. To date in Fiscal Year 2023, the facility has housed an average daily population of 156, but it has the capacity to hold 304 detainees.

17.   Originally, the Elizabeth facility was equipped to house only low-risk noncitizens, such as those who have recently crossed the border and those with minor criminal offenses. More serious criminal offenders were previously detained at the local government facilities. But, as noted above, those agreements were terminated after AB 5207 was enacted.

18.   In order to facilitate the detention of more dangerous individuals, the Elizabeth facility contract was modified in August 2021. The facility can now detain higher-risk individuals (those classified as Medium-High- and High-risk) for up to 72 hours. After 72 hours,

the detainees, pending removal proceedings or removal from the United States, are transported outside New Jersey to available bedspace. Due to the lack of bed space to detain Medium-High- and High-risk individuals in New Jersey beyond 72 hours, between October 1, 2020, and April 15, 2023, 766 noncitizens have been transferred from New Jersey to other facilities such as the Moshannon Valley Processing Center in central Pennsylvania or the Batavia Service Processing Center in western New York.

19. If the Elizabeth facility is forced to close, ICE will no longer have any facilities in New Jersey to house civil immigration detainees.

20. AB 5207's impact on immigration detention facilities in New Jersey has adversely affected ICE operations and currently forces ICE to relocate large numbers of high-risk and medium-risk noncitizen detainees to detention facilities outside of New Jersey. If ICE continues to be foreclosed from partnering with counties in New Jersey and is also not allowed to contract with private companies for detention services, all noncitizens arrested in the State will have to be transferred to detention facilities in other States. Any potential increase of noncitizen transfers from New Jersey to other States strains transportation resources as well as negatively affects detention in out-of-state facilities. In addition, ICE's inability to house detainees in New Jersey poses a risk to the community in the event detention beds cannot be found within the detention network and noncitizens must be released.

21. Although AB 5207 does not foreclose the federal operation of immigration detention facilities in New Jersey, this alternative is not a practical or legal possibility. ICE faces statutory requirements regarding the order in which it must consider detention options. *See* 8 U.S.C. § 1231(g)(2) ("Prior to initiating any project for the construction of any new detention facility," ICE must "consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use."). Contracts are awarded for a specific number of detention beds because the population of detained removable noncitizens in the United States fluctuates every day.

22. If ICE is unable to contract for detention space with private or local detention

facilities in New Jersey, the only option to obtain detention space in the State would be to purchase or construct its own detention facilities. Constructing and opening a new facility would be more expensive and time-consuming than entering into a contract with a private company or public entity for an existing facility. Requiring ICE to construct and operate its own facilities would also mean that, should detention needs decrease, which is highly likely, ICE would be utilizing taxpayer dollars pay for an idle facility in addition to having hired hundreds of staff. The potential result is that facilities would be constructed and employees hired at taxpayer expense to accommodate a projected demand that may never materialize due to the ebb and flow of migration or other circumstances. Those facilities could then become idle and remain vacant for an extended period. And, if the demand for detention beds later increases, ICE would likely need to invest significant taxpayer dollars to prepare these facilities for use in addition to hiring staff to operate the facility. By contracting for detention beds in either privately or publicly operated facilities, ICE is able to develop contracts that permit efficient management of the detention population. AB 5207 precludes ICE's ability to efficiently and effectively manage detainees, including high-risk detainees and detainees that are a safety threat.

23. Regardless, ICE cannot purchase or construct its own facility before CoreCivic's contract expires on August 31, 2023. If new construction is required, it could take a minimum of three years before ICE is able to gain access to the beds at any new detention facilities. And even if ICE could theoretically purchase an existing facility, it lacks purchasing authority. The General Services Administration is responsible for the Federal Government's real estate portfolio. Purchasing a facility would be a protracted process likely requiring the construction of a new facility—*i.e.*, at least three years. Staffing such a facility with ICE personnel is likewise complicated. Currently ICE does not have the types of employees required to operate a detention facility. To staff such a facility, ICE would need to classify, hire, and train several hundred detention officers, cooks, maintenance and sanitation workers, transportation officers, and others to safely operate a detention facility.

24. Accordingly, a responsible and efficient administration of public resources and funds require awarding contracts based on bed space needs because, when the demand for immigration detention space is reduced, or when other unforeseen factors require ICE to adjust its detention operations in a particular area, ICE can terminate a contract or reduce its use of beds afforded by contractors.

25. If AB 5207 is permitted to remain in place, ICE would also likely need to begin a competitive solicitation process for new private contracts in other States to replace the lost capacity in New Jersey. But any new facilities in neighboring States wouldn't be available for some time. As noted above, it typically takes 6 to 12 months from the beginning of preparation for ICE to award a contract. The new vendor would also require at least three months after the contract award to hire and train staff to operate the facility. Again, if new construction is required as part of the solicitation, it could take a minimum of three years before ICE is able to gain access to the beds at the new detention facilities.

26. If other States passed laws like AB 5207, there may be a near-catastrophic impact on ICE'S ability to meet its mission. As more States limit or prohibit the federal government's ability to house noncitizens, ICE will be unable to detain some (or perhaps many) noncitizens who are public safety or national security risks. A drastic decrease in ICE's ability to contract for detention facilities would also result in massively increased costs in terms of both transportation needs and the hiring of more officers to ensure that noncitizens are safely transported to distant facilities. If all or many States had laws like AB 5207, ICE would also likely be forced to build and run its own facilities, which would cause all the legal and practical problems explained above.

## IV.  New Contract for the Elizabeth Facility

27. For the reasons explained above and in the accompanying declaration of Robert Guadian, the Elizabeth facility is a mission critical location for ICE. As such, ICE fully intends to extend CoreCivic's contract before its current contract expires on August 31, 2023. And the agency is currently on track to do so.

28.     ICE issued an RFI on May 30, 2023 to determine the capabilities of detention facilities that could be suitable for the Newark Field Office's use. The RFI requested specific information, including facility location, facility capacity, medical services, and transportation capability. Responses were also required to describe their ability to meet specific detention-related standards. ICE received four responses to its RFI, including a response from the incumbent contractor CoreCivic, who owns and operates the Elizabeth facility. Of the four responses, only CoreCivic is capable of meeting ICE's requirements.

29.     ICE therefore intends to modify and extend CoreCivic's existing contract for an additional 12 months to continue critical detention services after the current expiration of CoreCivic's current contract. In order to properly execute this contract extension, ICE is required to complete several steps, some of which have already been completed.

30.     First, ICE completed an evaluation of the marketplace following the May 30 RFI. Based on the results of market research, ICE determined that only CoreCivic can meet ICE's needs by the required start date of September 1, 2023. On July 12, 2023, the Office of Acquisition Management issued a public notice (on Sam.gov) of ICE's intent to modify and extend CoreCivic's contract. The agency is now finalizing a justification to forego the normal bidding process for detention services. Following an evaluation of CoreCivic's proposed price for the 12-month extension and required congressional notification, the contract modification will be fully executed.

Executed on this 19th day of July 2023.

_____
Monica S. Burke
Acting Assistant Director
Custody Management Division
Enforcement and Removal Operations (ERO)
U.S. Immigration and Customs Enforcement (ICE)
U.S. Department of Homeland Security (DHS)