UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CORECIVIC, INC.,<br><br>   Plaintiff,<br><br>v.<br><br>PHILIP D. MURPHY, in his official capacity as Governor of New Jersey, *et al.*,<br><br>   Defendants. | Case No. 3:23-CV-00967-RK-TJB |

**DECLARATION OF ROBERT GUADIAN**

I, Robert Guadian, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

**I.      Personal Background**

1. I am the Deputy Assistant Director for Field Operations, within the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations. I have served in this capacity since August 2020.

2. ICE's enforcement and removal efforts are conducted by its 25 national field offices. At Headquarters, the Field Operations Division provides guidance to and coordination among those offices. In my current position as Deputy Assistant Director for Field Operations, I oversee, direct, and coordinate all enforcement and removal field operations throughout the Nation's field offices to enhance national security and public safety while ensuring such activities further the policies of DHS and ICE. As an operational program of ICE, Enforcement and Removal Operations is responsible for the planning, management, and direction of broad programs relating to identification, apprehension, detention, and

removal of noncitizens who are removable from the United States under the immigration laws.  Its mission is to protect the homeland through the arrest and removal of noncitizens who undermine the safety of our communities and the integrity of our immigration laws.

3. Since 1997, I have worked in various other positions within ICE and the former Immigration and Naturalization Service.  Prior to my current position, I held several positions with ICE Enforcement and Removal Operations, including the Field Office Director for the Chicago Field Office, Deputy Field Office Director for the Dallas Field Office, and Assistant Field Office Director for the San Antonio Field Office.

4. Due to my experience and the nature of my official duties, I am familiar with ICE operations throughout the United States, including in New Jersey.  This declaration is based upon my personal knowledge and information provided to me in the course of my official duties.

## II. AB 5207's Impact on ICE Operations

5. ICE is charged with enforcement of more than 400 federal statutes, and its mission is to protect the United States from the border-related crime and illegal immigration that threaten national security and public safety.  ICE is charged with removing noncitizens who lack lawful immigration status or are otherwise removable from the United States under the immigration laws.  The agency has statutory authority to detain noncitizens in pursuit of its mission pending their removal proceedings and/or removal from the United States.

6. Detention is an important and necessary part of immigration enforcement.  While ICE has discretion to release certain noncitizens pending their removal proceedings if they are not flight risks and do not pose a public-security threat, ICE is required to detain categories of noncitizens who are subject to mandatory detention under the immigration laws or those who pose risk to public safety.

7. I am aware that, in August 2021, the State of New Jersey enacted New Jersey Assembly Bill No. 5207 (AB 5207), N.J. Stat. §§ 30:4-8.15, 8.16, which prohibits agreements between the federal government and state, local, and private entities for civil immigration

detention. AB 5207's forced closure of the Elizabeth Contract Detention facility would cripple law-enforcement operations in New Jersey and the surrounding region.

### A.   Loss of a Key Detention Location in Elizabeth, New Jersey

8. The Elizabeth facility is a mission critical location for DHS and ICE operations nationwide. It is the only facility that houses ICE detainees within 60 miles of New York City, with 2,142 immigration detainees book-ins during Fiscal Year 2022, and 2,035 book-ins for Fiscal Year 2023 (as of July 15, 2023). The next closest facility to New York City is Orange County Jail in Orange County, New York, which only has 90 available beds.

9. The Elizabeth facility's proximity to Newark Liberty International Airport and JFK International Airport is also crucial to effect removals from field offices nationwide. Many ICE removals require a direct flight from the United States. For a number of countries, direct flights are only available from a handful of airports, one being Newark, which has direct flights from the United States to destinations worldwide. ICE field offices depend on ICE's assistance from the Newark Field Office to place their noncitizens on these flights, most of which require that noncitizens are housed overnight in the Elizabeth facility, which is close to the airport.

10. Currently, ICE in Newark takes custody of the noncitizen from other ICE field offices and places them on the foreign-bound flights and verifies departure. But without the Elizabeth facility, other ICE field offices would require more funding for overtime and travel costs to send ICE officers to Newark to escort the noncitizens to the outbound flight, verify departure, and return to their field office. In other words, the ICE field offices would be using their officers to transport detainees for at least a full day, rather than having them conduct their law-enforcement mission.

11. Importantly, any flight delays may result in the officers having custody of the noncitizens at Newark airport for prolonged periods without an option to house the noncitizen for the next flight. Likewise, if a foreign-bound flight is missed and there is no local ICE

facility in New Jersey, these officers may have to stay overnight and return to their field office with the noncitizens the next day, further increasing costs and public-safety risks.

