# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CORECIVIC, INC., | |
|   Plaintiff, | |
| v. | Hon. Robert Kirsch, U.S.D.J.<br>Hon. Tonianne J. Bongiovanni,<br>U.S.M.J. |
| PHILIP D. MURPHY, in his official capacity as Governor of the State of New Jersey, and MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey, | Docket No. 3:23-cv-967-RK-TJB |
|   Defendants. | |

---

### BRIEF IN OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION

---

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, New Jersey 08625
*Attorney for Defendants*

Jeremy M. Feigenbaum
  *Solicitor General*
Michael L. Zuckerman
  *Deputy Solicitor General*
Peter Wint
  *Assistant Attorney General*
David Chen (NJ Bar No. 416482022)
Nathaniel I. Levy
Daniel Resler
Ashleigh B. Shelton
  *Deputy Attorneys General*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ..............................4

    A.   Public and Private Incarceration ..................................................4

    B.   Immigration Detention At The Elizabeth Detention Center (EDC) ...........6

    C.   AB 5207 And This Case.................................................................8

STANDARD FOR PRELIMINARY INJUNCTION...............................10

ARGUMENT

    I.   PLAINTIFF WILL NOT SUCCEED ON THE MERITS .........................11

        A. New Jersey's Law Is Not Preempted .....................................11

           1.  The Federal Laws On Which Plaintiff And the United States
              Rely Cannot Serve As Bases For Preemption ..................11

           2.  Even If The Federal Laws Relied Upon Regulate Private
              Parties, They Do Not Preempt New Jersey's Law ...........15

        B. New Jersey's Law Comports With Intergovernmental Immunity.........26

           1.  The Act Does Not Violate Well-Established Intergovernmental
              Immunity Doctrine............................................................27

           2.  Absent Discrimination Or Direct Regulation, There Can Be
              No Violation Of The Intergovernmental Immunity Doctrine ........32

    II.   THE EQUITIES CONFIRM THAT CORECIVIC IS NOT ENTITLED
        TO THE BELATED EMERGENCY RELIEF IT SEEKS .......................36

CONCLUSION ........................................................................40

i

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                                                                   **<u>Page(s)</u>**

*Abdullah v. Am. Airlines, Inc.*,
   181 F.3d 363 (3d Cir. 1999)................................................................................23

*Acierno v. New Castle Cnty.*,
   40 F.3d 645 (3d Cir. 1994)............................................................................10, 36

*Adams v. Freedom Forge Corp.*,
   204 F.3d 475 (3d Cir. 2000)..........................................................................36, 37

*Arizona v. California*,
   283 U.S. 423 (1931)............................................................................................31

*Arizona v. United States*,
   567 U.S. 387 (2012)......................................................................................16, 25

*Arroyo v. DHS*,
   No. 19-815, 2019 WL 2912848 (C.D. Cal. June 20, 2019)..................................40

*Barnett Bank of Marion County v. Nelson*,
   517 U.S. 25 (1996)..............................................................................................22

*Boumediene v. Bush*,
   553 U.S. 723 (2008)............................................................................................28

*Boyle v. United Techs. Corp.*,
   487 U.S. 500 (1988)............................................................................................25

*Buckman v. Plaintiffs' Legal Comm.*,
   531 U.S. 341 (2001)............................................................................................25

*Caplan v. Fellheimer Eichen Braverman & Kaskey*,
   68 F.3d 828 (3d Cir. 1995)..................................................................................37

*Chamber of Commerce of United States v. Whiting*,
   563 U.S. 582 (2011) ................................................................17

*County of Ocean v. Grewal*,
   475 F.Supp.3d 355 (D.N.J. 2020) ............................................13, 16, 21

*Crosby v. National Foreign Trade Council*,
   530 U.S. 363 (2000) ................................................................22

*Davis v. Mich. Dep't of the Treas.*,
   489 U.S. 803 (1989) ..............................................................27, 29

*DeCanas v. Bica*,
   424 U.S. 351 (1976) ..............................................................16, 26

*Frank's GMC Truck Ctr., Inc. v. Gen'l Motors Corp.*,
   847 F.2d 100 (3d Cir. 1988) ......................................................10

*Geo Group., Inc. v. Newsom*,
   50 F.4th 745 (9th Cir. 2022) ...............................................14, 22, 32

*Goodyear Atomic Corp. v. Miller*,
   486 U.S. 174 (1988) ................................................................31

*Granillo v. FCA US LLC*,
   No. 16-cv-153, 2016 WL 9405772 (D.N.J. Aug. 29, 2016) ..................31

*H-1 Auto Care, LLC v. Lasher*,
   No. 21-18110, 2022 WL 13003468 (D.N.J. Oct. 21, 2022) .................36

*Hancock v. Train*,
   426 U.S. 167 (1976) ................................................................31

*Helvering v. Gerhardt*,
   304 U.S. 405 (1938) ................................................................35

*Hillsborough Cnty. v. Automated Med. Lab'ys.*, Inc.,
  471 U.S. 707 (1985)..................................................................................25

*Hines v. Davidowitz*,
  312 U.S. 52 (1941)....................................................................................25

*Hines v. Lanigan*,
  No. 17-2864, 2020 WL 6613213 (D.N.J. Nov. 10, 2020)....................................36

*Holk v. Snapple Beverage Corp.*,
  575 F.3d 329 (3d Cir. 2009)......................................................................15

*In re Adoption of Child by W.P.*,
  748 A.2d 515 (N.J. 2000).........................................................................28

*Johnson v. Maryland*,
  254 U.S. 51 (1920)..................................................................................31

*Kansas v. Garcia*,
  140 S.Ct. 791 (2020)...................................................................21, 23, 24

*Lanin v. Borough of Tenafly*,
  515 F. App'x 114 (3d Cir. 2013) ..............................................................36

*Leslie Miller, Inc. v. Arkansas*,
  352 U.S. 187 (1956).................................................................................31

*Lozano v. City of Hazleton*,
  724 F.3d 297 (3d Cir. 2013)................................................................16, 25

*Maryland v. King*,
  567 U.S. 1301 (2012)...............................................................................38

*McHenry Cnty. v. Kwame Raoul*,
  44 F.4th 581 (7th Cir. 2022) ............................................................passim

iv

*MD Mall Assocs., LLC v. CSX Transp., Inc.*,
  715 F.3d 479 (3d Cir. 2013).....................................................................................16

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996).......................................................................................1, 15

*Messina v. Coll. of New Jersey*,
  566 F. Supp. 3d 236 (D.N.J. 2021).......................................................................37

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
  138 S.Ct. 1461 (2018)................................................................................passim

*Nken v. Holder*,
  556 U.S. 418 (2009).................................................................................................10

*North Dakota v. United States*,
  495 U.S. 423 (1990)..................................................................................passim

*Novoa v. GEO Grp., Inc.*,
  No. 17-2514, 2022 WL 2189626 (C.D. Cal. Jan. 25, 2022)..................................35

*Nwauzor v. GEO Grp.*,
  No. 17-5769, 2020 WL 1689728 (W.D. Wash. Apr. 7, 2020) .............................35

*Ocean Cnty. Bd. of Commissioners v. Att'y Gen. of State of New Jersey*,
  8 F.4th 176 (3d Cir. 2021) ..................................................................11, 13, 14, 18

*Penn Dairies v. Milk Control Comm'n of Pennsylvania*,
  318 U.S. 261 (1943).........................................................................................30, 33

*Perkins v. Lukens Steel Co.*,
  310 U.S. 113 (1940)...............................................................................................25

*Pharmacia Corp. v. Alcon Labs.*,
  201 F. Supp. 2d 335 (D.N.J. 2002).................................................................36, 37

*Portview Properties, LLC v. CoreCivic, Inc.*,
   No. 22-3220, 2023 WL 372857 (D.N.J. Jan. 24, 2023) ......................................... 8

*Pub. Utils. Comm'n of Cal. v. United States*,
   355 U.S. 534 (1958) ........................................................................................ 31

*Reilly v. City of Harrisburg*,
   858 F.3d 173 (3d Cir. 2017) ............................................................................ 10

*Robinson v. Ardoin*,
   37 F.4th 208 (5th Cir. 2022) ........................................................................... 38

*Sikkelee v. Precision Airmotive Corp.*,
   822 F.3d 680 (3d Cir. 2016) ................................................................. 15, 23, 25

*South Carolina v. Baker*,
   485 U.S. 505 (1988) ........................................................................................ 30

*Takahashi v. Fish & Game Comm'n*,
   334 U.S. 410 (1948) ........................................................................................ 25

*Treasurer of New Jersey v. U.S. Dep't of Treasury*,
   684 F.3d 382 (3d Cir. 2012) ....................................................................... 31, 35

*United States v. Boyd*,
   378 U.S. 39 (1964) .......................................................................................... 30

*United States v. California*,
   921 F.3d 865 (9th Cir. 2019) ...................................................................... 16, 24

