UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CORECIVIC, INC.,

    Plaintiff,

        v.

PHILIP D. MURPHY, in his official capacity
as Governor of the State of New Jersey, and
MATTHEW J. PLATKIN, in his official
capacity as Attorney General of the State of
New Jersey,

    Defendants.

Civil Action No. 23-967 (RK) (TJB)

**OPINION**

**KIRSCH, District Judge**

    In August 2021, New Jersey enacted Assembly Bill 5207 ("AB 5207"), which prohibits New Jersey, its political subdivisions, and private entities from prospectively contracting to own or operate any facility that detains individuals for violating civil immigration laws. Only the federal government enacts or enforces immigration law. At the time of AB 5207's passage, the United States Immigration and Customs Enforcement ("ICE"), the division of the Department of Homeland Security ("DHS") responsible for detaining individuals for civil immigration violations, had use of four detention facilities in New Jersey. Shortly after AB 5207's passage, three of the four facilities — all operated by New Jersey counties — stopped housing detainees on ICE's behalf. The one remaining facility in New Jersey, the Elizabeth Detention Center ("EDC"), is operated by Plaintiff CoreCivic, Inc. ("Plaintiff" or "CoreCivic") pursuant to an ICE contract. The contract will expire on August 31, 2023. At that time, AB 5207 will prohibit ICE and Plaintiff

from renewing their contract, and the federal government will lack any facility in New Jersey to hold individuals detained for civil immigration violations.

Plaintiff contends that AB 5207 violates the Supremacy Clause by precluding Plaintiff and ICE from renewing their contract. (Am. Compl., ECF No. 14.) Plaintiff seeks to enjoin Defendants Philip D. Murphy, the Governor of New Jersey, and Matthew J. Platkin, the Attorney General of New Jersey ("Defendants" or "New Jersey"), from enforcing AB 5207 against Plaintiff with respect to its relationship with ICE. (*Id.*) Presently before the Court is Plaintiff's Motion for Preliminary Injunction seeking declaratory and injunctive relief from AB 5207's enforcement. (ECF Nos. 17, 18.) Plaintiff filed its moving brief (Pl.'s Br., ECF No. 17-4), and the United States filed a statement of interest pursuant to 28 U.S.C. § 517 in support of the preliminary injunction (U.S.'s Br., ECF No. 37). Defendants opposed the preliminary injunction motion (Defs.' Br., ECF No. 41), and Plaintiff filed a reply brief (ECF No. 45). The Court has received declarations from each party in interest, including Plaintiff (ECF Nos. 17-1, 17-2), Defendants (ECF No. 41-1), and the United States (ECF Nos. 37-1, 37-2).

On August 14, 2023 the Court heard oral argument from the parties and the United States. Given the solely constitutional questions underpinning Plaintiff's claim, the parties consented to entry of a final decision on the merits after the hearing. (Letter, ECF No. 47.) The Court thus construes Plaintiff's and Defendants' briefs as cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(f).

For the reasons set forth below, the Court enters judgment in Plaintiff's favor, declares AB 5207 unconstitutional as applied to Plaintiff's operation of the EDC to hold detainees on ICE's behalf, and permanently enjoins Defendants from enforcing AB 5207 against Plaintiff with respect to Plaintiff's relationship with ICE.

# I.     BACKGROUND [1]

## A.     FEDERAL IMMIGRATION DETENTION

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012) (citing *Toll v. Moreno*, 458 U.S. 1, 10 (1982)). This authority flows from "the National Government's constitutional power to 'establish a uniform Rule of Naturalization,' and its inherent power as sovereign to control and conduct relations with foreign nations." *Id.* at 394–95 (quoting U.S. Const. art. I, § 8, cl. 4, then citing *Toll*, 458 U.S. at 10). "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Id.* at 396. "A principal feature of the removal system is the broad discretion exercised by immigration officials." *Id.* "Agencies in [DHS]," including ICE, "play a major role in enforcing the country's immigration laws." *Id.* at 397.

Unlawfully entering or re-entering the United States violates federal law. *Id.* at 395. "The federal statutory structure instructs when it is appropriate to arrest an alien during the removal process." *Id.* at 407. Under certain circumstances, Congress requires ICE to detain non-citizens pending resolution of their immigration proceedings. *See* 8 U.S.C. § 1231(a)(2) ("During the removal period, the Attorney General shall detain the alien."); 8 U.S.C. § 1225(b)(1)(B)(ii), 1225(b)(2)(A) (requiring that an "alien shall be detained" under certain circumstances); 8 U.S.C.

---

[1] The facts in this section are drawn from the five declarations submitted by the parties in conjunction with their preliminary injunction briefing papers. They are the Declaration of Bradley D. Simon, Plaintiff's counsel (ECF No. 17-1); the Declaration of Bart Verhulst, Plaintiff's Vice President of Federal & Local Partnership Relations (Verhulst Decl., ECF No. 17-2); the Declaration of Monica S. Burke, Acting Assistant Director of ICE's Enforcement and Removal Operations, Custody Management Division (Burke Decl., ECF No. 37-1); the Declaration of Robert Guadian, Deputy Assistant Director for Field Operations of ICE's Enforcement and Removal Operations (Guadian Decl., ECF No. 37-2); and the Declaration of Melinda S. Haley, Assistant Commissioner of the Division of Diversity and Legal Affairs in the New Jersey Department of Corrections (ECF No. 41-1).

§ 1226(c)(1) (stating that the Attorney General "shall take into custody any alien who" is inadmissible or deportable pursuant to certain enumerated statutes).[2] Under other circumstances, Congress delegated the decision whether detention for a civil immigration violation is appropriate. *See* 8 U.S.C. § 1226(a) ("[A]n alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."); *see also* (Guadian Decl. ¶ 6 ("While ICE has discretion to release certain noncitizens pending their removal proceedings if they are not flight risks and do not pose a public-security threat, ICE is required to detain categories of noncitizens who are subject to mandatory detention under the immigration laws or those who pose risk to public safety.").)

Congress has likewise granted DHS discretion over the manner in which it detains individuals for civil immigration violations. "The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1).[3] Before constructing a new detention facility, DHS "shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use." 8 U.S.C. § 1231(g)(2). DHS has promulgated regulations permitting ICE to "enter into contracts of up to fifteen years' duration for detention or incarceration space or facilities, including related services." 48 C.F.R. § 3017.204-90. However, when ICE contracts

---

[2] Authority vested in the Attorney General was transferred to the Secretary of Homeland Security and divisions of DHS by the Homeland Security Act of 2002. *See Clark v. Suarez Martinez*, 543 U.S. 371, 374 n.1 (2005) ("The authorities described herein as having been exercised by the Attorney General and the Immigration and Naturalization Service (INS) now reside in the Secretary of Homeland Security (hereinafter Secretary) and divisions of his Department . . . ."); *see also* 6 U.S.C. § 251. References in the above statutes to "Attorney General" are read to refer to the Secretary of Homeland Security.

[3] This provision mirrors other statutes that delegate to specific agencies the authority to provide for federal detainees. *See* 18 U.S.C. § 4001(b)(1) ("The control and management of Federal penal and correctional institutions . . . shall be vested in the Attorney General, who shall promulgate rules for the government thereof . . ."); 18 U.S.C. § 4086 ("United States marshals shall provide for the safe-keeping of any person arrested, or held under authority of any enactment of Congress pending commitment to an institution.").

with a "private entit[y]" to detain individuals in ICE's custody, the private contractor must comply with the "Standard Statement of Work for Contract Detention Facilities" and meet "four mandatory criteria." 8 C.F.R. § 235.3(e).

"ICE neither constructs nor solely operates its own immigration detention facilities." (Burke Decl. 8.) Instead, the federal government houses immigration detainees through a network of facilities, namely (1) ICE-owned, contractor-operated facilities; (2) contractor-owned and contractor-operated facilities; and (3) facilities owned by or operated on behalf of local governments pursuant to an "Intergovernmental Service Agreement." (*Id.* ¶¶ 8, 9.)[4] This affords ICE necessary "flexibility" given "significant fluctuations in the number and location of removable noncitizens apprehended by DHS and subject to detention." (*Id.* ¶ 8.) Through this approach, ICE avoids "invest[ing] heavily in its own facilities only to have them stand idle if a particular area later experiences a drastic decrease in demand for detainee housing." (*Id.*)

**B.      ICE'S NEW JERSEY FACILITIES AND CORECIVIC**

"The federal government has been housing immigration detainees in New Jersey since at least 1986." (*Id.* ¶ 12.) Prior to AB 5207's passage, "ICE had use of four contracts to house detainees in New Jersey: two intergovernmental-service agreements with Essex County and Hudson County, the use of the U.S. Marshals' agreement with Bergen County, and the privately owned-and-operated Elizabeth Contract Detention Facility run by CoreCivic." (*Id.* ¶ 14.) ICE's access to the New Jersey counties' facilities was terminated in 2021 after the passage of AB 5207. (*Id.* ¶ 15.)

---

[4] Apart from these three categories of detention facility, the Burke Declaration also identifies several "[o]ther facilities used by ICE under various contractual arrangements" to house ICE detainees. (Burke Decl. ¶ 9.) The details of these facilities are outside the scope of this case.