12.     As an example, the ICE office in Philadelphia transports noncitizens to the Elizabeth facility on regularly scheduled runs one or two days before their scheduled removal for the ICE office in Newark to complete the removal from Newark airport.  The ICE office in Philadelphia mainly holds detainees in the Moshannon Valley Processing Center, in Philipsburg, Pennsylvania, which is approximately 250 miles, or a four-hour drive, from Newark airport and about a five-hour drive to JFK airport.  Without the Elizabeth facility, ICE staff in Philadelphia would need to depart the Moshannon Valley Processing Center at least seven hours before the departure time to account for early arrival, traffic, and other factors.  Then the officer would need to wait for the flight to depart and return the four hours to the Moshannon Valley Processing Center.  On average, this would be an 11–12 hour day for the officers.  And flight delays, poor weather, traffic, and other unforeseen occurrences would frequently expand the time required.  Removals to JFK would be even more problematic due to the extra hour or more of travel.  If flights are cancelled, officers may be required to return to the Moshannon Valley Processing Center with a noncitizen after already working long hours, possibly in adverse winter weather that frequently affects Moshannon Valley.

13.     Ground transport is the only feasible option to Newark or JFK because there are logistical difficulties in relying on air transport.  For example, the Philadelphia airport has significantly fewer international flights and, when flights are available, these flights typically cost substantially more than flights departing from Newark or JFK.  Further, connecting flights from Philadelphia to either Newark or New York are extremely limited and are quickly sold well in advance of the time that ICE typically can secure commercial flights.  And in any event, for example, Moshannon is three hours from Philadelphia and four hours from Newark, making it labor and cost prohibitive to drive detainees to Philadelphia and then fly to Newark airport or JFK airport.

14. The Elizabeth facility is also critical for other law-enforcement operations. The Newark and New York FBI Joint Terrorism Task Force often detain individuals—as civil immigration detainees as opposed to filing criminal charges—who are watch-listed by the Terrorist Screening Center. Many times, those individuals are placed into immigration proceedings and detained by ICE at the Elizabeth facility. Having a local facility in New Jersey allows Newark and New York JTTF agents to utilize the Elizabeth facility to interview detainees in exigent circumstances.

15. The Elizabeth facility is also the primary facility supporting U.S. Customs and Border Protection (CBP) operations in the region. CBP operates at international airports in the area and apprehends noncitizens who are denied entry, known as turnaround cases. The Elizabeth facility is the only facility in New York and New Jersey that houses such turnaround detainees. Without that facility, turnaround cases would either remain in the airport for days in CBP holding rooms, waiting for their return flight, or be released into the United States with little hope that they would actually depart as required by law. Release is especially likely if bedspace is not immediately identified, the logistics of transferring the noncitizen to a specific location cannot be arranged quickly, or there are special circumstances (such as the need for a facility that provides support for medical issues). The risk of releasing inadmissible noncitizens arrested by CBP poses a national security concern, as many such noncitizens attempt entry into the United States with fraudulent documents or no identifying information. In Fiscal Year 2022, ICE in Newark housed 362 detainees awaiting their removal and 197 cases requiring some sort of removal proceedings at the Elizabeth facility. As of July 13, 2023, for Fiscal Year 2023, ICE in Newark has housed 301 detainees ready for removal and 183 detainees in removal proceedings at the Elizabeth facility.

    B.    **Possible Release of Dangerous Individuals**

16. Originally, the Elizabeth facility was equipped to house only low-risk noncitizens, such as those who have recently crossed the border and those with minor criminal

offenses. More serious noncitizen criminal offenders were previously detained at facilities for which intergovernmental-service agreements were terminated in 2021.

17. To continue to detain serious noncitizen criminal offenders in the region, in August 2021, the CoreCivic contract was modified to house noncitizens with Medium, Medium-High, and High custody classifications for up to 72 hours. The contract was also modified to provide dedicated dorms or Special Housing Units for noncitizens with these custody classifications. After 72 hours—or less than 72 hours in the case of High-risk detainees—these noncitizens are transported to out-of-state facilities better suited to hold them, pending removal proceedings or removal from the United States.

18. Due to the cancellation of previous intergovernmental-service agreements, ICE has only been able to detain criminal noncitizens (for up to 72 hours) in the Elizabeth facility.

19. When state and local prisons or jails in New Jersey tell ICE that they are releasing individuals subject to an immigration detainer, those facilities only detain individuals for a few hours before releasing them into the public. ICE therefore needs to arrange for an immediate pickup from prisons or jails around the State and, in many cases, transport them to the Elizabeth facility for detention. Previously, these pickups were done by county corrections officers via intergovernmental-service agreements in New Jersey, but those agreements were terminated in 2021.

20. But without the Elizabeth facility, it may not be possible to pick up and immediately transport noncitizens to other out-of-state facilities, including those with violent criminal histories that would be subject to mandatory detention. That's because the logistics of bedspace location, security classification determinations (e.g., housing determinations based on prior violent offenses or gang affiliation), medical housing needs, and transportation arrangements to an out-of-state facility are often too complicated to be accomplished on the same day without potentially compromising the safety of noncitizens and ICE officers. The

significantly higher likelihood of releasing dangerous individuals not only harms ICE's immigration operations, but also increases the danger to the public.