*United States v. New Mexico*,
   455 U.S. 720 (1982) ........................................................................................ 30

*United States v. Philadelphia*,
   798 F.2d 81 (3d Cir. 1986) .............................................................................. 31

*United States v. Tingey*,
  30 U.S. 115 (1831) ...................................................................................25

*United States v. Washington*,
  142 S.Ct. 1976 (2022) .......................................................1, 26, 27, 33

*Va. Uranium v. Warren*,
  139 S.Ct. 1894 (2019) ...............................................................................17

*Vita-Pure, Inc. v. Bhatia*,
  No. 14-7831, 2015 WL 1496396 (D.N.J. Apr. 1, 2015) .......................................37

*Washington v. GEO Grp.*,
  No. 17-5806, 2018 WL 6448778 (W.D. Wash. Dec. 10, 2018) ...........................35

## Statutes

6 U.S.C. § 112 ............................................................................................13, 20

8 U.S.C. § 1103 ...............................................................................................19

8 U.S.C. § 1231 ..........................................................................................passim

18 U.S.C. § 4013 .............................................................................................19

N.J. Stat. Ann. § 30:4-8.15 ...........................................................................passim

N.J. Stat. Ann. § 30:4-8.16 .............................................................................9, 29

N.J. Stat. Ann. §§ 30:4-91.9 ........................................................................5, 27, 28

N.J. Stat. Ann. §§ 30:4-91.10 ......................................................................5, 27, 28

P.L.2021, c.199 ..................................................................................................2

## Other Authorities

*Access to Due Process* 4, ICE (Jan. 4, 2023),
  bit.ly/3KcpNSx .........................................................................................40

*Alternatives to Detention (ATD)*, Transactional Records Access
Clearinghouse (July 15, 2023), bit.ly/43CJSs7 .....................................................39

*Detention Facilities*, ICE (updated Mar. 30, 2023),
https://bit.ly/3oKX5A9 ............................................................................................7

*Detention FY 2023 YTD*, ICE (July 20, 2023),
https://tinyurl.com/2p92df3 .....................................................................................39

Emily Ryo & Ian Peacock, *A National Study of Immigration Detention
in the United States*, 92 S. Cal. L. Rev. 1, 39 (2018)............................................40

Exec. Order No. 14006,
86 C.F.R. 7483 (Jan. 26, 2021) ...............................................................................5

Giulia McDonnel Nieto Del Rio, *There Are No Immigrants Left
in New Jersey County Jails. Where is ICE Sending Them?*,
Documented (Nov. 18, 2021), bit.ly/3Q8irTJ..........................................................9

Human Rights First, *Ailing Justice: New Jersey* (Feb. 2018),
https://bit.ly/3Jy5WN8 .............................................................................................8

*ICE detainee passes away at New Jersey hospital*,
ICE (Sept. 26, 2011), bit.ly/3q3sIpN .......................................................................8

Imm. & Customs Enf't, *Fiscal Year 2024 Congressional
Justification* (Mar. 13, 2023), https://bit.ly/3N73Mqs............................................7

INS, *Interim Assessment Report Concerning the Elizabeth,
New Jersey, Contract Detention Facility*, 4 (July 21, 1995),
https://bit.ly/46kVi6q ...............................................................................................7

Mariana Alfaro, *Democrats Battle Over a New Jersey Jail's
Contract With ICE*, N.Y. Times (Aug. 31, 2018),
https:// bit.ly/3XN67u3 .............................................................................................7

viii

Mem. Law in Opp. to Pltfs' TRO Mot. 27,
    *Juan R. v. DHS*, No. 21-13117 (D.N.J. July 1, 2021)............................................40

Monsy Alvarado, *Essex County will end contract to house ICE
    detainees at Newark jail*, NorthJersey.com (Apr. 28, 2021),
    https:// bit.ly/44A3DBh...........................................................................7

Nina Bernstein, *Few Details on Immigrants Who Died in Custody*,
    N.Y. Times (May 4, 2008), nyti.ms/3O1rXW9....................................................8

Office of the Inspector Gen., Dep't Homeland Sec., OIG-19-47,
    *Concerns about ICE Detainee Treatment and Care at Four Detention
    Facilities* (June 3, 2019), https://bit.ly/3phz0lt........................................6

Office of the Inspector Gen., Dep't Homeland Sec., OIG-21-30,
    *Violations of Detention Standards amid COVID-19 Outbreak
    at La Palma Correctional Center in Eloy, AZ* (March 30, 2021),
    https:// bit.ly/44ljrrs.........................................................................6

Office of the Inspector Gen., Dep't Homeland Sec., OIG-21-46,
    *Violations of ICE Detention Standards at Adams County Correctional
    Cente*r 4 (July 14, 2021), https:// bit.ly/3Pykcc .......................................6

Office of the Inspector Gen., Dep't Homeland Sec., OIG-22-31,
    *Management Alert – Immediate Removal of All Detainees from the
    Torrance County Detention Facility* 3 (March 16, 2022),
    https://bit.ly/43XPWMU.............................................................................6

Office of the Inspector Gen., Dep't Homeland Sec., OIG-22-47,
    *Violations of ICE Detention Standards at Folkston ICE Processing
    Center and Folkston Annex* 6 (June 30, 2022), https:// bit.ly/3XH17ax ...............6

Sharon Dolovich, *State Punishment and Private Prisons*,
    55 Duke L.J. 437 (2005) ........................................................................4

Steve Janoski, *Bergen County will collect $12M for housing immigrant
    detainees*, NorthJersey.com (July 2, 2018),
    https://bit.ly/3XDJb08...........................................................................7

## PRELIMINARY STATEMENT

In our federalist system, States have "great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996). After all, although the Federal Government is one of enumerated powers, States enjoy plenary powers to regulate the sale of goods and services within their borders. There are, of course, exceptions to that rule. While States enjoy plenary powers over the *private* entities within their domain, they do not have the same powers over the Federal Government itself, and thus States may not "directly regulate" the United States. *United States v. Washington*, 142 S.Ct. 1976, 1982 (2022). Similarly, States may adopt evenhanded laws governing private citizens and companies, but not in a way that "discriminates against" the Federal Government, because States are not free to disfavor federal law or the Federal Government generally. *Id.* And finally, when Congress concludes that the United States should instead regulate particular private conduct, it may preempt state laws that regulate those private actors too. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S.Ct. 1461, 1479 (2018) ("*NCAA*"). But beyond those exceptions, States can regulate private parties—even those that contract with the United States.

That is what New Jersey did here. For decades, New Jersey has recognized the harms inherent in private, for-profit businesses providing detention services, and the State has long prohibited their use for criminal corrections. Concerned by reports

of deplorable conditions at private immigration detention facilities, including their "inadequate medical and mental health care," "use of isolated confinement," and "incidents of violence and retaliation," the Legislature extended that prohibition to private immigration detention services. *See* P.L.2021, c.199. Signed into law in August 2021 and effective immediately, AB 5207 prohibited all public and private entities in the State from prospectively contracting to provide immigration detention; it did not interfere with those contracts already in effect.

Although Plaintiff CoreCivic and the United States challenge the statute and demand an emergency injunction two years after enactment, they will not succeed on the merits. Their preemption claims fail for two reasons. First, as recent decisions from the Supreme Court and the Third Circuit make clear, federal laws only preempt state laws when they regulate private parties. *See NCAA*, 138 S.Ct. at 1481. But the federal laws CoreCivic and the United States claim preempt the Act do not regulate private actors at all. Second, even if they did, New Jersey's statute is not preempted. Multiple circuits have rejected the idea that "the federal government has occupied the field of detaining and housing noncitizens." *McHenry Cnty. v. Kwame Raoul*, 44 F.4th 581, 589 (7th Cir. 2022). And federal immigration law nowhere requires States to make private detention facilities available, or gives private companies the right to detain, let alone sufficiently to overcome the presumption against preemption. There is no dispute that Congress could have enacted a statute ensuring private companies

can provide detention services to federal agencies or expressly preempting contrary state laws. But it did not do so in the Immigration and Nationality Act (INA).

The narrower doctrine of intergovernmental immunity does not step into that void. That doctrine has dramatic consequences in that it prevents States from acting even when no federal law otherwise would preempt their choices. That is why it is carefully circumscribed. The doctrine applies if a State directly regulates the Federal Government, something States have no power do so. But AB 5207 regulates state, local, and private contractors, which is within the permissible scope of police power regulation. Intergovernmental immunity also applies if a law discriminates against the Federal Government, but that is inapplicable here too: New Jersey law prohibits private detention for prisons and immigration detention alike, treating the United States similarly to any similar entities. CoreCivic and the United States thus advance a third theory—that neutral laws which indirectly burden the Federal Government can still be invalid—but that argument is foreclosed by decades of Supreme Court precedent. Pursuant to its enumerated powers, Congress can pass laws exempting federal contractors from nondiscriminatory state laws. But if it fails to do so, States can regulate private companies within their borders pursuant to their police powers, and intergovernmental immunity is not to the contrary.

Even if CoreCivic could show likely success on the merits, its near two-year delay seeking relief is independently fatal to its emergency motion. The core purpose

of a preliminary injunction in constitutional disputes is to prevent a new statute from taking effect and disrupting the status quo. But here, the status quo cuts squarely the other way: New Jersey's law has been in effect for years; other facilities have since ceased providing immigration detention services and their detainees were transferred or released successfully; and nothing stopped the challengers from suing when the Act took effect in 2021, without this self-created emergency. The State knows of no other case in this Court granting emergency relief after an unexcused delay of this length. This application thus fails on both the merits and the equities.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

A.   <u>Public And Private Incarceration</u>.

Governments did not start experimenting with private detention of individuals until recent decades. The Federal Government, for instance, began paying businesses to provide civil immigration detention near the end of the 1970s. Sharon Dolovich, *State Punishment and Private Prisons*, 55 Duke L.J. 437, 457 (2005). States, too, began to look to the private sector around the same time, with CoreCivic—founded in Tennessee in 1983 as the Corrections Corporation of America—being "[t]he first private entity" to enter this market. *See id.* at 459.

In recent years, however, numerous governments (including New Jersey) have found that private incarceration is inconsistent with their "responsibility … to protect the health and safety, including the physical and mental health, of individuals" in

their custody. N.J. Stat. Ann. § 30:4-8.15(b). The Federal Government concluded in 2016 that "privately operated criminal detention facilities do not maintain the same levels of safety and security for people in the Federal criminal justice system or for correctional staff." Exec. Order No. 14006, 86 C.F.R. 7483, 7483 (Jan. 26, 2021). As a result, in January 2021, the President ordered the U.S. Department of Justice not to renew any "contracts with privately operated criminal detention facilities." *Id*. Similarly, New Jersey state law does not authorize private, for-profit incarceration— exempting only those *nonprofit* residential community centers that provide reentry services to specially "eligible" nonviolent individuals near the end of their criminal sentences. *See* N.J. Stat. Ann. §§ 30:4-91.9 to -.10; Haley Decl. ¶¶ 8-10.

New Jersey's concerns are particularly well-founded in the civil immigration context. In the last five years alone, federal inspectors have documented a host of violations at privately operated facilities, including at those run by CoreCivic, such as abusive practices involving the use of chemical agents on detainees, verbal abuse, and prolonged solitary confinement;[1] security risks from severe understaffing;[2]

---

[1] Office of the Inspector Gen., Dep't Homeland Sec., OIG-21-30, *Violations of Detention Standards amid COVID-19 Outbreak at La Palma Correctional Center in Eloy, AZ* at 5-6 (March 30, 2021), https:// bit.ly/44ljrrs; Office of the Inspector Gen., Dep't Homeland Sec., OIG-19-47, *Concerns about ICE Detainee Treatment and Care at Four Detention Facilities* at 6 (June 3, 2019), https://bit.ly/3phz0lt.
[2] Office of the Inspector Gen., Dep't Homeland Sec., OIG-22-31, *Management Alert – Immediate Removal of All Detainees from the Torrance County Detention Facility* 3 (March 16, 2022), https://bit.ly/43XPWMU.

unsanitary conditions from spoiled food, pervasive mold, and insect infestations;[3] and inadequate medical care, even leading to the death of detainees.[4] Conditions at one CoreCivic facility were so dire last year that the Federal Government called for the immediate relocation of all detainees housed there.[5]

B.    Immigration Detention At The Elizabeth Detention Center (EDC).

Prior to the enactment of AB 5207, the Department of Homeland Security (DHS) contracted with both publicly- and privately-operated facilities in New Jersey for immigration detention. As to publicly-operated facilities, DHS contracted with Hudson, Essex, and Bergen Counties to house over 1,700 immigrant detainees in county jails.[6] As to private facilities, DHS contracted with CoreCivic to operate EDC, which can hold 304 detainees. Burke Decl. ¶ 16, Dkt. 31-1. In recent years, however, DHS has only used half that capacity. *Id*. (average daily population of 156

---

[3] OIG-19-47 at 4; OIG-22-31 at 5; Office of the Inspector Gen., Dep't Homeland Sec., OIG-22-47, *Violations of ICE Detention Standards at Folkston ICE Processing Center and Folkston Annex* 6 (June 30, 2022), https:// bit.ly/3XH17ax.

[4] OIG-22-47 at 11-12; OIG-21-30 at 9; Office of the Inspector Gen., Dep't Homeland Sec., OIG-21-46, *Violations of ICE Detention Standards at Adams County Correctional Cente*r 4 (July 14, 2021), https:// bit.ly/3PykccS.

[5] OIG-22-31 at 1.

[6] *See* Mariana Alfaro, *Democrats Battle Over a New Jersey Jail's Contract With ICE*, N.Y. Times (Aug. 31, 2018) (600 detainees in Hudson County jail), https:// bit.ly/3XN67u3; Steve Janoski, *Bergen County will collect $12M for housing immigrant detainees*, NorthJersey.com (July 2, 2018) (373 detainees in Bergen County jail), https://bit.ly/3XDJb08; Monsy Alvarado, *Essex County will end contract to house ICE detainees at Newark jail*, NorthJersey.com (Apr. 28, 2021) (800 detainees in Essex County jail), https:// bit.ly/44A3DBh.

in 2023); *see also* Imm. & Customs Enf't (ICE), *Fiscal Year 2024 Congressional Justification*, 160 (Mar. 13, 2023), https://bit.ly/3N73mQS (43% capacity in 2022). In addition to these facilities, DHS operates or contracts with other entities to operate immigration detention facilities in six locations in neighboring states. *Detention Facilities*, ICE (updated Mar. 30, 2023), https://bit.ly/3oKX5A9 (listing facilities in Pennsylvania and New York, among other states).

EDC's history of unsafe and unhealthy detention conditions spans decades. In 1995, while EDC was privately operated, detainees staged a riot there, resulting in destroyed property and assaults on multiple officers. *See* INS, *Interim Assessment Report Concerning the Elizabeth, New Jersey, Contract Detention Facility*, 4 (July 21, 1995), https://bit.ly/46kVi6q. A federal investigation into the riot documented physical abuse and sexual harassment by guards, inadequate training, and inadequate supplies such as clean clothing for detainees. *Id*. at 1-2. As recently as 2018, an organization visiting EDC documented reports of worms or maggots in the shower area; insufficient clothing and hygiene products; unpotable water and raw, spoiled, expired, and maggot-ridden food; insufficient medical care; and retaliatory solitary confinement. *See* Human Rights First, *Ailing Justice: New Jersey* (Feb. 2018), https://bit.ly/3Jy5WN8. Two detainees at EDC have died in CoreCivic's custody. *See* Nina Bernstein, *Few Details on Immigrants Who Died in Custody*, N.Y. Times (May 4, 2008), nyti.ms/3O1rXW9; *ICE detainee passes away at New Jersey*

*hospital*, ICE (Sept. 26, 2011), bit.ly/3q3sIpN.  Indeed, CoreCivic is now facing a lawsuit from its landlord "to terminate CoreCivic's leasehold interest" at EDC, on the basis, among others, that "CoreCivic failed to … meet the basic safety, health care, sanitation, and hygiene needs of the confined persons." *Portview Properties, LLC v. CoreCivic, Inc.*, No. 22-3220, 2023 WL 372857, at *2 (D.N.J. Jan. 24, 2023).

    C.    <u>AB 5207 And This Case</u>.

After finding that "detention centers and correctional facilities in New Jersey have a history of poor conditions, including inadequate medical and mental health care, use of isolated confinement, and incidents of violence and retaliation against people in detention," N.J. Stat. Ann. § 30:4-8.15(c), the Legislature enacted AB 5207 and the Governor signed it into law on August 20, 2021. Am. Compl. ¶ 20. The Act prospectively prohibits State and local government agencies from engaging in civil immigration detention, N.J. Stat. Ann. § 30:4-8.16(b)(1), and—as relevant here—prohibits any "private detention facility" in New Jersey from entering, renewing, or extending any contract to provide private immigration detention, *id.* § 30:4-8.16(b)(2). The law has no effect on any preexisting contract. *Id.* § 30:4-8.16(b)-(c).

In response to both AB 5207 and community advocacy, Hudson, Bergen, and Essex counties announced they would no longer contract with DHS to hold detainees and, in late 2021, DHS released or transferred those detainees to nearby facilities in Batavia, New York, and Goshen, New York. Giulia McDonnel Nieto Del Rio, *There*

*Are No Immigrants Left in New Jersey County Jails. Where is ICE Sending Them?*,
Documented (Nov. 18, 2021), bit.ly/3Q8irTJ.

For approximately 18 months after the Act went into effect, neither the United
States nor CoreCivic took action. Then, in mid-February of this year, CoreCivic filed
a complaint against the Governor and the Attorney General (the State), alleging that
AB 5207 violates the Supremacy Clause. Nearly a month and a half later, it served
the Complaint. Dkt. 8 (Mar. 27, 2023). On May 15, the State moved to dismiss. Dkt.
12. After taking an extension, CoreCivic responded by filing an Amended Complaint
on June 7. Dkt. 14. At no time did CoreCivic seek preliminary relief, and at no time
did the United States sue or express an intent to be involved. Finally, a week after
filing its Amended Complaint—22 months after the Act went into effect—CoreCivic
moved for a preliminary injunction and TRO. *See* Dkt. 17 (June 14, 2023).

After this Court directed it to appear, the United States indicated its intent to
file suit challenging AB 5207 at a status conference on July 10, 2023. *See* U.S. Ltr.,
Dkt. 36. But on the agreed-on day for filing suit, the United States reversed course,
stating it only intended to file a statement of interest in this case. *Id*.

## STANDARD FOR PRELIMINARY INJUNCTION

Injunctive relief "is an extraordinary remedy … which should be granted only
in limited circumstances." *Frank's GMC Truck Ctr., Inc. v. Gen'l Motors Corp.*, 847
F.2d 100, 102 (3d Cir. 1988). The "primary purpose of a preliminary injunction is

maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994). As a result, "[a] party seeking [to] alter the status quo bears a particularly heavy burden" in satisfying the traditional four-factor test. *Id*. at 653. To obtain emergency relief, the movant must first "meet the threshold for the first two 'most critical' factors: it must demonstrate that it can win on the merits … and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). "If these gateway factors are met, a court then considers the remaining two factors"—the balance of parties' equities and public interest—"and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id*. Where the State is a defendant, the last two factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

## I.    PLAINTIFF WILL NOT SUCCEED ON THE MERITS.

CoreCivic presses two species of Supremacy Clause claims: preemption and intergovernmental immunity. Both claims fail.

### A.    New Jersey's Law Is Not Preempted.

#### 1.    *The Federal Laws On Which Plaintiff and the United States Rely Cannot Serve As Bases For Preemption.*

CoreCivic's and the United States's preemption arguments fail at a threshold step: the federal laws on which they rely cannot support preemption because they do

not regulate any private conduct. Both the Supreme Court and the Third Circuit have concluded that "[f]or a federal law to preempt state law [it] 'must be best read as one that regulates private actors.'" *Ocean Cnty. Bd. of Commissioners v. Att'y Gen. of State of New Jersey*, 8 F.4th 176, 181 (3d Cir. 2021) (quoting *NCAA*, 138 S.Ct. at 1479); *see also NCAA*, 138 S.Ct. at 1481 ("[R]egardless of the language sometimes used by Congress and this Court, every form of preemption is based on a federal law that regulates the conduct of private actors…."). In other words, federal laws that do not "impose[] restrictions or confer[] rights on private actors" cannot serve as a basis for express, conflict, or field preemption. *Id.* at 1480.

That makes sense. Where "Congress enacts a law that imposes restrictions or confers rights on private actors," but "a state law confers rights or imposes restrictions that conflict with the federal law," the Supremacy Clause explains how to handle the competing mandates on the citizenry: "the federal law takes precedence and the state law is preempted." *NCAA*, 138 S.Ct. at 1479. Otherwise, the Federal Government's power to govern private actors in its borders would be undermined. But where Congress enacts a law that only regulates States or federal agents, such provisions necessarily do not bind or impose rights or duties on private actors, and logically have no power to dictate how States may regulate that same private conduct pursuant to their own plenary police powers. *See id.* at 1481 (finding a law could not be "a preemption provision because there is no way in which this provision can be

understood as a regulation of private actors"). The lesson is clear: "the Constitution confers upon Congress the power to regulate individuals," *id.* at 1479, and Congress can preempt contrary state laws if it does so.  But if the federal law does not regulate private parties, it cannot invalidate a State's police-power statute that does.

*NCAA* and *Ocean County* illustrate how this works in practice. In *NCAA*, the Court explained that a federal law which prohibited States from authorizing sports gambling—but was silent on whether private parties can themselves engage in sports gambling—could not support preemption because it did "not give [private actors] a federal right to engage in sports gambling" or "impose any federal restrictions on private actors." *Id.* at 1481. And applying *NCAA*, the Third Circuit in *Ocean County* held that two provisions of the INA—which allegedly prohibited States from placing restrictions on state and local official communications with ICE—likewise could not preempt state laws because they said "nothing about private actors" and "cannot be fairly read to regulate them." 8 F.4th at 181-82. Although the United States claimed that federal immigration law imposed a duty on *federal agents* to remove noncitizens that "cannot be achieved" without procuring such information, *County of Ocean v. Grewal*, 475 F.Supp.3d 355, 380 (D.N.J. 2020) (describing argument), a mandate on federal officials to procure information does not obligate private parties to provide it or give them a federal right to do so. *See Ocean Cnty.*, 8 F.4th at 181-82.

12

That logic dooms CoreCivic's and the United States's preemption arguments too. Their claim rests entirely on the premise that federal law "authorizes *the Federal Government* and *ICE* to use private detention of civil immigrants in enforcing federal immigration law." CoreCivic Br. 33 (emphases added); *see also* CoreCivic Br. 4, 31, 33; U.S. Br. 1, 6, 14, 16-19. But that is the problem: the relevant statutes are directed at federal officials, and do not regulate or impose any rights or duties on private actors at all. The laws on which CoreCivic and the United States rely vest "the Secretary" with "authority to make contracts," 6 U.S.C. § 112(b)(2); provide "[t]he Attorney General shall arrange for appropriate places of detention" and "may expend" funds "to acquire, build, remodel, repair, and operate facilities," 8 U.S.C. § 1231(g)(1); and state "the Commissioner shall consider the availability for purchase or lease" of private detention facilities," 8 U.S.C. § 1231(g)(2).

That is not enough. These laws place obligations on and authority in federal agents to find appropriate detention for immigrant detainees, just like the provisions in *Ocean County* put obligations on federal agencies. But they do not afford private entities a "federal right to engage in" immigration detention, and do not trigger the Supremacy Clause. *NCAA*, 138 S.Ct. at 1481. Congress could have written a statute empowering private parties to provide immigration detention services to the Federal Government (for conflict preemption), or written that they could do so despite state law (for express preemption). But because the law Congress wrote gives no private

entity any rights or obligations vis-à-vis immigration detention, its provisions cannot preempt state laws that do speak to those private actors' duties and limitations.

CoreCivic's and the United States's reliance on *Geo Group., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) (en banc), cannot overcome this problem. Although the Ninth Circuit found that these laws preempt state restrictions on private immigration detention, the majority did not mention or consider whether the federal laws at issue constituted "a regulation of private actors" as required by *NCAA*. 138 S.Ct. at 1481. But in this circuit—and in *NCAA*—this step is a threshold, binding requirement this Court cannot ignore. *See Ocean Cnty.*, 8 F.4th at 181. Indeed, when another circuit considered these same provisions, it doubted they satisfy *NCAA*. *See McHenry Cnty.*, 44 F.4th at 588 (emphasizing *NCAA* "reject[s] preemption claims where the federal immigration statutes at issue did not regulate private actors"). That *Geo Group* never grappled with this inquiry is no excuse for this Court to do the same.

> 2. *Even if the federal laws relied upon regulate private parties, they do not preempt New Jersey's law.*

Even if the immigration laws CoreCivic and the United States cite could serve as bases for preemption, they do not actually preempt AB 5207. To begin, CoreCivic and the Federal Government must clear a high bar: "all preemption cases start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 687 (3d Cir. 2016) (cleaned

up); *see also id.* (explaining that courts "have a duty to accept the reading [of federal law] that disfavors pre-emption"). The presumption against preemption applies to AB 5207: The law was enacted to end abusive detention practices and to "protect the health and safety … of individuals detained within New Jersey," N.J. Stat. Ann. § 30:4-8.15(b), a power at the core of the State's traditional police powers. *See*, *e.g.*, *Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 334 (3d Cir. 2009) ("Health and safety issues have traditionally fallen within the province of state regulation."); *Medtronic*, 518 U.S. at 485 (noting presumption "is consistent with both federalism concerns and the historic primacy of state regulation of matters of health and safety").[7] CoreCivic and the United States fail to prove that the INA preempts AB 5207, and certainly fail to show that the statute does so clearly and manifestly.

---

[7] That is true even though the health and safety issues arise in the context of private New Jersey entities providing immigration detention, as courts regularly apply the presumption in immigration-adjacent cases. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 400 (2012); *DeCanas v. Bica*, 424 U.S. 351, 357 (1976); *United States v. California*, 921 F.3d 865, 885-86 (9th Cir. 2019); *Cnty. of Ocean*, 475 F.Supp.3d at 379, 381, 383. CoreCivic's and the United States's brief footnotes arguing that this presumption does not apply fall flat. *See* CoreCivic Br. 25 n.9; U.S. Br. 14 n.6. While both cite *Lozano v. City of Hazleton*, 724 F.3d 297 (3d Cir. 2013), that case does not help them. *Lozano* declined to apply the presumption in a *sui generis* context where the challenged law tied housing to immigration status, but *Lozano* found that the presumption still applied to employment laws prohibiting the hiring of unauthorized immigrants. *Id.* at 314 n.23. The Third Circuit's distinction turned on whether the state or local law attempted to regulate "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *Id.* at 315. But AB 5207 does not bear on that issue.

1. Begin with conflict preemption. Conflict preemption arises only "where it is impossible for a private party to comply with both state and federal law, or where under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *MD Mall Assocs., LLC v. CSX Transp., Inc.*, 715 F.3d 479, 495 (3d Cir. 2013) (quotation marks and citation omitted). "The mere fact of 'tension' between federal and state law," on the other hand, "is generally not enough to establish an obstacle supporting preemption." *Id*. Because the relevant provisions of the INA impose no obligations on private parties, *see supra* at 11-15, is it not "impossible for a private party to comply with both state and federal law." Instead, CoreCivic (at 28-33) and the United States (at 17-19) argue only that AB 5207 presents an obstacle to accomplishing the INA's and is impliedly preempted.

Their argument falls short. Because obstacle preemption asks courts to strike down state laws even if Congress did not expressly so require—and even if parties could comply with both federal and state statutes—"a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." *United States v. New Jersey*, No. 20-1364, 2021 WL 252270, *9 (D.N.J. Jan. 26, 2021) (quoting *Chamber of Commerce of United States v. Whiting*, 563 U.S. 582, 607 (2011)). Indeed, implied preemption "does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives." *Id.* (quoting

*Whiting*, 563 U.S. at 607). That is, "invoking 'some brooding federal interest' is not enough to support preemption claim," *McHenry Cnty.*, 44 F.4th at 591 (quoting *Va. Uranium v. Warren*, 139 S.Ct. 1894, 1901 (2019) (plurality op.)): the challenger "must point specifically to a constitutional text or a federal statute that does the displacing or conflicts with state law," *Va. Uranium*, 139 S.Ct. at 1901 (quotation marks and citation omitted). A contrary approach "would undercut the principle that it is Congress rather than the courts that preempts state law." *Whiting*, 563 U.S. at 607 (quotation marks and citation omitted).

Neither CoreCivic nor the United States can point to text establishing that AB 5207 impedes federal *laws* rather than particular federal officials' present goals. The INA directs DHS to "arrange for appropriate places of detention for aliens detained pending removal," and requires it to "consider the availability for purchase or lease" of existing facilities before constructing new ones. 8 U.S.C. § 1231(g)(1), (2). The statute never mentions private detention facilities, let alone expresses any preference for their use in detaining immigrants. In fact, the INA contemplates only that DHS may "acquire, build, remodel, repair, and operate facilities," nowhere mentioning that the agency could contract with private entities to operate facilities. *Id*. But the mere "congressional instruction to 'consider' available facilities and agreements to use them before building new ones does not preempt a State (or local) government's choice to make certain facilities unavailable." *McHenry Cnty.*, 44 F.4th at 591. AB

5207 is consistent with the scheme Congress wrote—it does not tell the United States who it may detain or where to house a detainee, and imposes no restriction on DHS's ability to detain immigrants by operating federal facilities in New Jersey.

The structure of Section 1231(g) makes the challengers' argument particularly untenable. Not only does the INA's scheme direct federal officials to "consider the availability for purchase or lease" of existing facilities, but it actually acknowledges that "facilities adapted or suitably located for detention" might be "unavailable for rental." 8 U.S.C. § 1231(g)(1), (2). Despite recognizing this possibility, the INA does not impose a duty on private companies to make unavailable properties available, or empower private companies to contract notwithstanding contrary state laws. Rather, the INA simply empowers federal officials to build their own new facilities should that problem arise, *id.* § 1231(g)(1)—a power that AB 5207 leaves untouched. The Third Circuit held that a federal law commanding States to allow cooperation with immigration officials was not enough to preempt policies limiting such cooperation. *Ocean Cnty.*, 8 F.4th at 182. It strains credulity that a federal law merely instructing federal officials to "consider the availability" of facilities and to build new facilities when they are unavailable preempts state regulations of private businesses.

Indeed, when Congress wants federal agencies to use non-federal facilities, it says so expressly. The INA permits federal immigration officials "to make payments [for] the housing, care, and security of persons detained by [ICE] pursuant to Federal

law under an agreement *with a State or political subdivision of a State*." 8 U.S.C. § 1103(a)(11)(A) (emphasis added); *see also id.* § 1103(a)(11)(B) (authorizing federal immigration officials "to enter into a cooperative agreement with any State, territory, or political subdivision … to establish acceptable conditions of confinement and detention services in any State or unit of local government which agrees to provide guaranteed bed space for persons detained").[8] The INA includes no similar language about private facilities. Nor is this because Congress was unaware that such language could be necessary for private contracting as well: 18 U.S.C. § 4013, by contrast, specifically authorizes the United States Marshall Service to "make payments from funds appropriated for Federal prison detention for … the housing, care and security of persons held … under agreements with State or local units of government or *contracts with private entities*." (Emphasis added). In other words, Congress knows how to specify such private contracts are proper. Yet the INA is silent on the use of private facilities for immigration detention purposes.

The United States's effort to marry the generalized detainee-housing sections with the Secretary's generalized authority to make contracts fares no better. *See* U.S. Br. 17-18 (citing 6 U.S.C. § 112(b)(2)). Like Section 1231(g), 6 U.S.C. § 112 says

---

[8] To be clear, notwithstanding this provision, the United States concedes that "New Jersey is free to implement AB 5207 for itself and its localities." Br. 24; *see also id.* at 25. And CoreCivic seeks no relief as to the portions of AB 5207 that apply to state and local detention facilities. As a result, if this Court incorrectly awards preliminary relief in this case, those provisions of AB 5207 should still remain in effect.

nothing about private detention centers—let alone that private detention companies must be available contracting parties notwithstanding state law. Instead, the United States really seems to be arguing that when Congress grants an agency generalized contracting authority, that federal law alone can immunize all of that agency's future contracting partners from complying with otherwise-applicable state regulations. Its logic would, for example, go so far as to allow federal contractors to place private detention facilities within 100 yards of a school, without regard to state or local zoning regulations. But that has never been the rule, which is why the United States offers no case relying on 6 U.S.C. § 112 for this proposition. Instead, when a U.S. agency contracts, no less than when a private actor does so, its choices are subject to what is available in the market—subject to applicable and neutral state provisions. *See infra* at 26-36 (discussing scope of intergovernmental immunity).

While federal officials find it easier to detain individuals if they have access to private detention facilities in New Jersey, *see* U.S. Br. 2-5, 17-19 (protesting that federal agencies have chosen to rely on private detention rather than to build in-state federally-operated detention facilities), that is not the test. Indeed, the "possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." *Kansas v. Garcia*, 140 S.Ct. 791, 807 (2020); *see Cty. of Ocean*, 475 F. Supp. 3d at 382 (holding, in rejecting a preemption claim under INA, that "merely because a state law inconveniences the federal government does not render

it preempted—the repugnance must be so direct and positive that the two acts cannot be reconciled or consistently stand together"). It could hardly be otherwise: "[t]he Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." *Kansas,* 140 S.Ct. at 807. But nothing in the *INA* requires private detention facilities remain available in a State that has concluded they undermine its health and safety interests, and nothing in the U.S. declarations expressing current agency policy fills that statutory gap.

None of the Supreme Court or Third Circuit precedents on which CoreCivic and the United States rely supply that missing textual evidence either. *Lozano* could hardly be more afield: as explained above, *see supra* at 16 n.7, that case invalidated a local ordinance restricting housing based on immigration status because the United States alone "regulate[s] who should or should not be admitted into the country, and the conditions under which a legal entrant may remain," 724 F.3d at 315—an issue AB 5207 does not touch. *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), involved a "calibrated Burma policy" that precisely set the national sanctions and preempted contrary state laws imposing greater sanctions through a procurement policy. *Id.* at 377-78. *Barnett Bank of Marion County v. Nelson*, 517 U.S. 25 (1996), held that a federal statute stating certain banks "may" sell insurance preempted state laws forbidding them to do so—the very conflict between a federal law establishing a right and a state law restricting the right's exercise that is missing here. *Id.* at 27.

21

And CoreCivic's string-cite of other cases, Br. 32-33, without a word of analysis as to how they apply, do not prove that AB 5207 is preempted either.

Finally, while the Ninth Circuit held to the contrary in *Geo Group*, *see* U.S. Br. 19; CoreCivic Br. 31, its divided decision was incorrect and inconsistent with circuit precedent. *See* 50 F.4th at 761-63 (preemption analysis). Its one paragraph of statutory analysis rests entirely upon the Secretary's duty to "arrange for appropriate places of detention," *id.* at 762 (quoting 8 U.S.C. § 1231(g)(1)), and did not cite any of the other statutes the United States pressed to them. But the *Geo Group* majority did not cite *NCAA* or explain how Section 1231 regulates private parties, something the Third Circuit requires. It did not acknowledge that Section 1231 fails to mention private facilities, in contrast to other federal statutes that expressly authorize private detention, or other provisions on the INA authorizing agreements with state or local entities. It did not address the text stating that if facilities are unavailable, the answer is to construct new ones—not trump state law. And the majority generally held that the state law "frustrate[d]" the underlying "congressional intent," *id.*, despite recent precedents demanding more grounding in the text.

2. Field preemption is an even weaker fit, which may be why *Geo Group* did not rely on it. The doctrine applies only "[i]n rare cases," where "Congress legislated so comprehensively in a particular field that it left no room for supplementary state legislation." *Kansas*, 140 S.Ct. at 804 (quotation marks and citation omitted). In

evaluating a field preemption claim, courts must avoid defining "the scope of the preempted field too broadly." *Sikkelee*, 822 F.3d at 689; *see also Abdullah v. Am. Airlines, Inc.*, 181 F.3d 363, 367 (3d Cir. 1999) (same).

Field preemption is "confined to only a few areas of the law," and this is not one of them. *McHenry Cnty.*, 44 F.4th at 589 (quotation marks and citation omitted). While the Seventh Circuit in *McHenry* only addressed a state restriction on state and local entities providing immigration detention, it nevertheless rejected a similar field preemption argument head on. *See id.* at 589-91. As it held, the view "that the federal government has occupied the field of detaining and housing noncitizens, thereby preempting State regulation … finds no support in the text." *Id.* at 589. Section 1231(g) empowers the Attorney General to arrange for immigration detention, and so New Jersey cannot prohibit the Federal Government from detaining immigrants and/or housing them within its borders. *Id.* at 590. But that is not what AB 5207 does. AB 5207 simply makes clear that—given the State's separate responsibility to "protect the health and safety … of individuals detained within New Jersey"—it will remove private facilities (as well as state and local facilities) from the group that can provide detention services, something these facilities already could not do in the state and local criminal corrections context. N.J. Stat. Ann. § 30:4-8.15. *See also California*, 921 F.3d at 886 (9th Cir. 2019) (explaining the States have "the general authority to ensure the health and welfare of inmates and detainees in facilities within

its borders"). And as noted above, the INA is *silent* regarding private detention, *see supra* at 17-18, which means it logically cannot have occupied the field. *See Kansas*, 140 S.Ct. at 804 (requiring "comprehensive[]" scheme for preemption).

Nothing in CoreCivic's or the United States's submissions overcome that core defect. CoreCivic identifies a smattering of statutes specifying who to detain for civil immigration violations, or authorizing various federal agencies to arrange detention, CoreCivic Br. 3-4, far from a "comprehensive[]" scheme that has "left no room for supplementary state legislation." *Kansas*, 140 S.Ct. at 804. The challengers next cite *Lozano* again, but as noted above, that case involved a local ordinance "regulat[ing] residency based on immigration status," 724 F.3d at 315, 322, a direct attack on the United States's exclusive power to decide "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain," *id.* at 315. *Arizona* invalidated state laws criminalizing violations of federal immigration laws for like reasons. 567 U.S. at 401 ("[T]he Federal Government has occupied the field of alien registration."). In both, Congress created a "comprehensive and unified system" with a "full set of standards" governing registration and residency, leaving no room for the States to regulate. *Id.* at 401; *Lozano*, 724 F.3d at 321.[9]

---

[9] None of the other cited cases are more relevant. *Hines v. Davidowitz*, 312 U.S. 52 (1941) involved alien registration; *Buckman v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001), *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988), and *Hillsborough Cnty. v. Automated Med. Lab'ys.*, Inc., 471 U.S. 707 (1985), never mention detention

But the fact Congress chose to occupy those specific fields does not mean it intended to occupy the field of detention conditions, let alone the field of restrictions on private detention companies. *See Sikkelee*, 822 F.3d at 689 (cautioning courts to avoid defining "the scope of the preempted field too broadly"). After all, Congress did not create anywhere close to a "full set of standards" regarding detention health and safety conditions in the INA. The United States attempts to make up for that lack by emphasizing allegedly dominant federal interests in providing for those in custody, in foreign relations, and in controlling obligations under contracts. Br. 14. But those interests are frequently present whenever the Federal Government deals with immigrants, yet the Supreme Court has repeatedly found that not "every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted." *DeCanas*, 424 U.S. at 354-55 (citing cases upholding state laws related to immigrants). And the United States fails to explain, for example, how foreign relations would be harmed by detaining immigrants in federally-owned and operated facilities rather than in private ones—just as the INA contemplates they will be. *See* 8 U.S.C. § 1231(g)(1), (2) (allowing Federal Government to finance new facilities if existing ones are unavailable for purchase or lease). The challengers cite no case holding Congress fully occupied the field of private detention.

---

or immigration; and *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410 (1948), *Perkins v. Lukens Steel Co.*, 310 U.S. 113 (1940), and *United States v. Tingey*, 30 U.S. 115 (1831), were not preemption cases at all.

B.    New Jersey's Law Comports With Intergovernmental Immunity.

Intergovernmental immunity, which also follows from the Supremacy Clause, is an older but narrower doctrine than preemption. In one sense, it is more powerful: it allows for the invalidating of state laws even *without* identifying a relevant federal law governing the conduct or field. But for that reason, it is carefully circumscribed: it only "immunizes the Federal Government from state laws that directly regulate or discriminate against it." *Washington*, 142 S.Ct. at 1982. AB 5207 does neither. And while CoreCivic and the United States contend that AB 5207 violates a third kind of intergovernmental immunity—invalidating neutral state laws with the indirect effect of "control[ling] federal operations," U.S. Br. 10—no such category exists.

1.    *The Act Does Not Violate Well-Established Intergovernmental Immunity Doctrine.*

The parties agree that AB 5207 would be invalid if it discriminates against the United States or directly regulates it. But AB 5207 does neither.

1. Begin with discrimination, on which CoreCivic and the United States train considerable fire. "A state law discriminates against the Federal Government or its contractors if it singles them out for less favorable treatment, or if it regulates them unfavorably on some basis related to their governmental status." *Washington*, 142 S.Ct. at 197 (cleaned up). To be nondiscriminatory, a state law must be imposed not only on the "Government contractor or supplier" but "imposed equally on other similarly situated constituents of the State." *North Dakota v. United States*, 495 U.S.

423, 438 (1990) (plurality); *see also McHenry Cnty,* 44 F.4th at 594. But differential treatment is permissible where "significant differences between the two classes" explain it. *Davis v. Mich. Dep't of the Treas.*, 489 U.S. 803, 816 (1989).

AB 5207 does not discriminate against the United States, and the challengers' discrimination claim rests on a misreading of state law. While the challengers argue state law bars private companies from providing immigration detention to the United States but authorizes them to run private corrections for the New Jersey Department of Corrections, *see* CoreCivic Br. 8, 21; U.S. Br. 6, 13, they are incorrect. N.J. Stat. Ann. § 30:4-91.10 does *not* permit companies like CoreCivic to run private prisons. That law speaks to the housing of "eligible inmates in private facilities," and though the challengers overlook it, N.J. Stat. Ann. § 30:4-91.9 expressly defines those terms. Those definitions (of both "eligible inmate" and "private facility") set forth clearly that DOC is empowered only to transfer a small number of particularly low-security prisoners approaching their release date to serve the brief remainder of a sentence at a "nonprofit" "residential center"—such as facilities colloquially known as halfway houses.[10] And neither CoreCivic nor the United States have ever contended that such

---

[10] Although the text of N.J. Stat. Ann. § 30:4-91.9 is clear on its face, to the extent this Court has any doubt about the interpretation of state law, it must defer to state agencies on this question, *see In re Adoption of Child by W.P.*, 748 A.2d 515, 524 (N.J. 2000) (affording deference to agency reading of state law advanced in a brief), particularly where the agency's reading would avoid an alleged constitutional defect, *see Boumediene v. Bush*, 553 U.S. 723, 787 (2008). That said, even if this Court

nonprofit residential providers of education and training are "similarly situated" to for-profit detention centers or implicate the same health and safety concerns.

But because CoreCivic's and the United State's state-law premise was wrong, their entire discrimination claim fails. Aside from N.J. Stat. Ann. § 30:4-91.9 to -10, neither challenger identifies any other state statute authorizing DOC to retain private companies to own and operate its prisons. For good reason: none exist. As a result, DOC does not retain private, for-profit companies like CoreCivic to own or operate corrections facilities, and DOC has never done so. *See* Haley Decl. ¶¶ 8-10. AB 5207 simply extended state law's longstanding prohibition on private criminal corrections detention facilities to the immigration detention context.

The Federal Government's sole other alleged example of discrimination falls flat. While the United States complains that state law authorizes a "private hospital contracted with a private company to house the mentally ill," U.S. Br. 12, a private hospital and corrections or immigration detention are not comparable. After all, New Jersey's concern with private, for-profit facilities' "history of … inadequate medical and mental health care," N.J. Stat. Ann. § 30:4-8.15(c), is not triggered by hospitals that provide care. Discrimination claims turn on identification of "similarly situated"

---

erroneously believes N.J. Stat. Ann. § 30:4-91.9 allows retention of private prisons, they are not situated like private immigration detention given the record establishing serious health and safety risks for the latter, including at EDC. *See supra* at 6-8.

entities, *North Dakota*, 495 U.S. at 438, not apples to oranges comparisons, *Davis*, 489 U.S. at 816 (no violation if "significant differences" explain distinction).

2. Nor is there a direct regulation, as the United States concedes. U.S. Br. 10. The reason for this prohibition is clear: while the States have police power to regulate private individuals and businesses within their borders, they enjoy no plenary power over the National sovereign. But AB 5207 follows that rule. The Act solely regulates two groups: (1) the State and *its* instrumentalities, and (2) private detention facilities operating within state borders. N.J. Stat. Ann. § 30:4-8.16(2)(b). The law places no rights or obligations on the Federal Government or on any federal official or agency. DHS therefore remains free to detain individuals for civil immigration violations and to acquire and/or operate its own facilities within the State.

Although AB 5207 certainly applies to private entities that *contract with* the Federal Government, decades of Supreme Court precedent make clear that this does not constitute "direct regulation" of the United States itself. *See, e.g.*, *North Dakota*, 495 U.S. at 437 (concluding that where a state law "operate[s] against suppliers, not the Government," the doctrine's "concerns about direct interference with the Federal Government … are not implicated"). On that basis, the Court has repeatedly upheld state regulations of federal contractors. *See id.* (labeling and reporting regulations for liquor sales imposed on federal contractors); *United States v. New Mexico*, 455 U.S. 720 (1982) (sales and use taxes imposed on federal contractors); *United States*

*v. Boyd*, 378 U.S. 39 (1964) (sales and use tax imposed on purchases made by federal contractors); *Penn Dairies v. Milk Control Comm'n of Pennsylvania*, 318 U.S. 261 (1943) (denial of milk-dealer's license to federal contractor that sold milk at prices below the fixed minimum ordered by the Commission); *see also South Carolina v. Baker*, 485 U.S. 505, 520 (1988) (noting the contrary view that a tax on government contractors is equivalent to a tax on the government "has been thoroughly repudiated by modern intergovernmental immunity caselaw").

The Seventh Circuit in *McHenry County* reached the same conclusion. It held that an Illinois law barring State and local government agencies from entering into contracts with the Federal Government for immigration detention did not regulate the government because the law "imposes no direct regulation on any federal official or agency." 44 F.4th at 593. This was true even though "a consequence of the Act— *the* intended consequence of the Act—is that the federal government will not be able to use cooperative agreements to house immigration detainees in Illinois State or county facilities." *Id*. That straightforward logic applies with equal force here. The Act regulates State and local entities and private detention facilities but "imposes no direct regulation on any federal official or agency." *Id*.

The cases CoreCivic cites do not change the answer. Most are distinguishable because they did impose burdens on the Government or its agencies. *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174 (1988) (federal nuclear facility); *Hancock v.*

*Train*, 426 U.S. 167 (1976) (federal installations); *Arizona v. California*, 283 U.S. 423 (1931) (Secretary of Interior); *Johnson v. Maryland*, 254 U.S. 51 (1920) (federal employees); *Treasurer of New Jersey v. U.S. Dep't of Treasury*, 684 F.3d 382, 406 (3d Cir. 2012) (federal bonds); *Granillo v. FCA US LLC,* No. 16-cv-153, 2016 WL 9405772, at \*19 (D.N.J. Aug. 29, 2016) (federal agency). Others did not rest on intergovernmental immunity at all. *See Pub. Utils. Comm'n of Cal. v. United States*, 355 U.S. 534 (1958) (distinguishing those "cases where, absent a conflicting federal regulation, a State seeks to impose safety or other requirements on a contractor who does business for the United States"); *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 188-90 (1956) (preemption grounds)*; United States v. Philadelphia*, 798 F.2d 81, 86 (3d Cir. 1986) (same). Even *Geo Group*, despite invalidating California's law on immunity grounds, *see infra* at 32, did not find the law a "direct regulation." *See* 50 F.4th at 759-61. None of these cases hold regulations on private contractors are "direct" regulations of the United States or its instrumentalities.

      2.    *Absent Discrimination Or Direct Regulation, There Can Be No Violation Of The Intergovernmental Immunity Doctrine.*

Relying on *Geo Group*, the United States claims AB 5207 violates a third kind of intergovernmental immunity prohibiting neutral state laws that operate on private parties but have the effect of "control[ling] federal operations." Br. 10. But no such immunity exists; instead, reams of precedent and first principles foreclose it.

The precedent could not be clearer. "Over 50 years ago … the Court decisively rejected the argument that any state regulation which indirectly regulates the Federal Government's activity is unconstitutional." *North Dakota*, 495 U.S. at 434 (plurality opinion). Under modern intergovernmental immunity doctrine, "[a] state regulation is invalid *only* if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *Id*. at 435 (emphasis added). That insight was core to the outcome in that case, upholding state regulations requiring labeling of out-of-state alcohol even when applied to the suppliers of federal military bases. *Id*. at 426. Although those state regulations had a clear impact on the Federal Government's operations—they caused several suppliers to stop selling to military bases altogether, *see id.* at 429—they were valid because the law "operate[d] against suppliers, not the Government," in a non-discriminatory way. *Id.* at 437-38.

Had there been any doubt before, a unanimous Court cleared it up in 2021 in *United States v. Washington*. The United States erroneously quotes *Washington* for the proposition that intergovernmental immunity "prohibit[s] States from interfering with or controlling the operations of the Federal Government." U.S. Br. 6, 7 (quoting *Washington*, 142 S.Ct. at 1984). But the Supreme Court was explaining specifically that this was a *previous* interpretation of the doctrine, and that "[o]ver time[,] … the intergovernmental immunity doctrine[] evolved" to be substantially narrower:

> Originally we understood it as barring any state law whose "effect ... was or might be to increase the cost to the Federal Government of

performing its functions," including laws that imposed costs on federal contractors. We later came to understand the doctrine, however, as prohibiting state laws that *either* "regulate the United States directly *or* discriminat[e] against the Federal Government or those with whom it deals" (*e.g.,* contractors). *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion) (emphasis added); *id.*, at 444 (Scalia, J., concurring in judgment) (noting that "[a]ll agree" with this aspect of the plurality opinion).

142 S.Ct. at 1984 (some citations omitted). Said another way, the whole point of this discussion was that intergovernmental immunity does not simply ask whether a state law "interfered with or controlled" federal operations indirectly by regulating private parties; rather, it asks about discrimination and direct regulation. *Id.* at 1983-84.

First principles justify the doctrinal evolution. The "Constitution presupposes the continued existence of the states functioning in coordination with the national government," including "to regulate their internal affairs and policy." *Penn Dairies*, 318 U.S. at 270-71. States therefore enjoy plenary police powers to regulate private parties in a nondiscriminatory way. Of course, when they do, the Supremacy Clause still plays an important role: Congress can supersede conflicting state law, including state law that interferes with federal operations, by enacting legislation that preempts the state regime. *See NCAA*, 138 S.Ct. at 1479 (explaining preemption is how the Constitution resolves competing state and federal regulations governing such private parties). No one disputes that Congress *could* decide private companies must be free from state health laws when contracting with ICE. But absent Congressional action, the Constitution itself does not imbue private actors doing business in the State with

33

immunity from neutral state laws regulating them just because the laws significantly impact federal operations. *See North Dakota*, 495 U.S. at 435. Far from "grind[ing]" U.S. operations "to a halt," U.S. Br. 11, this rule "accommodate[es] the full range of each sovereign's legislative authority" and, of special importance, is "respectful of the primary role of Congress in resolving conflicts between the National and State Governments." *North Dakota*, 495 U.S. at 435.

An example helps to show how far-reaching the challengers' theory is. They claim the Supremacy Clause invalidates a state regulation of private parties even if Congress *never* steps in with a federal statute that preempts it. *See supra* at 11-26 (explaining INA does not preempt AB 5207). But courts have repeatedly held that a state may apply generally applicable minimum wage law to businesses contracting with the Federal Government, unless some federal law preempts the application. *See Novoa v. GEO Grp., Inc.*, No. 17-2514, 2022 WL 2189626, at *21-*23 (C.D. Cal. Jan. 25, 2022) (neutral minimum wage law applied to private immigration detention facility did not violate intergovernmental immunity); *Nwauzor v. GEO Grp.*, No. 17-5769, 2020 WL 1689728, at *7 (W.D. Wash. Apr. 7, 2020); *Washington v. GEO Grp.*, No. 17-5806, 2018 WL 6448778, at *3 (W.D. Wash. Dec. 10, 2018). That makes sense: these laws are neutral; these laws do not regulate the government itself; and Congress has never seen fit to preempt them. That these laws impose costs is no reason to find them invalid, just as it is not for AB 5207.

34

Finally, a prohibition on any state regulation that has the effect of burdening or controlling federal government operations has no limiting principle. The Federal Government experiences collateral burdens resulting from State action all the time— just as States experience collateral burdens resulting from local actions—but "[s]uch burdens are but normal incidents of the organization within the same territory of two governments." *Helvering v. Gerhardt*, 304 U.S. 405, 422 (1938). The challengers' sweeping view of intergovernmental immunity would put in jeopardy all manner of state action from health regulations to labor or discrimination protections for private contractors. Regardless of the Ninth Circuit's view, that is not the law in this Circuit, which has faithfully followed the rule that "under the doctrine of intergovernmental immunity, states may not 'regulate the Government directly or discriminate against it.'" *Treasurer of New Jersey*, 684 F.3d at 406. And because AB 5207 contravenes nether prong—and because the INA does not preempt it—CoreCivic (and the United States) will not likely prevail under the Supremacy Clause.

## II.  THE EQUITIES CONFIRM THAT CORECIVIC IS NOT ENTITLED TO THE BELATED EMERGENCY RELIEF IT SEEKS.

CoreCivic's failure to meet the second gateway factor of irreparable harm and the overall balance of equities likewise undermine this application. Courts cannot grant relief "unless the moving party shows that it specifically and personally risks irreparable harm." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000). Critically, delay can "knock[] the bottom out of any claim of immediate and

irreparable harm," and offers a "dispositive basis" for rejecting emergency relief. *Pharmacia Corp. v. Alcon Labs.*, 201 F. Supp. 2d 335, 382-83 (D.N.J. 2002); *see H-1 Auto Care, LLC v. Lasher*, No. 21-18110, 2022 WL 13003468, at *4 (D.N.J. Oct. 21, 2022) (denying preliminary injunction based on delay alone, without considering the merits); *Hines v. Lanigan*, No. 17-2864, 2020 WL 6613213, at *3 (D.N.J. Nov. 10, 2020). After all, preliminary relief proceeds "under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights" or preserve the status quo before a new law takes effect. *Lanin v. Borough of Tenafly*, 515 F. App'x 114, 117-18 (3d Cir. 2013); *see Acierno*, 40 F.3d at 647 (same). CoreCivic's almost-22-month delay in "seeking enforcement of [its] rights" proves exactly the opposite. *Lanin*, 515 F. App'x at 117. Had CoreCivic filed suit when AB 5207 was enacted, it could have litigated its constitutional challenge on a reasonable schedule long ago. Now, "any purported harm Plaintiff[] face[s] is a consequence of [its] own delay," *Messina v. Coll. of New Jersey*, 566 F. Supp. 3d 236, 249 (D.N.J. 2021), and self-inflicted harm by definition "does not qualify as irreparable," *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995). And CoreCivic never seriously explains the basis for its almost-22-month delay.

This Court routinely denies injunctive relief based on far shorter delays. *See Messina*, 566 F. Supp. 3d at 249 (four months); *Vita-Pure, Inc. v. Bhatia*, No. 14-7831, 2015 WL 1496396, at *4 (D.N.J. Apr. 1, 2015) (same); *Pharmacia Corp.*, 201

F.Supp.2d at 383-84 & n.18 (collecting cases involving less than one-year delay). The State has not identified a single case in which this Court granted a preliminary injunction after more than 21 months of unexplained delay. CoreCivic waited until the law had been in effect for over two years and *every* single other detention facility in New Jersey had come into compliance. Allowing CoreCivic to now short-circuit the normal litigation process is a poor set of incentives for everyone.

While the movant alone must show irreparable harm, *Adams*, 204 F.3d at 487, the United States's unexplained delay undermines any emergency as well. When AB 5207 took effect, federal agencies knew precisely when the contract with CoreCivic would expire and knew that "[i]t typically takes 6 to 12 months from the beginning of preparation for ICE to award a contract" Burke Decl. ¶ 10. Yet they never sought relief until this Court sought their participation, and, even then, declined to file suit. The United States claims leaving a two-year-old state law in effect is "catastrophic," Guadian Decl. ¶ 29, but it does not attempt to explain its delay either.

On the other side of the ledger, an injunction preventing enforcement of AB 5207 would impose grievous harms on New Jersey and the public. Initially, the State "suffers . . . irreparable injury" whenever it is prevented "from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *see Robinson v. Ardoin*, 37 F.4th 208, 227 (5th Cir. 2022) ("When a statute is enjoined, the State necessarily suffers the irreparable

harm of denying the public interest in the enforcement of its laws."). But the public's interest goes far beyond that here. The Legislature enacted AB 5207 because it found facilities like EDC "have a history of poor conditions, including inadequate medical and mental health care, use of isolated confinement, and incidents of violence and retaliation against people in detention." N.J. Stat. Ann. § 30:4-8.15(c). With respect to EDC, the record contains evidence (from human rights organizations, detainees, and CoreCivic's own landlord) indicating a host of deplorable conditions including sexual harassment, spoiled food, poor medical care, misuse of solitary confinement, and failure to follow basic COVID-19 precautions. *See supra* at 6-8. Enjoining AB 5207 risks perpetuating the very abuses the Legislature sought to eliminate over two years ago when it broadened state law's prohibition on private detention.

By contrast, the parade of horribles the United States claims will occur lacks support. The Act has resulted in the closure of three other detention facilities housing more than five times as many detainees as EDC, leading to the release or transfer of those detainees to other facilities without frustrating the enforcement of immigration laws. *See supra* at 8-9. Indeed, ICE has a number of tools to absorb the consequences of closing EDC. It has discretion to decide whether to transfer particular detainees or release them, including whether to monitor particular civil immigration detainees via electronic monitoring. *See, e.g.*, *Alternatives to Detention (ATD)*, Transactional Records Access Clearinghouse (July 15, 2023) (14,448 individuals subject to ICE

ATD program in Newark Area of Responsibility on July 15, 2023), bit.ly/43CJSs7.[11]

And of course, in the longer term, federal law provides the agency with an obvious solution: when detention facilities are unavailable to them, ICE can acquire and operate its own facilities free from the strictures of state law—and free from the problems private detention creates.

Nor does ICE seriously establish that transferring some or all of its *156* current EDC residents next month would be infeasible. ICE has technology to allow virtual representation for those it transfers to other facilities. *See Access to Due Process* 4, ICE (Jan. 4, 2023), bit.ly/3KcpNSx. And it has repeatedly claimed in litigation that allowing detainees to meet with their counsel virtually does not "rise to the level of irreparable harm." Mem. Law in Opp. to Pltfs' TRO Mot. 27, *Juan R. v. DHS*, No. 21-13117 (D.N.J. July 1, 2021); *see Arroyo v. DHS*, No. 19-815, 2019 WL 2912848, at *23 (C.D. Cal. June 20, 2019) (claiming harms from transfers are "speculative"). Moreover, even before AB 5207, ICE routinely and frequently transferred detainees to different facilities, undercutting its current claim that transferring detainees out of state would be too onerous. *See* Emily Ryo & Ian Peacock, *A National Study of*

---

[11] The United States raises the bogeyman that allowing AB 5207 to remain in effect will result in the release of dangerous immigration detainees. But its records indicate that the overwhelming majority of current EDC detainees have no criminal record. *See Detention FY 2023 YTD*, ICE (July 20, 2023) (Row 52 of "Facilities FY23" tab showing 132 of 156 detainees classified as "No ICE Threat Level," and row 24 of "Footnotes" tab defining classifications), https://tinyurl.com/2p92df3. Regardless, ICE can of course transfer any individuals it decides not to release.

*Immigration Detention in the United States*, 92 S. Cal. L. Rev. 1, 39 (2018) (finding more than half of individuals detained by ICE were transferred between detention facilities). The balance of equities weighs sharply against an injunction.

## CONCLUSION

CoreCivic's motion for a preliminary injunction should be denied.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:    */s/ David Chen*
       David Chen
       Deputy Attorney General

Dated: July 26, 2023

## __CERTIFICATE OF SERVICE__

I certify that on July 26, 2023, I electronically filed the foregoing Brief in Opposition to Motion for a Preliminary Injunction and accompanying papers with the Clerk of the U.S. District Court for the District of New Jersey. Counsel for all parties will be served via CM/ECF.

 */s/ David Chen*                   
David Chen
Deputy Attorney General

Dated: July 26, 2023