CoreCivic operates private detention facilities nationwide pursuant to contracts with states and their subdivisions as well as the federal government. (Verhulst Decl. ¶ 5.) CoreCivic operates the EDC in Elizabeth, New Jersey, pursuant to a contract with ICE. (*Id.* ¶ 6.) ICE awarded CoreCivic the initial contract to operate the EDC in 2005 for a three-year period, and renewed the contract five times. (*Id.* ¶ 7.) The current contract is set to expire on August 31, 2023. (*Id.*)[5]

The EDC is the "only facility that houses ICE detainees within 60 miles of New York City." (Guadian Decl. ¶ 8.) The facility has the capacity to hold 304 detainees. (Burke Decl. ¶ 16.) The EDC recorded "2,142 immigration detainees book-ins during Fiscal Year 2022, and 2,035 book-ins for Fiscal Year 2023 (as of July 15, 2023)." (Guadian Decl. ¶ 8.) As of mid-June 2023, the EDC held approximately 285 detainees. (Verhulst Decl. ¶ 6.) ICE originally housed only "low-risk noncitizens, such as those who have recently crossed the border and those with minor criminal offenses" at the EDC. (Burke Decl. ¶ 17.) However, after AB 5207's passage in August 2021, ICE began "detain[ing] higher-risk individuals (those classified as Medium-High- and High-risk) for up to 72 hours" at the EDC. (*Id.* ¶ 18.)

**C.    AB 5207**

New Jersey Assembly Bill 5207, L.2021, c. 199, §§ 1-2, codified at N.J. Stat. Ann. §§ 30:4-8.15 to -8.16, was enacted on August 20, 2021 and became effective the same day. The legislative findings section of AB 5207 emphasizes "the responsibility of the State to protect the health and safety, including the physical and mental health, of individuals detained within New Jersey." N.J.S.A. § 30:4-8.15(b).

---

[5] Plaintiff leases the property on which it operates the EDC from its landlord, non-party Portview Properties, LLC. (Verhulst Decl. ¶ 17.) ICE would pay CoreCivic $18 million per year under the renewed contract. (*Id.* ¶¶ 18, 20.) Plaintiff has also made alterations to the EDC facility in order to carry out detention operations there, which Plaintiff avers totals approximately $7.5 million. (*Id.* ¶¶ 18, 20.)

To effectuate this legislative purpose, AB 5207 outlaws agreements between the federal government and any other entity to detain individuals for violating federal immigration law. AB 5207 states that both "the State or a local government agency" as well as "a private detention facility operating in this State shall not enter into, renew, or extend any immigration detention agreement . . . ." N.J.S.A. § 30:4-8.16(b). An "[i]mmigration detention agreement" is "any contract, agreement, intergovernmental service agreement, or memorandum of understanding that authorizes the State, local government agency, or private detention facility to house or detain individuals for civil immigration violations." N.J.S.A. § 30:4-8.16(a). The statute defines a "private detention facility" as "any privately owned or operated facility that houses or detains individuals for civil immigration violations." N.J.S.A. § 30:4-8.16(a).

### D.   EFFECTS OF AB 5207

If AB 5207 is enforced to prevent ICE and Plaintiff from renewing Plaintiff's contract to operate the EDC, "ICE will no longer have any facilities in New Jersey to house civil immigration detainees." (Burke Decl. ¶ 19.)

The United States avers that preventing the EDC from continuing to operate will force ICE to either transport detainees to out-of-state facilities or release noncitizens. (*Id.* ¶ 20.) The first option (transportation) would "negatively affect[] detention in out-of-state facilities" through, for example, overcrowding. (*Id.*) The second option (release) could, depending on the individual, create risks for the community. (*Id.*) ICE's loss of access to the three county-owned facilities in New Jersey has already "adversely affected ICE operations and currently forces ICE to relocate large numbers of high-risk and medium-risk noncitizen detainees to detention facilities outside of New Jersey" when they must be detained for more than 72 hours. (*Id.*)

If AB 5207 forces ICE to house detainees outside of New Jersey, ICE would likely need to initiate "a competitive solicitation process for new private contracts in other States to replace the lost capacity in New Jersey," which "wouldn't be available for some time." (*Id.* ¶ 25.) The United States cites the EDC's proximity to two international airports — the Newark Liberty International Airport and the JFK International Airport — that make EDC crucial to ICE's operations, as well as the operations of other federal agencies. (Guadian Decl. ¶¶ 9–13.) Reliance on out-of-state facilities would affect the federal government by:

- requiring ICE officers overseeing removals to transport detainees to and from out-of-state facilities, absorbing 10 to 11 hours per trip, (*Id.* ¶¶ 10–12);

- impeding the FBI's Joint Terrorism Task Force's ability to detain and interview at the EDC individuals "who are watch-listed by the Terrorist Screening Center" under exigent circumstances, (*Id.* ¶ 14);

- preventing the Customs and Border Protection (CBP) from quickly deporting noncitizens who are denied entry at one of the nearby international airports, as the EDC is the "primary facility supporting [CBP] operations in the region," (*Id.* ¶ 15);

- preventing ICE from taking custody of noncitizens upon notification by New Jersey state and local facilities that they are releasing individuals subject to an immigration detainer, (*Id.* ¶¶ 19–20);

- causing facilities that house ICE detainees in New York and Pennsylvania to become overcrowded, "increase[ing] the danger to federal contractors' personnel who would be supervising increased population with a higher detainee-to-officer ratio," (*Id.* ¶ 25); and

- hampering "the ability of detainees with families in New Jersey to access their families" and their attorneys, (*Id.* ¶¶ 25, 27).

According to the United States, if New Jersey's neighboring states passed laws similar to AB 5207, "ICE will be unable to detain some (or perhaps many) noncitizens who are public safety or national security risks. A drastic decrease in ICE's ability to contract for detention facilities would also result in massively increased costs in terms of both transportation needs and the hiring of more officers to ensure that noncitizens are safely transported to distant facilities." (Burke Decl. ¶ 26.)

8

The United States asserts that attempting to comply with AB 5207 by building and operating its own detention facility in New Jersey is "not a practical or legal possibility." (*Id.* ¶ 21.) "Constructing and opening a new facility would be more expensive and time-consuming than entering into a contract with a private company or public entity for an existing facility." (*Id.* ¶ 22.) ICE's purpose for contracting with others for a "specific number of detention beds" is to accommodate the daily fluctuations of ICE detainees. (*Id.* ¶ 21.) Given these fluctuations, AB 5207's effective prohibition on ICE entering into private partnerships would result in the federal government building and operating facilities and "hir[ing] hundreds of staff" to ensure ICE has sufficient capacity, and then letting those facilities stand idle during the "highly likely" periods of decreased detention needs. (*Id.* ¶ 22.) ICE asserts that AB 5207 "impairs ICE's ability to strategically plan at a national level for the contracts required to ensure there is sufficient capacity in New Jersey to enforce our nation's immigration laws." (*Id.* ¶ 13.)

"If new construction is required, it could take a minimum of three years before ICE is able to gain access to the beds at any new detention facilities." (*Id.* ¶ 23.) This accounts for both the "protracted process" required to purchase land and construct a facility as well as the time to "classify, hire, and train several hundred detention officers, cooks, maintenance and sanitation workers, transportation officers, and others to safely operate a detention facility." (*Id.* ¶ 23.) Because ICE does not currently operate any of its own detention facilities, it would start from square one in building and staffing its own. (*Id.* ¶ 9.)

The United States avers that the EDC is a "mission critical location for ICE." (*Id.* ¶ 27.) On May 30, 2023, ICE issued a "Request for Information" ("RFI") to identify locations to house individuals in support of its Newark, New Jersey Field Office. (Verhulst Decl. ¶ 10.) The RFI sets out certain mandatory requirements, as well as other conditions that bidders should but do not

necessarily have to satisfy. (*Id.* ¶¶ 11–12.) While ICE received four responses to the RFI, "only CoreCivic is capable of meeting ICE's requirements." (Burke Decl. ¶ 28.) The United States asserts that but for AB 5207's prohibition, ICE would "extend CoreCivic's contract before its current contract expires on August 31, 2023." (*Id.* ¶ 27.)

### E.   PROCEDURAL HISTORY

On February 17, 2023, CoreCivic filed the instant suit. (Compl., ECF No. 1.) After Defendants filed a Motion to Dismiss for lack of jurisdiction (ECF No. 12), Plaintiff filed its First Amended Complaint on June 7, 2023. (Am. Compl., ECF No. 14.)[6] Plaintiff's Amended Complaint alleges that AB 5207 is unconstitutional as applied to Plaintiff's operations under preemption principles (Count One) and under the intergovernmental immunity doctrine (Count Two). (*Id.* ¶¶ 45–57.) Plaintiff seeks declaratory relief that AB 5207 is unconstitutional as applied to Plaintiff and a permanent injunction enjoining Defendants from enforcing AB 5207 against Plaintiff or otherwise interfering with Plaintiff's negotiation and entry of a new contract with the United States to operate immigration detention facilities in New Jersey.

On June 14, 2023, Plaintiff filed a motion for a preliminary injunction with temporary restraints pursuant to Federal Rule of Civil Procedure 65, seeking temporary relief identical to the relief sought in its Amended Complaint. (ECF Nos. 17, 18.) Plaintiff seeks declaratory relief that AB 5207 "does not prevent CoreCivic from negotiating or contracting with ICE to continue housing civil immigration detainees after the ICE Contract's August 31, 2023 expiration." (ECF No. 17 at 2.) Plaintiff also seeks to enjoin New Jersey, through its officials, "from taking any action to enforce AB 5207 in such manner as to prevent CoreCivic from negotiating or contracting with

---

[6] Defendants subsequently withdrew their motion to dismiss in light of the superseding Amended Complaint. (ECF No. 15.)

ICE to continue housing civil immigration detainees after the ICE Contract's August 31, 2023 expiration." (*Id.*)

On June 20, 2023, the Court held a telephone conference with the parties, (Minute Entry, ECF No. 22), at which the Court denied Plaintiff's request for temporary restraints pending a decision on the preliminary injunction. (Text Order, ECF No. 23.) At a subsequent teleconference on July 10, 2023, the Court set a briefing schedule and argument date on Plaintiff's preliminary injunction motion. (Minute Entry, ECF No. 32; Text Order, ECF No. 33.) The parties stated that "they do not seek witness testimony but rather, will rely on oral argument and their written submissions." (ECF No. 33.) On July 19, 2023, the United States filed a statement of interest pursuant to 28 U.S.C. § 517 in support of Plaintiff's preliminary injunction motion. (ECF No. 37.)[7] On July 26, 2023, Defendants filed a brief opposing the preliminary injunction. (ECF No. 41.) On August 4, 2023, Plaintiff filed a reply brief. (ECF No. 45.)[8]

On August 8, 2023, the Court ordered the parties to file a joint letter ahead of oral argument indicating whether they would consent to the Court "advanc[ing] the trial on the merits and consolidat[ing] it with the hearing" pursuant to Federal Rule of Civil Procedure 65(a)(2). (Text Order, ECF No. 46.) On August 10, 2023, the parties filed a joint letter stating their "agree[ment] that there are no disputed issues of material fact presented in the submissions" and "consent[ing] to the Court entering a final decision on the merits of Plaintiff's Complaint after the hearing on

---

[7] At the Court's July 10, 2023 teleconference, the United States represented that it intended to file a separate lawsuit on the same subject ahead of the hearing on Plaintiff's preliminary injunction motion. (ECF No. 33.) Via letter filed on July 17, 2023, the United States indicated that it would instead file a statement of interest in the case "to streamline proceedings without a separate case." (ECF No. 36.)

[8] On July 24, 2023, the Immigration Reform Law Institute filed a motion for leave to file an *amicus curiae* brief in support of Plaintiff's motion for a preliminary injunction (ECF No. 40), along with its proposed brief (ECF No. 40-1). Both parties consented to the *amicus*'s filing. (ECF No. 40 at 2; Oral Arg. Tr. at 4:10–14.) The Court granted leave to file the *amicus* brief at the hearing on August 14, 2023. (*Id.* at 4:15–16.)

August 14, 2023." (ECF No. 47.)

The Court heard in-person oral argument from the parties and the United States on August 14, 2023. At the hearing, the Court restated its view that the case turned on "essentially a legal dispute," but that the Court would consider the submitted declarations where needed. (Oral Arg. Tr. at 4:20–5:3.) The parties reiterated their consent to the Court issuing a final decision on the merits after the hearing. (*Id.* at 5:5–13.)

## II.     <u>LEGAL STANDARD</u>

A district court may enter a preliminary injunction pursuant to Federal Rule of Civil Procedure 65. Rule 65 also provides a court with discretion to decide the merits of a case and enter a permanent injunction under certain circumstances. Fed. R. Civ. P. 65(a)(2) ("Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the [preliminary injunction] hearing."). Pursuant to Federal Rule of Civil Procedure 56, a court may treat a motion for a preliminary injunction as a motion for summary judgment and enter a final disposition on the merits. Fed. R. Civ. P. 56(f)(3) ("After giving notice and a reasonable time to respond, the court may . . . consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.").

A court's decision to proceed under either Rule 65(a)(2) or Rule 56(f), without the litigation that normally precedes the court's entry of a final decision on the merits, implicates important due process principles. Before consolidating the trial on the merits with the preliminary injunction hearing, a court will normally give "clear and unambiguous notice" of its intent "at a time which will still afford the parties a full opportunity to present their respective cases." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (quoting *Pughsley v. 3750 Lake Shore Drive Cooperative Bldg.*, 463 F.2d 1055, 1057 (7th Cir. 1972)). This requirement reflects the fact that often "the scope

and procedural posture of a hearing for a preliminary injunction is significantly different from a trial on the merits." *Anderson v. Davila*, 125 F.3d 148, 157 (3d Cir. 1997). Due process concerns are ameliorated when the relevant issues are solely legal, not factual, and the parties agree that they have had a full opportunity to brief the relevant legal issues. *See Franklin Univ. v. CGFNS Int'l, Inc.*, 534 F. Supp. 3d 457, 458 (E.D. Pa. 2021) (holding a consolidated hearing pursuant to Rule 65(a)(2) with "consent of the parties" because the issues involved "a matter of statutory interpretation of which the material facts are not in dispute"); *Morrill v. Weaver*, 224 F. Supp. 2d 882, 885 (E.D. Pa. 2002) (consolidating the preliminary injunction hearing with a trial on the merits on agreement of the parties "inasmuch as there were no factual issues in dispute—only legal questions").

Rule 56(f) likewise requires the parties to receive "notice and a reasonable time to respond" before the court enters summary judgment *sua sponte*. Fed. R. Civ. P. 56(f); *see also Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 280 (3d Cir. 2010) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence." (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986))). "[N]o additional notice is required if there is: (1) a fully developed record; (2) a lack of prejudice to the parties; and (3) a decision on a purely legal issue." *Zimmerlink v. Zapotsky*, 539 F. App'x 45, 49 (3d Cir. 2013) (citing *Gibson v. Mayor & Council of Wilmington*, 355 F.3d 215, 224 (3d Cir. 2004)); *see also Nat'l Collegiate Athletic Ass'n v. Christie*, 61 F. Supp. 3d 488, 491 (D.N.J. 2014) (entering a final disposition on the merits through summary judgment on party's motion for preliminary injunction where parties agreed that "no discovery or evidentiary hearing was required on the preliminary injunction application" and the parties'

disagreements turned on constitutional issues), *rev'd sub nom. on other grounds*, *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018).

In this case, the sole question presented is legal: whether AB 5207 as applied to Plaintiff survives Supremacy Clause scrutiny. The declaratory and injunctive relief Plaintiff seeks through its motion is identical to the relief sought in its operative complaint. The parties have had a full and fair opportunity to argue the relevant constitutional issues in their preliminary injunction briefing and at oral argument. Clearly, here, notice was provided and consent was obtained from all parties to consolidate the preliminary injunction hearing with a trial on the merits. Accordingly, the Court will construe the parties' briefing on Plaintiff's preliminary injunction motion as cross-motions for summary judgment pursuant to Rule 56(f), and proceed to the merits of the Amended Complaint in deciding whether to issue a permanent injunction against enforcement of AB 5207 against Plaintiff.[9]

## III.    DISCUSSION

The Supremacy Clause provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The Supremacy Clause prevents courts from "giv[ing] effect to state laws that conflict with federal laws." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015) (citing *Gibbons v. Ogden*, 22 U.S. 1 (1824)). Two strains of

---

[9] The parties' joint letter indicates a slight disagreement over the proper procedural mechanism for the Court to reach the merits of Plaintiff's complaint. Defendants proposed that the Court "construe the briefing on plaintiff's motion for a preliminary injunction as cross-motions for summary judgment." (Joint Letter, ECF No. 47.) Plaintiff proposed "consolidat[ing] the August 14 hearing for preliminary relief with a trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2)." (*Id.*) Because the Court's decision turns on solely legal questions without resolving any disputed issues of material facts, the Court sees no distinction between the parties' proposed manner of proceeding.

Supremacy Clause jurisprudence are at issue in the case at bar. One branch, the intergovernmental immunity doctrine, "prohibit[s] States from interfering with or controlling the operations of the Federal Government." *United States v. Washington*, 142 S. Ct. 1976, 1984 (2022). A separate branch, the preemption doctrine, comprises several "different ways in which federal statutes may displace state laws . . . ." *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901 (2019).

AB 5207 evades easy classification under a particular branch of the Supreme Court's Supremacy Clause jurisprudence. *See id.* (noting that the categories of preemption are "not rigidly distinct" (citation omitted)). Regardless of the doctrine invoked, the result in this case is clear. A state law that wholesale deprives the federal government of its chosen method of detaining individuals for violating federal law cannot survive Supremacy Clause scrutiny. AB 5207 would impose on the United States an intolerable choice between either releasing federal detainees or carrying out detention in an entirely novel way. As applied to Plaintiff, AB 5207 both violates the intergovernmental immunity doctrine and is preempted by federal law granting the federal government exclusive discretion over whether and how to detain individuals for immigration offenses. Detention, in the context of immigration, is a function that is and has always been performed solely by the federal government. Defendants are enjoined from enforcing AB 5207 against Plaintiff to bar the United States and Plaintiff from renewing their contract to operate the EDC.

## A.   INTERGOVERNMENTAL IMMUNITY

"The states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by congress to carry into effect the powers vested in the national government." *McCulloch v. Maryland*, 17 U.S. 316, 322 (1819); *see also Treasurer of New Jersey v. U.S. Dep't of Treasury*, 684 F.3d 382, 409–10 (3d Cir. 2012)

(referring to this language from *McCulloch* as establishing a "bedrock principle" of constitutional law). This injunction flows from the Constitution's requirement that "the Laws of the United States . . . shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. A "corollary" principle to this requirement is that the Supremacy Clause will "remove all obstacles to [the federal government's] action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence." *Hancock v. Train*, 426 U.S. 167, 178 (1976) (quoting *McCulloch*, 17 U.S. at 427). As the Supreme Court expressed more recently, the Supremacy Clause "prohibit[s] States from interfering with or controlling the operations of the Federal Government." *Washington*, 142 S. Ct. at 1984.

Plaintiff and the United States contend that AB 5207's attempt to deprive the federal government of its chosen contractor to detain individuals for violations of federal law runs afoul of the intergovernmental immunity doctrine. Plaintiff contends that a law that "regulates the operations of the Federal Government by restricting the actions of its contracting partners constitutes direct regulation of the Federal Government." (Pl.'s Br. at 18.) Plaintiff argues that the Constitution recognizes no distinction between a law that "bar[s] private contractors from entering into detention agreements with ICE for civil immigration detainees" and a law that "regulat[es] the Federal Government's immigration policies and operations." (*Id.* at 21.) The United States likewise cites a strand of Supremacy Clause doctrine that "has been consistently applied to invalidate state laws that impose requirements on federal contractors." (U.S.'s Br. at 8.)

New Jersey responds that state law only violates the intergovernmental immunity doctrine when it directly regulates the federal government or discriminates against it. (Defs.' Br. at 26.) New Jersey contends that direct regulation can only occur when state law "places [] rights or obligations" on the federal government." (*Id.* at 29.) Because, New Jersey argues, AB 5207 applies

only to private entities that contract with the federal government, the state law does not constitute direct regulation. (*Id.* at 29–30.) New Jersey accuses the United States of seeking the Court to recognize a "third kind of intergovernmental immunity prohibiting neutral state laws that operate on private parties but have the effect of controlling federal operations." (*Id.* at 31–32.)

### 1.    Law

In its decision today, the Court does not rule on a blank slate. In *Geo Group, Inc. v. Newsom*, an *en banc* panel of the Ninth Circuit Court of Appeals recently held unconstitutional a California statute constitutionally identical to AB 5207. 50 F.4th 745 (9th Cir. 2022). In California, as in New Jersey, "ICE relies almost exclusively on privately operated detention facilities in the state to maintain flexibility." *Id.* at 750. The panel in *Geo Group* concluded that "[a]s part of its protection of federal operations from state control, the Supremacy Clause precludes states from dictating to the federal government who can perform federal work." *Id.* at 754. The *en banc* Ninth Circuit continued:

> [W]hen federal law gives discretion to a federal official to hire a contractor to perform federal work, a state cannot override the federal official's decision to do so. That is a level of control over federal operations that the Supremacy Clause does not tolerate. And while a state has greater power to apply neutral regulations to a federal contractor than a federal employee, interfering with the federal government's hiring decisions goes too far—regardless of whether the decision is to hire an employee or a private contractor.

*Id.* at 575. While the Ninth Circuit's decision is not binding on this Court, the Court finds its reasoning persuasive.

Throughout its brief, New Jersey repeatedly cites *McHenry County v. Kwame Raoul*, 44 F.4th 581 (7th Cir. 2022) and heavily relies upon its reasoning in support of its argument that a state barring the federal government's chosen contractor for immigration detention does not constitute "direct regulation" of the federal government itself. (Defs.' Br. at 30.) The Court views

Defendants' reliance on *McHenry County* as misplaced and, frankly, that *McHenry County* actually supports the view of CoreCivic and the United States here. The Illinois law that survived Supremacy Clause scrutiny in *McHenry County* restricted only the ability of Illinois municipalities and counties — i.e., arms of the state itself — from contracting to house individuals for civil immigration offenses. *Id.* at 585 ("This case concerns the boundaries of that authority as applied to municipalities and other political subdivisions created by State law."). The Seventh Circuit explicitly recognized this critical distinction in limiting its holding: "No one suggests that Illinois could tell the Attorney General of the United States where to house a particular detainee. But the State can remove its own facilities—and those of its subordinate localities—from the list of options." *Id.* at 590; *see also id.* at 593 ("The federal government remains free to house immigration detainees in its own facilities in Illinois or to *contract with private parties*." (emphasis added)). In contrast here, the Court does not decide the constitutional soundness of the portion of AB 5207 that restricts the ability of the federal government to enter contracts with New Jersey and its subdivisions — the parties stipulate that this question is not now before the Court. (Oral Arg. Tr. at 9:13–10:2.)

The Supreme Court has consistently relied on the Supremacy Clause to strike down state laws that dictate how the federal government carries out its federal functions. In *Johnson v. Maryland*, Maryland sought to require a federal postal employee to comply with a state licensing regime before he could perform his federal duties. 254 U.S. 51, 55 (1920). In holding the state law unconstitutional, the Court observed:

> [T]he immunity of the instruments of the United States from state control in the performance of their duties extends to a requirement that they desist from performance until they satisfy a state officer upon examination that they are competent for a necessary part of them and pay a fee for permission to go on.

*Id.* at 57. To hold otherwise would permit each individual state to "lay[] hold of [federal employees] in their specific attempt to obey orders and require[] qualifications in addition to those that the Government has pronounced sufficient." *Id.*

*Johnson* involved an attempted state regulation of a federal employee, whose conduct the Supremacy Clause shields more broadly than it does the actions of federal contractors. *See United States v. New Mexico*, 455 U.S. 720, 736 (1982) (rejecting Supremacy Clause argument for tax imposed on federal contractor because a contractor is not "so assimilated by the Government as to become one of its constituent parts" (quoting *United States v. Boyd*, 378 U.S. 39, 47 (1964))); *see also Geo Grp.*, 50 F.4th at 755 (recognizing that a "critical distinction exists between a state regulation . . . applied to a federal employee, and [one] which only applies to private contractors"). However, the Supreme Court's decisions since *Johnson* affirm that *Johnson*'s predominant constitutional concern — that states should not impose conditions on top of "those that the Government has pronounced sufficient," *Johnson*, 254 U.S. at 57 — applies with similar force to federal contractors.

In *Leslie Miller, Inc. v. Arkansas*, the Supreme Court struck down an Arkansas law that prevented a contractor selected by the federal government from bidding, contracting, and commencing work on a military base "without having obtained a license under Arkansas law for such activity . . . ." 352 U.S. 187, 188 (1956). The Court, in rejecting the state law, reasoned that "[s]ubjecting a federal contractor to the Arkansas contractor license requirements would give the State's licensing board a virtual power of review" over the federal government's determination of who was qualified to perform federal work. *Id.* at 190.

In *Public Utilities Commission of California v. United States*, the Supreme Court struck down a California law that prohibited cargo transporters from charging the federal government a

contractually negotiated rate unless the state commission approved the agreement. 355 U.S. 534, 538 (1958). In the Court's view, the Supremacy Clause did not tolerate a state statute that effectively "place[d] a prohibition on the Federal Government" by controlling its agreement with a private party. *Id.* at 544. Even though the statute acted only on the private parties, the Court noted "the seriousness of the impact of California's regulation on the action of federal procurement officials." *Id.* In that way, the California law could be distinguished from one that merely "increase[s] the costs of the operation" for the government or "impose[s] safety or other requirements on a contractor who does business for the United States." *Id.* at 543–44.[10]

Defendants argue that the Supreme Court recognizes only two narrow strands of intergovernmental immunity: direct regulation of the federal government or discrimination against the government or its contractors. (Defs.' Br. at 26.) Defendants contend that Plaintiff and the United States seek the Court to recognize a third category of intergovernmental immunity — one focused on effects — that is unsupported by Supreme Court precedent.

Defendants are correct that over the past century, the Supreme Court has retreated from its once more expansive Supremacy Clause reading that "any state regulation which indirectly regulates the Federal Government's activity is unconstitutional." *North Dakota v. United States*, 495 U.S. 423, 434 (1990) (plurality opinion) (citing *South Carolina v. Baker*, 485 U.S. 505, 520 (1998)). More recently in *United States v. Washington*, the Supreme Court traced this doctrinal evolution and concluded that the modern intergovernmental immunity doctrine "prohibit[s] state laws that *either* 'regulat[e] the United States directly *or* discriminat[e] against the Federal

---

[10] Defendants argue that *Leslie Miller* and *Public Utilities Commission* are inapposite because their results turned on conflict preemption, not intergovernmental immunity, principles. (Defs.' Br. at 31.) The Court does not read either case so narrowly. *See also Geo Grp., Inc.*, 50 F.4th at 760 (discussing *Leslie Miller* and *Public Utilities Commission* and commenting that "[w]hile both cases discussed conflicts between federal and state law, they also undoubtedly drew on principles of intergovernmental immunity").

Government or those with whom it deals' (*e.g.*, contractors)." 142 S. Ct. at 1984 (emphasis in original).

However, this Court does not read *North Dakota* and *Washington* as a wholesale repudiation of any cases which considered whether a state law interfered with the operations of the federal government. As discussed above, *Leslie Miller* and *Public Utilities Commission* remain good law for the proposition that state regulation that in effect makes federal operations subject to state approval violates the intergovernmental immunity doctrine. As the *en banc* Ninth Circuit decided on its review of the identical cases Defendants cite, "[w]e are not persuaded that AB 32 cannot implicate intergovernmental immunity, even assuming it is drafted as a generally applicable regulation of federal contractors." *Geo Grp., Inc.*, 50 F.4th at 760.

The Supreme Court's deviation from its nineteenth century Supremacy Clause cases that struck down state laws *solely* on the increased costs they imposed on the federal government does not impose blinders on a reviewing court to refrain from *any* consideration of the state law's effect. The Supreme Court in *Public Utilities Commission* distinguished the cases *North Dakota* repudiated by noting that it would "lay to one side these cases which sustain nondiscriminatory state taxes on activities of contractors and others who do business for the United States, as their impact at most is to increase the costs of the operation." 355 U.S. at 543; *see also New Mexico*, 455 U.S. at 734 ("[I]mmunity may not be conferred simply because the tax has an effect on the United States, or even because the Federal Government shoulders the entire economic burden of the levy.").[11]

---

[11] In *South Carolina v. Baker*, a decision that pre-dated *North Dakota* by two years, the Supreme Court wrote that its "abandon[ment of] the burden theory was demonstrated most emphatically when the Court upheld a state sales tax imposed on a Government contractor even though the financial burden of the tax was entirely passed on" to the federal government. 485 U.S. at 520–21.

Indeed, recent cases in which the Court held that a state statute did not violate the intergovernmental immunity doctrine specifically noted that the challenged state law did not affect the federal government's operations. In *United States v. Fresno County*, the Court upheld a California housing tax on employees of the United States Forest Service who lived in homes located in national forests, owned by the federal government, and supplied to the employees as part of their compensation. 429 U.S. 452, 454–55 (1977). The Court noted specifically that "[t]here is no other respect in which the tax involved in this case threatens to obstruct or burden a federal function." *Id.* at 464. Several years later, the Court in *United States v. New Mexico* quoted approvingly from an earlier case holding that the intergovernmental immunity doctrine does not extend to laws "where no direct burden is laid upon the governmental instrumentality, and there is only a remote, if any, influence upon the exercise of the functions of government." 455 U.S. at 732 (quoting *James v. Dravo Contracting Co.*, 302 U.S. 134, 150 (1937)). The Court's most recent admonishment that a "a state law is thus no longer unconstitutional just because it indirectly increases costs for the Federal Government," *Washington*, 142 S. Ct. at 1984, does not bar the Court from any consideration of increased cost to the federal government. Rather it merely commands that in increased costs may not be the *sole* reason to find that a state law violates intergovernmental immunity.

Distilled to its essence, Defendants' interpretation of the Supreme Court's intergovernmental immunity doctrine would require the Court to ask simply whether the federal government is named in the text of a state statute. However, the Supreme Court has not adopted such a cramped view of the doctrine. In *New Mexico*, the Court rejected the federal government's attempt to clothe its contractors working at nuclear sites under Supremacy Clause taxation immunity by designating them its "agents." 455 U.S. at 737. The Court decried this "manipulation

and wooden formalism that . . . have no proper place in determining the allocation of power between coexisting sovereignties." *Id.* "We cannot believe that an immunity of constitutional stature rests on such technical considerations, for that approach allows 'any government functionary to draw the constitutional line by changing a few words in a contract.'" *Id.* at 737 (quoting *Kern-Limerick, Inc. v. Scurlock*, 347 U.S. 110, 126 (1954) (Douglas J., dissenting)).

### 2.    Application

Enjoining AB 5207's enforcement against Plaintiff fits soundly within this precedent. Federal law authorizes ICE to determine the "appropriate places of detention" for individuals detained for civil immigration violations. 8 U.S.C. § 1231(g)(1). Federal law expresses an unambiguous preference for DHS to rent detention facilities and requires ICE to "consider the availability for purchase or lease" of a facility before building one itself. 8 U.S.C. §§ 1231(g)(2). New Jersey's *de facto* prohibition on the federal government's exercise of discretion to determine what constitutes an "appropriate place[] of detention" is akin to Arkansas's restriction of the government's discretion to determine a "responsible bidder," held unconstitutional in *Leslie Miller*, 352 U.S. at 190. In *Public Utilities Commission*, the Court enjoined enforcement of a California law that affected the "practice of the [federal] Government" to effectuate the "federal policy of negotiated rates," 355 U.S. at 544–45; similarly, AB 5207 would impede the federal government's method of effectuating its congressional mandate to detain individuals for civil immigration violations.

Indeed, AB 5207 would pose a greater impediment to the federal method of detaining individuals for civil immigration violations than the impediments found unconstitutional in *Leslie Miller* and *Public Utilities Commission*. In those cases, the state statutes that fell before the Supremacy Clause merely set conditions on private contractors performing federal work. AB 5207

goes steps further by entirely banning them from contracting with the federal government. A law that skips the unconstitutional burdening of a federal contractor and instead directly bars any contract between the United States and its chosen contractor cannot survive Supremacy Clause scrutiny. As the Ninth Circuit in *Geo Group* appropriately synthesized, "[i]f California could not prohibit ICE from hiring a particular private detention operator by imposing licensing requirements, it surely cannot regulate private detention operators out of existence through a direct ban." 50 F.4th at 757–58.

Although AB 5207 does not explicitly mention the federal government by name, the law plainly targets the detention of "individuals for civil immigration violations." N.J.S.A. § 30:4-8.16(a). Only Congress enacts laws regulating immigration into the United States, only the federal government enforces those laws, and only DHS detains individuals for civil immigration violations. Although AB 5207 purports to not directly regulate the federal government, the Court finds that New Jersey cannot accomplish what it could not do directly — enjoining the federal government from detaining individuals for civil immigration violations — by simply omitting the federal government's name from the law. *See City of Detroit v. Murray Corp. of Am.*, 355 U.S. 489, 492 (1958) ("Consequently in determining whether these taxes violate the Government's constitutional immunity we must look through form and behind labels to substance."). Here, New Jersey's argument is tantamount to linguistic sophistry.

To understand the extent of AB 5207's unconstitutionality, one need only consider ICE's options for carrying out its required detention function if Plaintiff were barred from renewing its contract to operate the EDC. Each alternative illustrates how AB 5207 — far from merely increasing the cost to ICE to house immigrant detainees in New Jersey — would effectively shut down its operations in violation of the Supremacy Clause.

*First*, Defendants suggest that ICE could construct and operate its own facilities in New Jersey. (Defs.' Br. at 22 ("[I]f facilities are unavailable, the answer is to construct new ones—not trump state law.").) However, Congress has expressed a clear preference for the federal government to consider using existing facilities before building its own. 8 U.S.C. § 1231(g)(1)–(2). ICE has decided to house immigrant detainees through more flexible contracts given the "significant fluctuations in the number and location of removable noncitizens apprehended by DHS and subject to detention." (Burke Decl. ¶ 8.) The process to build a new facility would consume years of time — what the United States estimates as at least three years, a most conservative estimate in the Court's judgment. Once the facility was constructed, ICE would need to train a bevy of staff. (*Id.* ¶ 23 (the United States would need to "classify, hire, and train several hundred detention officers, cooks, maintenance and sanitation workers, transportation officers, and others to safely operate a detention facility").)

Significantly, AB 5207 prohibits not just private ownership but also private *operation* of immigration detention facilities. *See* N.J.S.A. § 30:4-8.16(a) (defining "private detention facility" as "any privately owned or operated facility that houses or detains individuals for civil immigration violations"). The parties do not dispute that the United States does not *operate* any detention facility itself. (*See* Burke Decl. ¶ 9 ("ICE does not have any federally owned and operated detention facilities.").) Thus, AB 5207 would force the federal government to do something it currently does not do because it has expressly contracted performance of that function out to private operators.

This forced change, as AB 5207 would require, is on par with the level of federal disruption the Supreme Court sought to avoid in *Public Utilities Commission*. There, the Court reviewed in depth the "the seriousness of the impact of California's regulation on the action of federal

procurement officials." 355 U.S. at 544. Indeed, it quoted extensively from the lower court's findings that enforcement of the California law would "abolish[]" the federal government's agreement with its own contractor:

> This would make it necessary for the shipping officers [of the federal government] to classify the hundreds and thousands of different items used in military operations, to segregate such items in accordance with published tariffs and classifications, to rearrange the boxing and crating of such items in order to meet the classifications and requirements of commercial traffic and fill out voluminous documents. This additional process could cause delays as high as thirteen hours in the shipment of one truckload or carload. In many situations a delay of this sort would seriously hamper or disrupt the military mission for which the shipment was made.

*Id.* at 545 (quoting from the district court decision below). Similarly here, once New Jersey takes ICE's ability to contract with counties or private entities off the table, ICE would be required to conduct its detention operations in an entirely different manner.

*Second*, the possibility that ICE could house detainees in privately-run facilities in New York or Pennsylvania is likewise infeasible. The EDC, based on its proximity to two international airports, is "crucial to effect removals from field offices nationwide." (Guadian Decl. ¶ 9.) Access to the EDC is also important for the FBI's and the CBP's operations out of the nearby international airports. (*Id.* ¶¶ 14–15). Transporting individuals from out-of-state facilities to New Jersey-area airports would be time and resource intensive. (*Id.* ¶¶ 10–12.) Further, housing individuals in out-of-state facilities would cause those facilities to become overcrowded, (*id.* ¶ 25), which could increase the danger to detainees, ICE agents, and federal contractors' personnel. Housing individuals out-of-state would also hamper "the ability of detainees with families in New Jersey to access their families and other visitors," including the detainees' attorneys. (*Id.* ¶¶ 25, 27). If reliant on Pennsylvania and New York facilities over the long term, ICE would be forced to initiate "a competitive solicitation process for new private contracts in other States to replace the lost

capacity in New Jersey," which would not be available "for some time." (Burke Decl. ¶ 25.) And as set forth in footnote 12, *infra*, a ban on private ownership and operation of detention facilities within New York's boundaries has already been proposed to the New York legislature.

The Court must also consider the result on federal operations if each state were to enact a law similar to AB 5207. In *Public Utilities Commission*, the Supreme Court considered what would happen if each state restricted the ability of common carriers to contract with the federal government subject to the California commission's approval. 355 U.S. at 546. Quoting from a government witness at trial, the Court held: "For [the military] to make these arrangements at the Washington level with the various states, let us say 48 states, with 48 varieties of methods to follow, we would find ourselves in an administrative morass out of which we would never fight our way, we would never win the war." *Id.* Viewed in this light, AB 5207's threat to ICE's operations is even starker.[12]

As the Ninth Circuit in *Geo Group* held, "[t]o comply with California law, ICE would have to cease its ongoing immigration detention operations in California and adopt an entirely new approach in the state." 50 F.4th at 758. If state law could cut off the federal government's ability to employ private contractors at federal facilities, so long as the state law purported to apply equally to state facilities, the states could intrude on the federal government's performance at that location of any activity the state objected to. Even if it were theoretically feasible for ICE to

---

[12] As evidenced by the statutes challenged in *Geo Group* and *McHenry*, New Jersey is not the first state to attempt to cut off the United State's ability to detain individuals for civil immigration violations this way. A law pending before the legislature of New Jersey's neighbor to the north indicates that AB 5207 may not be the last. *See* https://www.nysenate.gov/legislation/bills/2021/A7099 ("[N]o person, business or private entity shall own or operate . . . any building, facility or structure used, in whole or in part, to house or detain individuals for civil immigration violations.").

conduct its detention mandate in an entirely different manner from its current course, the Supremacy Clause does not permit such naked interference with the federal function.[13]

### B.   PREEMPTION

Like intergovernmental immunity, the preemption doctrine flows from the Supremacy Clause of the United States Constitution. The Supremacy Clause mandates that "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Kurns v. A.W. Chesterton Inc.*, 620 F.3d 392, 395 (3d Cir. 2010) (quoting *Free v. Bland*, 369 U.S. 663, 666 (1962)). "While the Supremacy Clause plainly provides Congress with the constitutional power to preempt state law, the challenge for courts has been deciding when a conflict between state and federal law requires application of that power." *Deweese v. Nat'l R.R. Passenger Corp. (Amtrak)*, 590 F.3d 239, 245 (3d Cir. 2009) (citing *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

Federal law recognizes three forms of preemption under which a state law may yield to an act of Congress: express preemption, field preemption, and conflict preemption. *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010) (citing *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)). A federal statute expressly preempts state law when Congress "declares its intent to preempt state law." *Id.* A state law is field preempted "when Congress has regulated an area so pervasively that it has not left room for state regulation." *Treasurer of New Jersey*, 684 F.3d at 406 (citing *United States v. Locke*, 529 U.S. 89, 111 (2000)). A state law is conflict preempted "when compliance with both state and federal law is impossible, 'or where state law erects an obstacle to the accomplishment and execution of the full purposes and objectives of

---

[13] Given its conclusion, the Court declines to reach Plaintiff's and the United States's alternative argument that AB 5207 violates intergovernmental immunity by discriminating against the federal government and those with whom it deals.

Congress.'" *Id.* (quoting *Farina*, 625 F.3d at 115). The Court need only evaluate whether AB 5207 is conflict preempted in order to discern Congress's intent here.[14]

Plaintiff and the United States claim that AB 5207 "prohibits conduct the [Immigration and Nationality Act] expressly authorizes the Federal Government to carry out." (Pl.'s Br. at 30; U.S.'s Br. at 17–19.) The United States points to several federal statutes that authorize detention for immigration offenses and grant broad discretion in effecting detention. (U.S.'s Br. at 14–15, 17–18.) Plaintiff and the United States argue that because AB 5207 "touch[es] on the traditionally-federal field of immigration," it does not trigger the presumption against preemption. (Pl.'s Br. at 25 n.9; U.S.'s Br. at 14 n.6.)

New Jersey responds that AB 5207 was enacted to "protect the health and safety of individuals detained within New Jersey," which is "a power at the core of the State's traditional police powers." (Defs.' Br. at 15.) Defendants argue that the most Plaintiff can point to is "tension" between AB 5207 and federal law, which is insufficient for preemption. (*Id.* at 16.) Defendants contend that Plaintiff and the United States cannot point to any "federal *laws* rather than particular federal officials' present goals" that are impeded by AB 5207. (*Id.* at 17 (emphasis in original).) Defendants also interpret language from a recent Third Circuit decision to require any federal law given preemptive effect to lay rights or obligations on "private actors" specifically. (*Id.* at 10–14.)

---

[14] Although the three categories of conflict preemption are separately-defined and the Court's analysis here focuses on conflict preemption, "the categories are not 'rigidly distinct.' Indeed, field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent . . . to exclude state regulation." *Treasurer of New Jersey*, 684 F.3d at 406–07 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)). Although the United States argues field and conflict preemption, it primarily discusses conflict preemption and acknowledges that field preemption in this instance functions more "as an overlay on top of conflict preemption." (Oral Arg. Tr. at 52:4–5.)

### 1.    Presumption Against Preemption

As a threshold matter, the Court must determine whether a presumption against preemption attaches to AB 5207. When federal law regulates a field that the States have traditionally occupied, courts assume that "'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona v. United States*, 567 U.S. 387, 400 (2012) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *see also Wyeth v. Levine*, 555 U.S. 555, 565 (2009). This "presumption against preemption . . . applies with particular force in fields within the police power of the state." *Farina*, 625 F.3d at 116 (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). However, the presumption is not triggered by state regulation of an "area of 'significant federal presence,'" *Lozano v. City of Hazleton*, 724 F.3d 297, 314 n.23 (3d Cir. 2013) (citing *Locke*, 529 U.S. at 108), or in a field that "the States have [not] traditionally occupied." *Treasurer of New Jersey*, 684 F.3d at 407 (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347–48 (2001)).

It is true that regulations of "[h]ealth and safety issues have traditionally fallen within the province of state regulation." *See Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 334 (3d Cir. 2009). AB 5207's legislative findings cite "poor conditions" of "[d]etention centers and correctional facilities in New Jersey," and state that the law is designed to "to protect and advance the health and just treatment" of detainees located within New Jersey. N.J.S.A. § 30:4-8.15(d). Furthermore, the fact that a state law "in any way deals with aliens" alone does not constitute a *per se* preempted regulation of immigration. *See DeCanas v. Bica*, 424 U.S. 351, 355 (1976), *superseded by statute as recognized in Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 588– 89 (2011). Finding that AB 5207 merely regulates New Jersey residents' health and safety, and accordingly is entitled to a presumption against preemption, thus has some superficial appeal.

However, the State's mere reference to its health and safety interests is insufficient alone to invoke the presumption's protections and end the Court's inquiry. The operation of any federal facility in New Jersey — whether a privately-run immigration detention facility or a federally-run military base — will necessarily implicate health and safety of New Jersey residents. The Court must consider *whose* health and safety the statute purports to safeguard. AB 5207 applies only to agreements "to house or detain individuals for civil immigration violations." N.J.S.A. § 30:4-8.16(a). But the only laws governing immigration are federal laws, and the only sovereign able to detain individuals for violating federal immigration laws is the federal government. While, broadly speaking, regulation of health and safety falls within the state's traditional police power, regulating the health and safety of individuals *detained for violating federal law* is not an area the states have traditionally occupied. To the contrary, decisions about federal detainees are clearly an area of "significant federal presence," *Lozano*, 724 F.3d at 314 n.23 (citation omitted), such that the presumption's application is inappropriate.

In *Lozano*, the Third Circuit declined to apply the presumption to an immigration-adjacent municipal ordinance that superficially dealt with health and safety. *Id.* at 304–14. The Third Circuit heard a challenge to several ordinances enacted by Hazelton, a Pennsylvania municipality, that regulated a "broad range of economic interactions with unauthorized aliens" (the employment provisions) and "prohibit[ed] unauthorized aliens from residing in any rental housing within the City" (the housing provisions). *Id.* at 304, 313. The Court held that the presumption against preemption did not apply to the housing provisions. *Id.* at 314 n.23. The Court wrote:

> Although we realize that a state certainly can, and presumably should, regulate rental accommodations to ensure the health and safety of its residents, and that such regulation may permissibly affect the rights of persons in the country unlawfully, we cannot bury our heads in the sand ostrich-like ignoring the reality of what these ordinances accomplish. Through its housing provisions,

> Hazleton attempts to regulate residence based solely on immigration status. Deciding which aliens may live in the United States has always been the prerogative of the federal government.

*Lozano v. City of Hazleton*, 620 F.3d 170, 220 (3d Cir. 2010) (cleaned up).[15] Similarly in *Buckman Company*, the Supreme Court declined to apply the presumption to state law fraud claims against the FDA, despite the health and safety concerns implicated by the defendants' alleged misrepresentations to the FDA. 531 U.S. at 347. "Policing fraud against federal agencies is hardly a field which the States have traditionally occupied." *Id.* The Court continued that "the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." *Id.* (citation omitted).

Although AB 5207 touches on "the health and safety" of individuals in New Jersey, the Court cannot "bury [its] head[] in the sand ostrich-like ignoring the reality of what [AB 5207] accomplish[es]." *Lozano*, 620 F.3d at 220. AB 5207's intended and actual effect is to dictate the manner in which the federal government may detain individuals in connection with immigration proceedings. Like the municipal ordinance in *Lozano* that attempted to regulate immigration by regulating residency based on immigration status, AB 5207 in effect decides where and how, and as a result, whether the federal government detains individuals pending an immigration decision. The decision to detain individuals for violating federal law, including the immigration laws, "has always been the prerogative of the federal government." *Id.* Accordingly, the presumption against

---

[15] The Supreme Court vacated the Third Circuit's 2010 decision in *Lozano* and remanded the case for further consideration in light of *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582 (2011). *See City of Hazleton, Pa. v. Lozano*, 563 U.S. 1030 (2011). The Third Circuit issued a new decision two years later in *Lozano v. City of Hazleton*, 724 F.3d 297 (3d Cir. 2013), in which it reached the same result even accounting for *Whiting* and *Arizona*, 567 U.S. at 387. The Third Circuit extensively cited and incorporated by reference its 2010 presumption discussion because "nothing in *Whiting* or *Arizona* undermines our [presumption against preemption] analysis of the contested housing provisions here." *Lozano*, 724 F.3d at 314 n.23.

preemption does not apply to AB 5207's regulation of private parties' contracts with the federal government to detain immigrants for violations of federal immigration law.[16]

Notably, even when the presumption applies, it can be "overcome where a Congressional purpose to preempt or the existence of a conflict is clear and manifest." *Farina*, 625 F.3d at 116 (citing *Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237, 248 (3d Cir. 2008)). Here, even with the benefit of the presumption, AB 5207 still would be preempted by federal law. For the reasons explained below, the Court finds that the conflict between Congress's purpose in assigning DHS and ICE responsibility for detaining individuals for civil immigration violations and AB 5207's effect of wresting control from the federal government over who may carry out federal detention is irreconcilable. Thus, as analyzed below, whether or not the presumption against preemption applies, the outcome remains the same: AB 5207 cannot stand.

### 2.    Law

"Conflict pre-emption can occur in one of two ways: where 'compliance with both federal and state regulations is a physical impossibility,' or 'where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Lozano*, 724 F.3d at 303 (quoting *Arizona*, 567 U.S. at 399). The Court's determination of "an unconstitutional impediment to federal law . . . [is] 'informed by examining the federal statute as a whole and identifying its purpose and intended effects.'" *Id.* at 303 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)). This requires weighing "the entire scheme of the statute" to determine "if the purpose of the federal act cannot otherwise be accomplished — if its operation with its chosen field would be frustrated and its provisions be refused their natural

---

[16] The *en banc* Ninth Circuit panel in *Geo Group* reached the same conclusion on California's AB 5207-analogue, holding that the presumption does not apply to a state law prohibiting private contracts for civil immigration detention because the law "would interfere with inherently federal relationships," namely the contracts between the United States and its contractor. 50 F.4th at 761.

effect" — by enforcement of the conflicting state law. *Bruesewitz v. Wyeth Inc.*, 561 F.3d 233, 239 (3d Cir. 2009) (cleaned up) (quoting *Crosby*, 530 U.S. at 373), *aff'd sub nom. Bruesewitz v. Wyeth LLC*, 562 U.S. 223 (2011); *see also id.* at 239–40 (deciding obstacle preemption "requires an examination of the "whole law, and [] its object and policy" (quoting *Gade v. Nat'l Solid Wastes Mgmt. Assn.*, 505 U.S. 88, 98 (1992))).

"Federal regulations preempt state laws in the same fashion as congressional statutes." *Farina*, 625 F.3d at 115 (citing *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982)). "Where Congress has delegated the authority to regulate a particular field to an administrative agency, the agency's regulations issued pursuant to that authority have no less preemptive affect than federal statutes, assuming those regulations are a valid exercise of the agency's delegated authority." *Id.* at 243 (quoting *Fellner*, 539 F.3d at 248).

The "ultimate touchstone" of any preemption analysis is Congress's intent. *Medtronic, Inc.*, 518 U.S. at 485 (citations omitted). Congressional intent is determined through "the language of the pre-emption statute and the 'statutory framework' surrounding it." *Id.* at 486 (quoting *Gade*, 505 U.S. at 111 (Kennedy, J., concurring)). The Court must also consider the "structure and purpose of the statute as a whole," considered in light of "the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Id.* (citing *Gade*, 505 U.S. at 98).

The Court is not persuaded by Defendants' argument that any preemption claim "fail[s] at a threshold step" because Plaintiff and the United States cite no laws that "regulate any private conduct." (Defs.' Br. at 11.) Defendants cite language from *Murphy v. National Collegiate Athletic Association*, recited more recently by the Third Circuit, that federal law can only preempt state law when it "imposes restrictions or confers rights on private actors." 138 S. Ct. 1461, 1480 (2018);

*see also Ocean Cnty. Bd. of Comm'rs*, 8 F.4th 176, 181–82 (3d Cir. 2021) (quoting this language from *Murphy*).

However, these cases each involved a federal regulation that purported to control actions *of the state*. *Murphy* involved a federal law prohibiting the state from authorizing sports gambling. *Id.* The federal law in *Ocean County* prohibited the state from restricting local governments from sharing information with the federal government, which the Third Circuit found "a clear prohibition on *state* action; it says nothing about private actors, so it cannot be fairly read to regulate them." 8 F.4th at 181–82 (emphasis in original) (citing *Murphy*, 138 S. Ct. at 1481). The Supreme Court recognized this distinction itself, writing that a preemptive federal law "regulates the conduct of private actors, *not the States*." *Murphy*, 138 S. Ct. at 1481 (emphasis added). Accordingly, the Court does not read these cases to require that federal law must explicitly name a private actor in order to have preemptive effect. The federal laws discussed below lay no command on New Jersey, but rather instruct the federal government how to carry out a uniquely federal function by permitting it to contract with private actors, i.e. contractors, to carry out a federal function.

### 3.   Application

The language and framework of the Immigration and Nationality Act (the "INA") make plain Congress's intent that the federal government is authorized to decide whether to detain individuals for civil immigration violations, and if so how to detain them, without submitting to state regulation. Congress either requires ICE to detain non-citizens under various provisions of the INA, *see* 8 U.S.C. § 1231(a)(2); 8 U.S.C. § 1225(b)(1)(B)(ii), (b)(2)(A); 8 U.S.C. § 1226(c)(1), or grants DHS discretion to decide whether detention is appropriate, *see* 8 U.S.C. § 1226(a). Whether an individual is detained either by congressional mandate or pursuant to a DHS

determination, Congress has granted DHS the discretion to decide the appropriate manner of detention. 8 U.S.C. § 1231(g)(1) ("The [Secretary of the DHS] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal."). Congress has also guided the exercise of DHS's discretion, by instructing DHS to "consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use" before "initiating any project for the construction of any new detention facility for the Service." 8 U.S.C. § 1231(g)(2).

DHS has also promulgated regulations to effectuate this congressional purpose, informed by certain guidelines. ICE may "enter into contracts of up to fifteen years' duration for detention or incarceration space or facilities, including related services." 48 C.F.R. § 3017.204-90. However, any private facility that houses detainees pursuant to an ICE contract must meet additional requirements. When "an alien is taken into Service custody and detained at a facility other than at a Service Processing Center, the public *or private entities* contracted to perform such service" must meet four listed "mandatory criteria." 8 C.F.R. § 235.3(e) (emphasis added).

Read together, the "purpose and intended effects" of these statutes, *Crosby*, 530 U.S. at 373, considered along with the federal regulations promulgated under them, *Farina*, 625 F.3d at 115, is to permit the federal government to make independent decisions on the proper manner for housing its own detainees. These statutes "give[] both responsibility and broad discretion to the Secretary to choose the place of detention for deportable aliens." *Geo Grp.*, 50 F.4th at 751 (cleaned up); *see also Newbrough v. Piedmont Reg'l Jail Auth.*, No. 10-867, 2012 WL 169988, at *4 (E.D. Va. Jan. 19, 2012) (observing that these provisions of the INA "leave [ICE] ample room for judgment: ICE remains free to choose among any number of detention facilities that comport with the threshold parameters established by 8 U.S.C. § 1231(g) and 8 C.F.R. § 235.3(e)"). To

carry out Congress's intent, these statutes must be free from restrictive state laws that circumscribe the federal government's ability to contract for the housing of its own detainees.[17]

AB 5207 is preempted even absent Congress's explicit mandate that ICE contract with private operators for detention. Conflict preemption may be found when the challenged state statute interferes with the federal government's exercise of discretion, as long as that discretion is sufficiently recognized by Congress. In *Arizona*, the Supreme Court struck down the section of an Arizona statute that permitted a state officer to arrest a person for a suspected civil immigration offense because it "violate[d] the principle that the removal process is entrusted to the *discretion* of the Federal Government*.*" 567 U.S. at 409 (emphasis added) (citing *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483–84 (1999)). In *Crosby*, the Supreme Court recognized the preemptive effect of federal sanctions laws that invested the President with "flexible and effective authority" to eliminate or alter sanctions against Burma as appropriate. 530 U.S. at 374. The Court held that a state sanctions law that imposed sanctions in the same country stood as an obstacle to the federal regime because if enforced, the state regime would "blunt the consequences of *discretionary* Presidential action." 530 U.S. at 376 (emphasis added). As the Ninth Circuit aptly summarized, "interference with the discretion that federal law delegates

---

[17] Although Defendants argue that Congress did not specifically provide for ICE to use private agreements, the United States correctly notes that Congress is certainly cognizant of and approves the same. *See* Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, 133 Stat. 2317, 2507 (2019) ("None of the funds provided . . . may be used to continue any contract for the provision of detention services" if the contracted facilities received certain ratings on their recent performance evaluations); 8 U.S.C. § 1368(b)(2)(a)(i) (establishing reporting requirements for ICE on detention facilities "operated directly by [ICE] or through contract with other persons or agencies"); *see also Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 27 (D.D.C. 2020) (reading these provisions of the INA together to "suggest[] that Congress was well aware that such noncitizens might be detained in different kinds of facilities, either government owned or otherwise, depending on need and availability").

to federal officials" by a state law restricting the federal government's contracting parties for immigration detention "goes to the heart of obstacle preemption." *Geo Grp., Inc.*, 50 F.4th at 762.[18]

As discussed above, AB 5207 conflicts not just with the federal government's determination of the *manner* of detention but also on its decision whether or not to detain someone at all. In *Lozano*, the Third Circuit found that the municipal housing ordinance impeded the federal government's ability to decide who should be admitted to the country, even though the ordinances "neither control actual physical entry into the City, nor physically expel persons from it." *Lozano*, 620 F.3d at 220 (cleaned up) (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 160 (1989)).[19] The municipality argued that the ordinance did not conflict with federal law because "aliens lacking lawful status could still reside in the City through purchasing a home, or through staying with friends." *Id.* at 221. The Third Circuit found the argument "disingenuous" and "unrealistic" because there was no evidence "that the people whom the residential provisions are aimed at could avail themselves of such options." *Id.* In other words, the Third Circuit saw through the flimsy argument that the state provision did not directly dictate the federal

---

[18] AB 5207 is also suspect in light of the constitutional concern for the United States's control over foreign nations' nationals and the United States's ability to speak with one voice in the field of international relations. "One of the most important and delicate of all international relationships . . . has to do with the protection of the just rights of a country's own nationals when those nationals are in another country." *Arizona*, 567 U.S. at 409 (quoting *Hines*, 312 U.S. at 64). "It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate states." *Id.* at 395. When a foreign nation's citizens are detained for violating federal immigration law, the foreign nation holds the national government responsible for the manner in which they are detained. By making decisions for the federal government regarding the manner in which foreign nationals may be detained, New Jersey attempts to make "policy choices that bear on this Nation's international relations." *Id.* at 396; *see also Lozano*, 724 F.3d at 318–19.

[19] The Court again relies on language from the vacated 2010 Third Circuit decision in *Lozano*, as the 2013 *Lozano* decision affirmed that its analysis of the housing provision remained good law. 724 F.3d at 314 ("Moreover, nothing in *Whiting* or *Arizona* undermines our analysis of the contested housing provisions here. On the contrary, the Court's language reinforces our view that Hazleton's attempt to prohibit unauthorized aliens from renting dwelling units in the City are pre-empted.").

government's removal decision, because "in essence, that is precisely what they attempt[ed] to do." *Id.* (citation omitted).

Like Hazelton's housing ordinance, AB 5207 disingenuously purports to leave federal control over immigration detention undisturbed because ICE can move detainees to other states or build its own facilities. However, it is illusory to expect that ICE could create its own detention system from scratch — which would require designing and building its own facilities as well as hiring and training its own employees — by the time the contract expires on September 1, 2023. Without question, for many or most of the individuals that ICE would otherwise detain for civil immigration violations, AB 5207 would be outcome-determinative of whether ICE could detain them at all. Just as the housing-specific law in *Lozano* actually interfered with ICE's removal decisions, the manner-specific law of AB 5207 before the Court would actually interfere with ICE's detention decisions.[20]

The Court must also contemplate the real-life consequences that would result if each state passed a law similar to AB 5207. *Cf. Farina*, 625 F.3d at 126 ("Moreover, the resulting state-law standards could vary from state to state, eradicating the uniformity necessary to regulating the wireless network."). In finding Hazelton's housing provisions preempted in *Lozano*, the Third Circuit noted that "it is not only Hazleton's ordinance that we must consider. If Hazleton can regulate as it has here, then so could every other state or locality." *Lozano*, 620 F.3d at 221 (quoting *Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 373 (2008)). If each state passed an AB 5207-analogue, the federal government would be forced to navigate an impossible patchwork of regulations on how it could detain people for violating federal law. But immigration in the

---

[20] While the Court does not defer to ICE's preemption analysis, the Court considers ICE's "explanation of how state law affects the regulatory scheme." *Farina*, 625 F.3d at 126 (deferring to agency statement of harms when "the subject matter is technical and the relevant history and background are complex and extensive" (quoting *Wyeth*, 555 U.S. at 576)).

United States operates on a nationwide scale. (Burke Decl. ¶ 13 ("[AB 5207] impairs ICE's ability to strategically plan at a national level for the contracts required to ensure there is sufficient capacity in New Jersey to enforce our nation's immigration laws.").) The government requires the flexibility afforded by private contracts in each state in which it operates. (*Id.* ¶ 8 ("Due to significant fluctuations in the number and location of removable noncitizens apprehended by DHS and subject to detention, it is important for ICE to maintain flexibility regarding its immigration detention facilities.").) It is axiomatic that in tasking DHS with enforcing the federal immigration laws, Congress intended that it would not be subjected to using different methods of detention from state to state.

IV.    **CONCLUSION**

The detention of any person — whether by the federal or State government, in a state-run or privately-run facility — raises health and safety concerns. However, New Jersey's disagreement with the manner in which ICE detains individuals for civil immigration violations, or that the federal government detains individuals for civil immigration violations at all, does not permit AB 5207's intrusion into this uniquely federal function. If New Jersey objects to how the federal government carries out its detention operations, it should use its voice, through its nationally elected representatives and federal elections, to make its objection heard.

Enforcing AB 5207 against Plaintiff would close the last remaining facility in New Jersey to which ICE has access. The result of any one of New Jersey's neighboring states passing a comparable law — let alone an ensuing domino effect to other states — would result in nothing short of chaos. Although reference to the federal government was conveniently omitted from AB 5207, the statute is a dagger aimed at the heart of the federal government's immigration enforcement mission and operations. Congress's assignment to the federal government the responsibilities to enforce the civil immigration laws, including, when necessary, through detention, renders AB 5207 unconstitutional under the Supremacy Clause.

The Court **GRANTS** summary judgment for Plaintiff, declares AB 5207 unconstitutional as applied against Plaintiff, and enjoins Defendants from enforcing AB 5207 against Plaintiff.

_____
ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE

Dated: August 29, 2023