### C. Relocation of Detainees and Attendant Consequences

21. If AB 5207 forced the closure of the Elizabeth facility, detainees in the Elizabeth facility would have to be relocated at great cost to the government. ICE has no access to housing capacity in New Jersey prisons or jails, so all current detainees would need to be relocated outside New Jersey to neighboring States.

22. The same is true for any future noncitizens apprehended in New Jersey. Without the Elizabeth facility, ICE would likely need to schedule and complete out-of-state transfers daily. This would come at great cost to ICE, both financially and in terms of broader ICE operations.

23. ICE does not currently have ground-transportation contracts sufficient to complete daily out-of-state transfers. So ICE would need to divert its law-enforcement personnel to transport noncitizens outside of New Jersey. This critically affects ICE's daily enforcement operations because ICE personnel will be used for transport duties, rather than arrest, detention, and removal functions. Due to ICE's finite staff and resources, diverting ICE personnel to conduct noncitizen transfers ultimately results in fewer arrests of criminal noncitizens and therefore increases the risk to public safety. Transportation of such noncitizens long distance to out-of-state facilities will further strain ICE resources.

24. The drastic increase in ICE transportation would also heighten security concerns for detainees, federal personnel, and the public. Frequent transportation of detainees increases the amount of time these individuals are outside the heightened security of a detention facility. And because this frequent transportation may be regularly scheduled, individuals could gain additional opportunities to gather intelligence on ICE operations, thus increasing the chances of an adversarial encounter during transport. Detainees with medical or mobility concerns may be further adversely affected by frequent transport.

25. Frequent transport would also cause other harm to ICE, its detainees, and the public. ICE facilities in neighboring States—most prominently the Moshannon Valley Processing Center—could become overcrowded due to the influx of detainees from New Jersey. That overcrowding, in turn, would place an even greater strain on ICE operations and increase the danger to federal contractors' personnel who would be supervising increased population with a higher detainee-to-officer ratio. Fewer personnel may also result in increased workhours, increasing fatigue and personnel turnover in detention facilities and eroding a dedicated and experienced workforce. The relocation outside New Jersey may also reduce the ability of detainees with families in New Jersey to access their families and other visitors.

26. This out-of-state relocation and lack of family access for detainees with families in New Jersey would also slow immigration proceedings. Generally, a noncitizen uses their family members to gather information needed in a removal proceeding. Because AB 5207 would force noncitizens to be housed outside New Jersey—and possibly at great distances from their families—AB 5207 may delay detainees' ability to gather evidence if they have family in New Jersey. And when evidence is not collected in a timely fashion, immigration bond hearings and removal proceedings may be delayed.

27. ICE anticipates complaints if it must send all detainees out of New Jersey. Initially, after AB 5207 forced the termination of ICE's intergovernmental-service agreements in New Jersey, ICE began transporting many detainees outside the State, mainly to Pennsylvania and New York. When it did so, a putative class-action lawsuit was brought against ICE, alleging (among other things) that the agency was unlawfully transferring detainees out of New Jersey and thus hindering the detainees' access to counsel and families. *See Robles v. U.S. Dep't Homeland Sec.*, No. 21-cv-13117 (D.N.J. June 30, 2021). While that lawsuit was eventually dismissed, ICE continues to face informal complaints for its out-of-state transfers. These include allegations about limited attorney-client access, visiting limitations for family and friends, and the possible impact on ongoing criminal and family court proceedings if an out-of-state facility has inadequate technology for virtual appearances.

28. Finally, AB 5207 may pose a significant obstacle to ICE's compliance with federal court orders that limit ICE's ability to transfer noncitizens outside of certain areas where they are originally encountered. *See Orantes-Hernandez v. Meese*, 685 F. Supp. 1488 (C.D. Cal. 1988). For example, if AB 5207 remains in place, ICE will likely be unable to detain unrepresented Salvadorian nationals in New Jersey, including those with criminal convictions.

29. Overall, the lack of a detention facility in Elizabeth, New Jersey would impact nationwide ICE operations, FBI operations, and CBP operations. The lack of detention resources in New Jersey has already had a severe impact on national-security, public-safety and border-security operations in a critical area of the nation. And if the Elizabeth facility is forced to close due to AB 5207, those severe impacts will become catastrophic.

Executed on this 19th day of July 2023.

ROBERT GUADIAN JR
Digitally signed by ROBERT GUADIAN JR
Date: 2023.07.19 09:56:33 -04'00'

Robert Guadian
Deputy Assistant Director for Field Operations
U.S. Department of Homeland Security (DHS)
U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO)